UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NORTH DAKOTA


United States of America,    )
    )
        Plaintiff,    )
    )
      vs.    )     File No. 3:22-cr-5
    )
Nicholas James Morgan-Derosier,    )
    )
        Defendant.    )


<u>REDACTED TRANSCRIPT OF SUPPRESSION HEARING</u>
<u>VOLUME II</u>
<u>Pages 195-450</u>



Taken at
United States Courthouse
Fargo, North Dakota
May 4, 2023



BEFORE THE HONORABLE ALICE R. SENECHAL
-- UNITED STATES DISTRICT COURT MAGISTRATE JUDGE --



Sandra E. Ehrmantraut, CRR
U.S. District Court Reporter
sandie_ehrmantraut@ndd.uscourts.gov
Proceedings Recorded by Mechanical Stenography
Transcript Produced by Computer-Aided Transcription

APPEARANCES

MS. JENNIFER K. PUHL
U.S. Attorney's Office
655 First Avenue North, Suite 250
Fargo, North Dakota 58102

       AND

MR. CHARLES D. SCHMITZ
Department of Justice
1301 New York Avenue N.W., Suite 1100
Washington, DC 20005

FOR THE UNITED STATES

- - - - - - - - - -

MR. CHRISTOPHER P. BELLMORE
MS. ANNE M. CARTER
Federal Public Defender's Office
Federal Square
112 Roberts Street North, Suite 200
Fargo, North Dakota 58102

FOR THE DEFENDANT

- - - - - - - - - -

GOVERNMENT WITNESSES

Page No.

David Buzzo
   Redirect Examination by Ms. Ms. Puhl               200
   Recross-Examination by Mr. Bellmore         217
   Further Redirect Examination by Ms. Puhl    224

Michael Arel
   Direct Examination by Ms. Puhl                  226
   Cross-Examination by Mr. Bellmore           247
   Redirect Examination by Ms. Puhl              250

Jennifer Freeman
   Direct Examination by Mr. Schmitz           252
   Cross-Examination by Mr. Bellmore           314
   Redirect Examination by Mr. Schmitz        354
   Recross-Examination by Mr. Bellmore      366

DEFENSE WITNESSES

Daniel Casetta
   Direct Examination by Mr. Bellmore          369
   Cross-Examination by Ms. Puhl              384
   Redirect Examination by Mr. Bellmore      395

Daniel Meinke
   Direct Examination by Mr. Bellmore          396
   Cross-Examination by Mr. Schmitz          422

- - - - - - - - - -

Certificate of Court Reporter - Page 450

- - - - - - - - - -

1          (The above-entitled matter came before the Court, The

2     Honorable Alice R. Senechal, United States District Court

3     Magistrate Judge, presiding, commencing at 8:30 a.m., Thursday,

4     May 4, 2023, in the United States Courthouse, Fargo, North

5     Dakota.  The following proceedings were had and made of record

6     in open court with the defendant present.)

7                         - - - - - - - - - - -

8          THE COURT:  Today is May 4th, 2023.  It is 8:30 a.m.

9     This is a continued hearing in Case Number 3-22-cr-5.  That is

10    *United States of America versus Nicholas James Morgan-Derosier.*

11    Attorneys Puhl and Schmitz are here representing the United

12    States.  Attorneys Bellmore and Carter are here representing

13    Mr. Morgan-Derosier.  Mr. Morgan-Derosier is present as well.

14         Counsel, is there anything that needs attention

15    before we resume testimony?

16         MS. PUHL:  No, Your Honor.

17         THE COURT:  Mr. Bellmore?

18         MR. BELLMORE:  Your Honor, I have two things.  It

19    looks -- first of all, as far as the scheduling today and

20    potential conflicts with hearings before Judge Welte, my office

21    is still working on that, and it looks like that is probably

22    going to be rescheduled, the 2:30 hearing I have.

23         Also, as we mentioned yesterday, the defense was

24    proceeding with its exhibits in continuation of the exhibits

25    that were included in the briefing.  If the Court -- obviously

1    we want the Court to consider the exhibits that were contained

2    within the briefing, so if the Court is considering those

3    exhibits as they've been submitted or whether the Court is

4    requesting that we offer those separately as a part of this --

08:32    5    a part of this hearing.

6            THE COURT:  Well, you can confirm this, but

7    Mr. Thomson has reviewed the exhibits that came in yesterday

8    and compared them to those that were attached to the briefing

9    and has identified a few that have not been yet received into

08:32    10   evidence.  So why don't we plan to take a look at that after

11   the end of the evidentiary presentation.

12           But as of right now there are four that you had

13   attached to your opening brief that are not yet in evidence and

14   one that you had attached to the reply brief that is not yet in

08:33    15   evidence during this hearing, so let's check that again at the

16   end of the day.  And why don't you go ahead and continue with

17   the numbering system that you used yesterday.  I understand

18   that there may be a gap, but I think we can make that work.

19           MR. BELLMORE:  Yes, Your Honor.  Thank you.

08:33    20           THE COURT:  Certainly.  Anything else?

21           MR. BELLMORE:  No, Your Honor.

22           THE COURT:  All right.  Detective Buzzo is on the

23   stand, of course.  Sir, you are still under oath.  And, Ms.

24   Puhl, you may do the redirect exam.

08:33    25           MS. PUHL:  Sorry, Your Honor.

1          THE COURT:  That's okay.

2                        DAVID BUZZO,

3    having been previously sworn, was examined and testified

4    further as follows:

08:33   5                    REDIRECT EXAMINATION

6    BY MS. PUHL:

7    Q.    Detective Buzzo, when we ended the day yesterday,

8    Mr. Bellmore had asked you several questions about the search

9    warrant and your investigation, is that right?

08:34  10   A.    That's correct.

11   Q.    And just to be clear, that investigation began in December

12   of 2019, is that right, or not -- the case -- what happened in

13   2019?

14   A.    In December, December 26th of 2019, Ms. Dawn Peterson

08:35  15   reported to the police department that a check had been altered

16   that she had written to Team Lawn.

17   Q.    And that complaint was immediately assigned to you, right,

18   in December of 2019?

19   A.    Yes, ma'am.

08:35  20   Q.    From December of 2019 until August of 2020, August 12,

21   2020, you did nothing on that case, is that right?

22   A.    That's correct.

23   Q.    And you testified it wasn't a priority, right?

24   A.    That's correct.

08:35  25   Q.    So during that eight-month period did you ever talk to

1    Detective Freeman about Mr. Derosier?

2    A.    No, I did not, ma'am.

3    Q.    And when you picked up that case on August 12, 2020, to

4    clear it out of your queue, as you said, did you know about the

08:35    5    cyber tip?

6    A.    I did not.

7    Q.    And you first learned of that cyber tip when you talked

8    with Detective Freeman about an address, right?

9    A.    That's correct.

08:36    10    Q.    How long did you talk to Detective Freeman on that

11    particular occasion?

12    A.    Maybe a minute, a little bit more, a little bit less, give

13    or take.  I mean, it was -- it was about -- I was trying to

14    find Detective Riedinger, I mean, regarding the death of

08:36    15    Mr. Coons and happened across Jen or Detective Freeman.  And I

16    mentioned the name and -- the business name, and it was like a

17    light bulb just went off, and she was like, "Oh, what do you

18    need?"  "I need to verify an address."

19        And she jammed on her keyboard into her -- wherever

08:36    20    she got the file from.  I'm assuming it was in her records

21    management system.  She said, "Check the printer.  It'll be

22    there," and that's where I got it from.

23    Q.    And that's the first time you learned about the cyber tip,

24    right?

08:37    25    A.    That's right.

1    Q.    And is there any discussion about the cyber tip?

2    A.    No --

3    Q.    Okay.

4    A.    -- other than it -- it was closed, or whatever.  I mean,

08:37  5  she -- it was clear it was done.  She had nothing going on with

6    it.

7    Q.    Okay.  And do you know why she requested information about

8    where Mr. Derosier was receiving mail in July of 2020?

9    A.    At that time I did not.

08:37  10  Q.    You never asked her, and she never told you, right?

11   A.    That's correct.

12   Q.    So you walked out of the office with the address, is that

13   right?

14   A.    That's correct.

08:37  15  Q.    Okay.  Now, the date of the injunction that precluded the

16   defendant from doing business was dated October 15, 2019, is

17   that right?

18   A.    That is correct.

19   Q.    So that's ten months before you begin investigating this

08:37  20  case, right?

21   A.    That's correct.

22   Q.    And before the Attorney General could get an injunction,

23   he -- the Attorney General's Office needs to file an

24   application for an injunction, right?

08:38  25  A.    That's correct.

1    **Q.**   A notice for injunction, right?

2    **A.**   Correct.

3    **Q.**   A brief in support of the application for an injunction,

4    right?

08:38    5             MR. BELLMORE:  Your Honor, I'm going to object.  This

6    is the government's witness, and this is nothing but leading

7    questions.

8             THE COURT:  That's sustained.

9    **Q.**   (MS. PUHL CONTINUING)  Detective Buzzo, why was the

08:38   10    injunction obtained?

11    **A.**   Because there were a couple different issues.  There were

12    complaints of construction fraud where money had been taken and

13    projects not either started or completed.  There was also

14    misrepresentation on the applications for a construction -- a

08:38   15    contractor licensing that they had found.

16             Mr. Derosier had misrepresented that he had not been

17    part of any of the -- had not been sued or complained upon,

18    however it's worded in that -- in that brief, and that was a

19    misrepresentation on the application to the State of North

08:39   20    Dakota.  The Attorney General's Office found that that was a

21    violation, as well as the consumer protection laws were

22    violated by accepting money and not either completing or even

23    starting the jobs.

24             And that's when they -- they summoned Mr. Derosier to

08:39   25    the Attorney General's Office to -- I think the first -- the

1    first request was -- or the first demand was to produce

2    documents.  He failed to do that.  There was a follow-up

3    request or a demand to take a sworn deposition, I believe, and

4    there was interaction between the Attorney General's Office and

08:40   5    Mr. Derosier that he -- he believed that the subpoena was

6    overbroad or overreaching in all things.

7    **Q.**   There were --

8    **A.**   He wasn't going to comply, and eventually, as of the date

9    of the application for the injunction, he had not complied with

08:40   10   the subpoenas and requests from the Attorney General's Office.

11   **Q.**   So just to clarify, the AG's Office sought an injunction

12   because the defendant had accepted money and not performed --

13   and failed to perform contracting work, right?

14   **A.**   That's right.

08:40   15   **Q.**   The defendant was not licensed to do business, right?

16   **A.**   That's correct.

17   **Q.**   And he lied in his application for a license, is that

18   right?  That's what the AG's Office was alleging.

19   **A.**   That's correct.

08:40   20   **Q.**   And all of that activity is occurring before the date of

21   the injunction, right?

22   **A.**   That's right.

23   **Q.**   And, in fact, but for that activity, there would be no

24   injunction, right?

08:41   25        MR. BELLMORE:  Objection, Your Honor, calls for

1   speculation.

2           THE COURT:  Sustained.

3   **Q.**   (MS. PUHL CONTINUING)   Were you in -- what were you

4   investigating the defendant for?

08:41   5   **A.**   Construction fraud, contracting without a license,

6   violation of judicial order, forgery.

7   **Q.**   And you would agree that construction fraud was happening

8   before the date of the injunction.

9   **A.**   That's correct.

08:41   10   **Q.**   And you would agree that he didn't have a license --

11          MR. BELLMORE:  Objection, leading.

12   **Q.**   (MS. PUHL CONTINUING)   -- before the date of the junction,

13   is that right?

14          MR. BELLMORE:  I've objected, Your Honor.  Objection,

08:41   15   leading questions.

16   **Q.**   (MS. PUHL CONTINUING)  Did he have a --

17          THE COURT:  That's sustained.

18   **Q.**   (MS. PUHL CONTINUING)  Did he have a license before the

19   date of the injunction?

08:41   20   **A.**   No, ma'am.

21   **Q.**   And you were investigating him for that.

22   **A.**   Correct.

23   **Q.**   If we could pull up the Court -- the Exhibit A, Court

24   Exhibit A, if you could look at Exhibit 13, the face of the

08:42   25   warrant, Detective Buzzo.

1  **A.**   Yes, ma'am.

2  **Q.**   Now, that face of the warrant incorporates Exhibit A, is

3  that right?

4  **A.**   That's correct.

08:42  5  **Q.**   Is "incorporated" specifically included in this template,

6  the word "incorporated" for Exhibit A, Attachment A?

7  **A.**   Yes, ma'am.

8  **Q.**   And where is that?  You can circle it, please.

9  **A.**   (Indicating.)

08:43  10  **Q.**   Is that same language included in reference to the

11  affidavit?

12  **A.**   No, ma'am.

13  **Q.**   So this template does not, quote, unquote, incorporate the

14  affidavit, is that right?

08:43  15  **A.**   That is correct.

16  **Q.**   Do you have any control over that?

17  **A.**   No, ma'am.

18  **Q.**   Nonetheless, did you view your submitting the affidavit as

19  part of the E warrant process as incorporating your affidavit?

08:43  20  **A.**   Yes.

21  **Q.**   And after you submit this E warrant, what do you believe

22  happens to it?

23  **A.**   The -- all the information is sent to the state's

24  attorney's office, and it is sent to the Judge.

08:44  25  **Q.**   And nobody contacted you and said, "Hey, you messed up."

1   **A.**   No.

2   **Q.**   Now, you testified that there were nine officers that

3   executed the search warrant, or roughly.

4   **A.**   Yes, ma'am.

08:44   5   **Q.**   Is that a lot?

6   **A.**   Not particularly when -- especially when there's multiple

7   subjects involved that could possibly be there.  And keep in

8   mind that of those nine, or so, there's other duties going on.

9   There's somebody surveilling the house.  There's somebody out

08:44   10   looking for Mr. Derosier because it was known that he had got a

11   new car.  The car wasn't there, so it was assumed that Mr.

12   Derosier was not there, so that's at least two bodies right

13   there.  I mean, it's not many at all.

14   **Q.**   There are 92 officers, right?

08:45   15   **A.**   At that time, yes.

16   **Q.**   And how many patrol officers are on duty in the -- in the

17   day, on any given day?

18   **A.**   At that time five uniformed patrol officers and one

19   uniformed supervisor.

08:45   20   **Q.**   Okay.  So when you're looking for all hands on deck, you

21   go to the detectives, right?

22   **A.**   That's correct.

23   **Q.**   And in this case you also went and requested assistance

24   from Special Agent Casetta, right?

08:45   25   **A.**   That's correct.

1   Q.   Now, how many forensic people work fraud cases at the

2   Grand Forks P.D.?

3   A.   Forensic?  Computer forensics?

4   Q.   Yes.

08:45   5   A.   One.

6   Q.   And how many forensics people work drug cases at the Grand

7   Forks P.D.?

8   A.   Computer forensics, one.

9   Q.   How many forensic people work gun cases at the Grand Forks

08:45   10   P.D.?

11   A.   Computer forensics, one.

12   Q.   And how many people work child exploitation?  How many

13   forensic people work child exploitation cases at the Grand

14   Forks P.D.?

08:46   15   A.   Computer forensics, there's one.

16   Q.   And who was that?

17   A.   Detective Freeman.

18   Q.   She is the only one.

19   A.   The only one.

08:46   20   Q.   Now, you also testified that you asked Special Agent

21   Casetta to participate because it was a fraud investigation and

22   you'd previously worked with him, is that right?

23   A.   That's correct.

24   Q.   Have you ever investigated a child pornography case?

08:46   25   A.   No.

1  **Q.**   Had you assisted in a search warrant for child
2  pornography?
3  **A.**   Yes.
4  **Q.**   Because you're a detective with the police department,
5  right?
6  **A.**   That's correct.
7  **Q.**   Have you ever seen Special Agent Casetta at the scene of a
8  search warrant for child pornography?
9  **A.**   No.
10 **Q.**   Who would you call if you had a question -- at HSI, who
11 would you call if you had a question about child pornography,
12 child exploitation?
13 **A.**   Special Agent Mike Arel and Special Agent Tim Litzinger.
14 **Q.**   Why?
15 **A.**   The times that I have assisted in either serving a search
16 warrant or when there were other issues going on involving
17 child pornography, those were the two agents that would always
18 be involved.
19 **Q.**   Now, you testified that you didn't seize every item that
20 you were authorized to seize at the house, is that right?
21 **A.**   That's correct.
22 **Q.**   You said that you didn't seize financial documents because
23 you took pictures of many of them, right?
24 **A.**   That's correct.
25 **Q.**   Did you seize physical documents that were only relative

08:46
08:46
08:46
08:47
08:47

209

1    to Coons, when he owned the business?

2    **A.**    No.

3    **Q.**    And that's because he died, right?

4    **A.**    That's correct.

08:47   5    **Q.**    And this was his house until he died, right?

6    **A.**    That's correct.

7    **Q.**    And you didn't seize all the items in the safe, is that

8    right?

9    **A.**    That's correct.

08:47   10            MR. BELLMORE:  Objection, Your Honor, leading

11    questions.  I'd like to move this along, and I know leading

12    questions can help, but I don't think the questions are

13    appropriate.

14            THE COURT:  That's sustained.

08:48   15            MS. PUHL:  Your Honor, he raised a lot of these

16    topics, but -- and I think they need re-questioning because he

17    questioned the intent of why the officer didn't take all the

18    items in the -- in the safe.

19            THE COURT:  I don't question the substance of your

08:48   20    questions.  The leading --

21            MS. PUHL:  Okay.

22            THE COURT:  Please do not make them leading.

23            MS. PUHL:  Yep, we'll be here longer.

24    **Q.**    (MS. PUHL CONTINUING)  How did -- did you read this search

08:48   25    warrant to authorize you to look for any evidence of a crime?

**A.**   Any evidence of a -- of a crime?

**Q.**   Right.

**A.**   No, ma'am.

**Q.**   How did it limit you?

**A.**   To evidence of the crimes of contracting without a
license, construction fraud, and violations of a judicial
order.

**Q.**   So you'd agree that you were authorized to seize all the
-- seize all the electronic evidence and search it for the
crimes that you just stated, right?

MR. BELLMORE:  Objection, leading.

THE COURT:  Sustained.

**Q.**   (MS. PUHL CONTINUING)  Okay.  You agree that you had a
search warrant that authorized you to look for evidence of a
crime.

MR. BELLMORE:  Objection, leading.

**Q.**   (MS. PUHL CONTINUING)  Okay.  What crimes were you
authorized to look for the electronic evidence for?

**A.**   Construction fraud, contracting without a license, and
violation of a judicial order.

**Q.**   Were you limited to search just for QuickBooks files?

**A.**   No, ma'am.

**Q.**   If we could pull up Exhibit A, Bates 706, Exhibit A of
Government's Exhibit 13, Bates 706, paragraph 3, if you could
read that first -- that paragraph.

1   A.    "Information, correspondence, records, documents or other

2   materials pertaining to the possession, receipt or distribution

3   of visual depictions of projects, job sites, communications,

4   account data, timesheet information, customer information,

08:50   5   address and accounts that were transmitted or received using

6   digital media, including, but not limited to, electronic mail,

7   chat logs and electronic messages or any other forms of

8   transmission."

9   Q.    Were you specifically authorized to look for images of job

08:50   10   sites?

11   A.    Yes.

12   Q.    Now, moving to page 9 of your affidavit, Bates 716, in

13   this warrant affidavit, do you mention the importance of

14   photographs and videos in a financial investigation?

08:51   15   A.    Yes.

16   Q.    Where is that?

17   A.    Paragraph 18.

18   Q.    If I could -- if I could direct your attention to 17,

19   first.

08:51   20   A.    You have to back up a page.  So the bottom of page 8 --

21   Q.    Okay.

22   A.    -- where it begins --

23   Q.    Beginning with, "Your affiant knows from his training and

24   experience," is that right?

08:51   25   A.    That's correct.

1   **Q.**   Okay.  And in that paragraph do you provide any

2   information about photographs, videos?

3   **A.**   Yes.

4   **Q.**   What do you say?

08:52   5   **A.**   It's on page 9.  "Computers have facilitated the ability

6   of people to keep their records stored or hidden.  Photographs,

7   videos and other records that were previously stored in boxes

8   are now collected as digital images and files that can be

9   stored and maintained on electronic media, such as a digital

08:52   10   storage device called a micro secure digital card that is

11   smaller than a postage stamp."

12   **Q.**   So based on your training and experience, individuals take

13   photographs of business documents.  That's what you said,

14   right?

08:52   15   **A.**   That's correct.

16   **Q.**   And when you interviewed the defendant on the day of the

17   search, what did he tell you about this?

18   **A.**   That he scans documents, he uses his computer for

19   QuickBooks, so --

08:53   20   **Q.**   That was consistent with your training and experience.

21   **A.**   That's correct.

22   **Q.**   And you'd agree that someone could hide or rename a

23   QuickBooks file as a JPG, right?

24   **A.**   Yes.

08:53   25   **Q.**   Especially someone engaged in fraudulent activity.

**A.**   Yes.

**Q.**   Now, Mr. Bellmore asked you whether the evidence of QuickBooks was the alone -- was the only electronic evidence mentioned in this affidavit, is that true?

08:53

**A.**   Yes.  I'm sorry.  He -- he mentioned the website.

**Q.**   Did you have other information in addition to QuickBooks contained in this affidavit?

**A.**   Yes.

**Q.**   Did you mention anything about online job apps?

08:53

**A.**   Yes.

**Q.**   How many job online apps?

**A.**   I found two.

**Q.**   Which two?

**A.**   Job Terro and Craigslist.

08:53

**Q.**   And that was in your affidavit.

**A.**   That was.

**Q.**   What about a website?

**A.**   Yes.

**Q.**   Your affidavit mentions that you found a website for his business, right?

08:54

**A.**   That's correct.

**Q.**   What about an e-mail account?

**A.**   Yes.

**Q.**   And that e-mail account was associated with the defendant's business?

08:54

1   A.   Yes.

2   Q.   What about contract estimates?

3   A.   Yes.

4   Q.   If we could pull up Exhibit 13, Exhibit A, again,

08:54   5   Detective Buzzo, are you familiar with attribution evidence?

6   A.   I am.

7   Q.   What is it?

8   A.   It's linking somebody to an object, essentially,

9   ownership --

08:55   10   Q.   Okay.

11   A.   -- indicia.

12   Q.   Evidence of that would indicate who owns the thing, right?

13   A.   That's correct.

14   Q.   And directing your attention to paragraph 4 of Exhibit A,

08:55   15   were you authorized to seize attribution evidence?

16   A.   Yes.

17        MS. PUHL:  If we could blow that up, please, the

18   fourth paragraph.  There you go.  Thank you.

19   Q.   (MS. PUHL CONTINUING)  And could you read that, please,

08:55   20   the first clause?

21   A.   "Records evidencing ownership of digital media devices and

22   removable storage, to include evidence of who used or

23   controlled the computer at the time the items described in this

24   warrant were created, edited or deleted, such as logs, registry

08:55   25   entries, saved user names and passwords, documents and browsing

215

1   history."

2   **Q.**   Is attribution evidence especially important when you have

3   multiple people residing in a residence?

4   **A.**   Very important.

08:56   5   **Q.**   Now, looking at the Defendant's Exhibits 19, 20 and 21,

6   starting with Exhibits 19 and 20, what do they depict?

7   **A.**   Defendant's Exhibit 19 is the -- I guess the front top

8   portion of a class ring.

9   **Q.**   Okay.  Is there a name on that ring?

08:56   10   **A.**   I can't tell it in Defendant's Exhibit 19.  In Defendant's

11   Exhibit 20 you can see the name "Nicholas."

12   **Q.**   And where was that ring found?

13   **A.**   In the safe.

14   **Q.**   And why is that important?

08:57   15   **A.**   It shows who -- who used the safe.

16   **Q.**   Is that why this picture was taken?

17   **A.**   I'm assuming.  I -- I learned about this after the

18   hearing, when I went -- when researched where these were from

19   following the hearing yesterday.

08:57   20   **Q.**   Is the ring important to your financial investigation?

21   **A.**   Yes.

22   **Q.**   Because it's attribution, is that right?

23   **A.**   Yes.

24   **Q.**   Because it would tend to show who owns the devices that

08:57   25   were found in the safe, right?

1   **A.**   Yes.

2   **Q.**   Okay.  Now, there was other documents with Mr. Derosier's

3   name that were taken as well, right, photographs of those

4   items?

08:57  5   **A.**   Yes.

6   **Q.**   And again, why were they taken?

7   **A.**   The birth certificate and the drive -- the birth

8   certificate, Defendant's Exhibit 21, is especially important

9   when it comes to attribution.  In my experience people

08:58  10  typically keep the most important documents close, and that

11  birth certificate would be needed for several things throughout

12  just the course of life, so I consider the birth certificate as

13  especially important of showing who used that safe.

14  **Q.**   So you'd agree the affidavit authorized you to take

08:58  15  attribution evidence, right?

16  **A.**   Yes.

17  **Q.**   And you agree it's important.

18  **A.**   Yes.

19          MS. PUHL:  No further questions, Your Honor.

08:58  20          THE COURT:  Thank you.  Mr. Bellmore, anything else?

21          MR. BELLMORE:  Yes, Your Honor.

22                  <u>RECROSS EXAMINATION</u>

23  <u>BY MR. BELLMORE:</u>

24  **Q.**   Detective Buzzo, going back to when you had your first

08:59  25  conversation with Detective Freeman about your investigation, I

1    want to clarify.  You had information that the cyber tip was

2    closed?

3    **A.**    Yes.

4    **Q.**    Is that --

08:59    5    **A.**    Well, I'll say this:  It's my understanding that it was

6    closed.  Whether the term "closed" was used -- it was my

7    understanding from the conversation it was closed, that nothing

8    came of it.

9    **Q.**    And yesterday we talked about, your report mentioned that

08:59    10   there was a pending investigation with Ms. Freeman?

11   **A.**    That's correct.

12   **Q.**    And that was taking place in July of 2020?

13   **A.**    My conversation with Detective Freeman, I believe, was

14   August, August 12th.

09:00    15   **Q.**    Of 2020.

16   **A.**    Yes, if not later than that.  I'd have to check my report

17   to see what the date was.

18   **Q.**    But we talked about a document from the Grand Forks Police

19   Department to the post office requesting an address.  Do you

09:00    20   recall that?

21   **A.**    Yes.

22   **Q.**    And that was Ms. Freeman requesting an updated address for

23   Mr. Morgan-Derosier?

24   **A.**    Yes.

09:00    25   **Q.**    And that had dates of July 2020.

1    **A.**   Well, I don't know that it was -- was her request

2    specifically for Mr. Derosier, or was it -- I believe it goes

3    by address, so who -- who was residing at that specific

4    address --

09:01    5    **Q.**   All right.  My question was to date.

6    **A.**   -- not by name.

7    **Q.**   Okay.  But to the date of that document, that was July

8    of 2020.

9    **A.**   I believe it was July 14th of 2020, was the request to the

09:01   10    post office.  The response came back -- I think it was dated

11    the 29th.

12    **Q.**   And that was the document that Detective Freeman printed

13    out for you?

14    **A.**   Yes.

09:01   15    **Q.**   That didn't relate to a cyber tip, or did you not know?

16    **A.**   My understanding is that when -- there was a cyber tip.

17    I'm assuming it was associated with that.  At that time I'm

18    assuming that.

19    **Q.**   You talked about the October 15, 2019, injunction,

09:01   20    correct?

21    **A.**   I'm sorry.  I missed the date.  October 15, 2019, yes.

22    **Q.**   October 15, 2019, you'd agree that that's an important

23    date in this case.

24    **A.**   It is.

09:02   25    **Q.**   That's the date of the injunction?

1   **A.**   It is.

2   **Q.**   And that's -- Ms. Puhl this morning just went over what

3   you knew about that injunction, correct?

4   **A.**   Correct.

09:02   5   **Q.**   All right.  And you were aware that as a part of that

6   injunction, the Court stated that any sort of noncompliance was

7   going to be punishable by civil contempt?

8   **A.**   I guess I'm not familiar with that -- those specific words

9   in there.

09:02   10   **Q.**   But all the other content of the injunction you're aware

11   of?

12   **A.**   Word for word, no.

13   **Q.**   Detective Buzzo, last, I want to clarify, you had

14   mentioned that Mr. Morgan-Derosier told you that he had scanned

09:03   15   documents?

16   **A.**   Yes.

17   **Q.**   Are you saying that that was in your affidavit?

18   **A.**   No, sir, that was when I was interviewing him outside the

19   residence.

09:03   20   **Q.**   Okay.  After the warrant was already issued?

21   **A.**   Correct.

22   **Q.**   When you were executing this warrant, we talked yesterday,

23   you spent a good amount of time outside?

24   **A.**   I did.

09:04   25   **Q.**   Outside of the residence?

1   A.   Yes.

2   Q.   And when you were outside the residence, Ms. Freeman,

3   Detective Freeman, was inside performing the search?

4   A.   Performing the search and collecting evidence.

09:04   5   Q.   As well as Special Agent Casetta?

6   A.   Yes, he was in the house.

7   Q.   He came out at some point and joined your conversation,

8   right?

9   A.   I'm assuming he came directly out of the house.  I -- when

09:04   10   you asked that question yesterday, I'm assuming he came from

11   the house when he approached me -- or us, rather.  I didn't see

12   where he came from.

13   Q.   Detective Buzzo, I'm going to put Government's Exhibit 56

14   on the screen.

09:05   15           MS. PUHL:  Are you asking her to pull it up?

16           MR. BELLMORE:  We can -- we can do it.

17           MS. PUHL:  Okay.  We can do it too.

18           MR. BELLMORE:  Ours will be the Bated-stamp.  It does

19   not -- it's not -- we don't have a scanned copy of the -- with

09:05   20   the exhibit sticker on it, so if it's easier to pull up 56 just

21   to clarify, I would appreciate it.

22   Q.   (MR. BELLMORE CONTINUING)  Detective Buzzo, do you

23   recognize Exhibit 56?

24   A.   Yes.

09:05   25   Q.   That is the safe that was searched in the bedroom of the

221

1    residence?

2    A.    That's correct.

3    Q.    There's a number of objects in that safe?

4    A.    Yes.

09:06    5    Q.    Towards the bottom of the image there is a disk that says

6    "TaxCut" on it?

7    A.    Yes.

8    Q.    Towards the top of the image within the safe there are

9    three disk containers?

09:06    10    A.    Yes.

11    Q.    The one in the front is blue?

12    A.    Yep.

13    Q.    And it's blocked by some documents, but you see a -- it

14    looks like a red circle?

09:06    15    A.    Yep.

16    Q.    And that's the logo for Intuit?

17    A.    Correct.

18    Q.    Intuit has several software platforms?

19    A.    My understanding, yes.

09:07    20    Q.    TurboTax?

21    A.    TurboTax is one of them.

22    Q.    Including QuickBooks?

23    A.    I'm sorry.  Is Intuit a Turbo -- I'm not familiar --

24    QuickBooks is an Intuit product.

09:07    25    Q.    Do you know whether those three containers were seized?

222

1   A.   They were not.

2   Q.   Were they photographed?

3   A.   I'm not -- I'm not sure.

4   Q.   But the class ring that was in the safe was photographed?

09:07   5   A.   I know that now, yes.

6   Q.   And I want to clarify.  When -- when did you learn about

7   the class ring, just the timeframe?  Was it shortly after the

8   search, or was it before this hearing?

9   A.   When I learned about the class ring?

09:07   10   Q.   Yes.

11   A.   When you handed it to me.

12   Q.   You had previously not viewed that image.

13   A.   I -- no, sir.

14        MR. BELLMORE:  Thank you.  I don't need the image up

09:08   15   anymore.

16   Q.   (MR. BELLMORE CONTINUING)  Did your affidavit list how

17   many people lived at the residence?

18   A.   I do not believe so.

19   Q.   Was there any information in there to suggest that there

09:08   20   were multiple businesses being operated out of that residence?

21   A.   I believe they're mentioned, Vaughn -- Vaughn

22   Construction, Team Lawn and -- Team Lawn, GPHQ, Garden & Patio

23   Headquarters, and Derosier Outdoors.  Those company names are

24   in the affidavit.

09:09   25   Q.   And you associate each of those company names with Mr.

223

1   Morgan-Derosier?

2   **A.**   Yes.

3        MR. BELLMORE:  I have no further questions, Your

4   Honor.

5        THE COURT:  All right.  May Detective Buzzo be

6   excused?

7        MS. PUHL:  Your Honor, I think I just have two

8   questions about Exhibit 56.

9        THE COURT:  Go ahead.

10        MS. PUHL:  You could put up 56.

11                  FURTHER REDIRECT EXAMINATION

12   BY MS. PUHL:

13   **Q.**   Now, just to be clear, you didn't participate in the

14   search of this safe, right?

15   **A.**   Correct.

16   **Q.**   Okay.  And Mr. Bellmore asked you about some of those

17   disks that you see in this safe, right?

18   **A.**   Correct.

19   **Q.**   Okay.  What are they?

20   **A.**   So the one on the bottom that's covered up by -- it looks

21   like an external -- this one (indicating), this here is a

22   program called TaxCut.  This appears to be -- I can speculate

23   what that symbol is, TurboTax product of some sort.

24   **Q.**   But what are these?

25   **A.**   These are -- these are programs that you put on a

1  computer, or they're product keys.  And in this situation, my

2  understanding is that these CDs contain product keys, not

3  storage for the company documents.  So what you would do with

4  these disks is either -- with a program key is insert the disk,

09:10  5  or the container would -- would contain a number or some sort

6  of a code where you would go on a website and download -- enter

7  that product key and download the product onto your computer.

8  **Q.**   So they don't include personal data, in your training and

9  experience.

09:11  10  **A.**   No.

11  **Q.**   Is that why you typically don't take them?

12  **A.**   A lot of times, yes.

13       MS. PUHL:  No further questions.

14       THE COURT:  Now may Detective Buzzo be excused?

09:11  15       MS. PUHL:  Yes, and we would release him from -- ask

16  that he be released from the subpoena, Your Honor.

17       MR. BELLMORE:  Same, Your Honor.  We believe we

18  subpoenaed Detective Buzzo.  I would ask that he be released

19  from his subpoena as well.

09:11  20       THE COURT:  All right.  Thank you, Detective Buzzo.

21       THE WITNESS:  Thank you, Your Honor.

22       THE COURT:  You are excused.

23       Please call the next witness.

24       MS. PUHL:  The United States calls Special Agent Mike

09:12  25  Arel, Your Honor.

225

1          THE COURT:  Good morning.  Please take an oath.

2          THE CLERK:  Raise your right hand.

3                    <u>MICHAEL AREL</u>,

4    having been first duly sworn, was examined and testified as

09:12   5    follows:

6                    <u>DIRECT EXAMINATION</u>

7    <u>BY MS. PUHL</u>:

8    **Q.**   Good morning, Special Agent Arel.

9    **A.**   Good morning.

09:12   10   **Q.**   Could you please introduce yourself for the record?

11   **A.**   Sure.  My name is Michael Arel, A-R-E-L.  I'm a retired

12   special agent from Homeland Security Investigation.

13   **Q.**   Recently retired, right?

14   **A.**   Yes, last September, September of 2022.

09:13   15   **Q.**   You were a special agent, is that right?

16   **A.**   Correct.

17   **Q.**   And what were your assigned duties as a special agent with

18   HSI?

19   **A.**   To conduct criminal investigations in a wide variety of

09:13   20   areas, financial investigations, child exploitation

21   investigations, immigration, narcotics.

22   **Q.**   And during the time period of 2019, 2020, were you

23   assigned to any task forces?

24   **A.**   Yes.

09:13   25   **Q.**   Which task force?

1    A.    The Internet Crimes Against Children, ICAC, Task Force.

2    Q.    And how many years of experience do you have investigating

3    internet crimes against children?

4    A.    Approximately 21.

09:13    5    Q.    And before you were employed as an HSI agent, were you

6    employed with another federal agency?

7    A.    Yes.

8    Q.    Where was that?

9    A.    United States Secret Service.

09:14    10    Q.    And as both an agent with the Secret Service and an agent

11    with HSI, you have a wide range of experience, is that right?

12    A.    Correct.

13    Q.    So you would agree -- would you agree that child

14    exploitation has always been your priority assignment with HSI?

09:14    15    A.    With HSI and U.S. Customs, yes, it was the primary focus.

16    Q.    Special Agent Arel, are you familiar with the defendant,

17    Nicholas Derosier?

18    A.    Yes.

19    Q.    How are you familiar with him?

09:14    20    A.    I worked on a cyber tip that was related to him.

21    Q.    And what year?

22    A.    2019.

23    Q.    Can you explain what a cyber tip is?

24    A.    Sure.  A cyber tip is a report generated by an electronic

09:15    25    service provider such as Google or Microsoft or Facebook.  When

227

1   one of those providers detects child exploitation material on

2   their platform, they generate a report that is sent to the

3   National Center for Missing and Exploited Children reporting

4   that activity and some basic information about the user account

09:15   5   that it was discovered in.

6   Q.   And as a special agent with HSI, how many cyber tips have

7   you worked?

8   A.   Over the years, probably in excess of a hundred.  We --

9   dozens a year.

09:15   10   Q.   How many cyber tips does the Internet Crimes Against

11   Children Task Force typically receive?

12   A.   Hundreds a year in North Dakota.

13        MS. PUHL:  Permission to approach, Your Honor?

14        THE COURT:  You may.

09:16   15   Q.   (MS. PUHL CONTINUING)  I'm handing you Government's

16   Exhibit 77.  Do you recognize that?

17   A.   I do.

18   Q.   And what is it?

19   A.   It is a cyber tip.

09:16   20   Q.   And is it the cyber tip that you worked at Detective

21   Freeman's request, is that right?

22   A.   That's correct.

23        MS. PUHL:  Okay.  United States offers Exhibit 77,

24   Your Honor.

09:16   25        THE COURT:  Mr. Bellmore?

1       MR. BELLMORE:  No objection, Your Honor.

2       THE COURT:  Exhibit 77 is received.

3       MS. PUHL:  If we could pull it up, please.

4  Q.   (MS. PUHL CONTINUING)  So according to this cyber tip,

5  what's at issue?

6  A.   The cyber tip is reporting that Google discovered a file

7  of child exploitation material on their platform.

8  Q.   And is that set forth -- or where is that set forth in

9  this cyber tip?  And if you could direct our attention to the

10 number in the right corner, please.

11 A.   The number?

12 Q.   The Bates number in the right corner.

13      THE COURT:  Top-right corner.

14      THE WITNESS:  Oh, I'm sorry.  03786.

15 Q.   (MS. PUHL CONTINUING)  Okay.  Where in this cyber tip does

16 it provide that Google became aware that one of its users was

17 storing child pornography in the Google Photos infrastructure?

18 A.   That would be on the third page, 03788, towards the

19 bottom.

20 Q.   Okay.  And directing your attention to 03789 --

21 A.   Yes.

22 Q.   -- is there information on this page about the Google

23 Photos infrastructure?

24 A.   Yes.  This page indicates the telephone number of the

25 user, as well as the number of files that were detected.

1  **Q.**   What -- what's listed below "Additional Information

2  Submitted by the Reporting ESP"?

3  **A.**   "Google became aware of the reported content which was

4  stored in Google Photos infrastructure."

09:18  5  **Q.**   Okay.  Thank you.  So that's what's at issue, right?

6  **A.**   Correct.

7  **Q.**   And how many images, if any, were submitted to this cyber

8  tip?

9  **A.**   According to the cyber tip, one.

09:19  10  **Q.**   And how, according to the cyber tip, was the image

11  categorized?

12  **A.**   NCMEC categorized it as an A1 image, which would indicate

13  it depicts prepubescent minor engaged in sexually explicit

14  conduct.

09:19  15  **Q.**   And where is that found?

16  **A.**   That would be on the page 03790.

17  **Q.**   And could you circle that with your finger?

18  **A.**   Just on the screen here?

19  **Q.**   Yes, please.

09:19  20  **A.**   Right there (indicating).

21  **Q.**   Okay.  So that image depicts a prepubescent child engaged

22  in sexual activity, right?

23  **A.**   That's what the tip indicated.  I have not reviewed the

24  image.

09:19  25  **Q.**   Okay.  And you never did, is that right?

1   **A.**   Correct.

2   **Q.**   Okay.  And when was this activity discovered by Google

3   according to the cyber tip?  And if you could refer us to the

4   page again.

09:20   5   **A.**   Sure.  It'd be a page labeled 03788, again, at the bottom

6   under "Incident Information."

7   **Q.**   We gotta catch up to you.

8   **A.**   I'm sorry.

9   **Q.**   And you can clear the circle just by tapping in the

09:20   10   corner, Special Agent Arel.

11   **A.**   You want me to circle it again at the bottom?

12   **Q.**   Please.

13   **A.**   It's this information right here (indicating).

14   **Q.**   So to be clear, that's when Google became aware of the

09:20   15   content in the Google -- Google Photos infrastructure of the

16   user, is that right?

17   **A.**   That's correct, November 23rd of 2018.

18   **Q.**   And after Google makes this discovery, it reports it to

19   the National Center for Missing and Exploited Children, right?

09:20   20   **A.**   Correct.

21   **Q.**   And when was the tip processed?

22   **A.**   The tip was processed on -- would you like to go to the

23   page that indicates that?

24   **Q.**   Sure.

09:21   25   **A.**   So 03791, I believe it's on that page.  Yes, right here

1    (indicating), on December 13th of 2018.

2    Q.    And after a tip -- cyber tip, rather, is processed, what

3    happens typically next?

4    A.    NCMEC will then distribute that tip to the local ICAC in

5    the area where they believe the user is located.

6    Q.    And how is that determination made?

7    A.    Generally through the geolocation, in this case of a cell

8    phone number.

9    Q.    Okay.  So what type of user information did Google provide

10   as part of this cyber tip?

11   A.    They only provided the telephone number.

12   Q.    Nothing else.

13   A.    Nothing else.

14   Q.    Now, how did you get involved in the investigation, if

15   that's what it is, of this cyber tip?

16   A.    I was contacted by Detective Freeman from the Grand Forks

17   Police Department.  She asked me for assistance in helping her

18   identify the user of the telephone number.

19   Q.    So just to be clear, the tip is -- first goes to the ICAC

20   Task Force, is that right?

21   A.    That's correct, the BCI receives the tip initially.

22   Q.    And then BCI, in turn, refers it to the Grand Forks P.D.?

23   A.    Yes.

24   Q.    Okay.  And then the Grand Forks P.D., in this case

25   Detective Freeman, contacted you for assistance.

232

1    **A.**    Correct.

2    **Q.**    Do you recall when that was?

3    **A.**    That was in February of 2019.

4    **Q.**    Do you -- do you and Detective Freeman have a phone

09:22    5    conversation about this cyber tip, or do you communicate

6    otherwise?

7    **A.**    It was communicated -- she reached out to me in e-mail.

8    **Q.**    I'm handing you Government's Exhibit 83, 84, 85, 86 and

9    87.  Beginning with Exhibit 83, do you recognize that exhibit?

09:24    10    **A.**    I do.

11    **Q.**    And what is it?

12    **A.**    It is an e-mail conversation between Detective Freeman and

13    -- and me.

14    **Q.**    And when did that correspondence occur?

09:24    15    **A.**    On -- it started on February 4, 2019.

16             MS. PUHL:  Your Honor, the United States offers

17    Exhibit Number 83.

18             THE COURT:  Mr. Bellmore?

19             MR. BELLMORE:  No objection.

09:24    20             THE COURT:  Exhibit 83 is received.

21    **Q.**    (MS. PUHL CONTINUING)  Do you want to clear the circle,

22    Special Agent Arel?

23    **A.**    Oh, sure.

24    **Q.**    And going to Bates Number 3803, please, so at the -- at

09:25    25    the bottom of this page is the beginning of that

233

1   correspondence, right?

2   **A.**   Correct.

3   **Q.**   Okay.  And what is happening, if you could paraphrase,

4   please?

09:25   5   **A.**   Detective Freeman was reaching out to me because she

6   received a cyber tip and -- received the cyber tip that we

7   previously spoke about.  All it contained was a telephone

8   number that she believed originally was a Midcontinent

9   Communications landline number.  And she was confused because

09:25   10   it was a Google Photos infrastructure related cyber tip, and

11   that doesn't make sense with a landline telephone number, so

12   she was reaching out to me for some assistance in identifying

13   that further.

14   **Q.**   Because a landline can't upload child pornography, right?

09:26   15   **A.**   Correct.

16   **Q.**   Okay.  So did you agree to help her?

17   **A.**   Yes.

18   **Q.**   And on what date did that occur?

19   **A.**   I responded to her on the 4th and said that I would take a

09:26   20   look at it the following day.

21   **Q.**   Okay.  And moving to page 3802, did you, in fact, look

22   into it then?

23   **A.**   I did.  I had been in communication with Midcontinent on

24   another investigation at this same time, and so I reached out

09:26   25   to the lady that I was working with on the other case, and I

234

1    just ran this scenario by her.  And she indicated to me that it

2    was likely at one point a Midcontinent landline number, but had

3    since been ported to another provider.

4    **Q.**   And if you would, could you please read your e-mail

5    correspondence to Detective Freeman on February 5th --

6    **A.**   Sure.

7    **Q.**   -- 2019?

8    **A.**   "Okay.  I think I might have figured this out.  The number

9    was a Midcontinent number, but they said it had been ported to

10   another company.  Looks like it is a Verizon number now.  I

11   also tried to go to the website for Team Lawn, and it doesn't

12   seem to work, so I'm guessing that whoever is running or ran

13   that business probably ported the number to his cell phone.

14   Should I fire off a subpoena for it and see who's using it?  I

15   also thought a subpoena to Google might" -- sorry.  "I also

16   thought a subpoena to Google might provide more information

17   than they provided in the cyber tip, which is basically

18   nothing."

19   **Q.**   Okay.  And her -- Detective Freeman's initial

20   correspondence with you, the landline was assigned to Team

21   Lawn, is that right?

22   **A.**   Yes.

23   **Q.**   Okay.  So you did some work, and you determined that this

24   number was ported away to a cell phone company, right?

25   **A.**   Correct.

235

1   **Q.**   And that cell phone company was Verizon.

2   **A.**   Yes.

3   **Q.**   Okay.  And what did you do next?

4   **A.**   I subpoenaed Verizon and Google, as I'd suggested in my

5   e-mail to Detective Freeman.

6   **Q.**   And do you recall when you served those subpoenas?

7   **A.**   It was in -- I believe it was in February of that year.  I

8   don't recall the exact dates.

9   **Q.**   Okay.  February of 2019?

10  **A.**   Yes.

11  **Q.**   Okay.  And what type of information were you looking

12  from -- for Verizon?

13  **A.**   I was looking for just basic subscriber information for --

14  for that telephone number that was named in the cyber tip.

15  **Q.**   And what information were you looking for from Google?

16  **A.**   I was looking for, again, more subscriber information

17  related to the cyber tip that Google filed.

18  **Q.**   So looking at -- or did you receive a -- in the meantime,

19  did you receive a response from Verizon?

20  **A.**   I did.

21  **Q.**   And did you notify anybody after you received that

22  response?

23  **A.**   Yes, I e-mailed Detective Freeman.

24  **Q.**   And is that e-mail set forth at Exhibit 85?

25  **A.**   It is.

1   Q.   This is an accurate correspondence between you and Special

2   Agent -- or Detective Freeman, is that right?

3   A.   Yes.

4        MS. PUHL:  United States offers Exhibit 85, Your

09:29   5   Honor.

6        THE COURT:  Mr. Bellmore?

7        MR. BELLMORE:  No objection.

8        THE COURT:  Exhibit 85 is received.

9   Q.   (MS. PUHL CONTINUING)  Looking at the correspondence --

09:29  10   first at the correspondence on page 3813 --

11   A.   Yes.

12   Q.   -- this is the Verizon -- this is -- this contains the

13   response that you received from Verizon, is that right?

14   A.   Yes, this is the information that was contained in the

09:30  15   response.

16   Q.   And what is that information?

17   A.   That the subscriber for the telephone number was a Sandra

18   Simons from Champlin, Minnesota.

19   Q.   And was that name familiar to you?

09:30  20   A.   No.

21   Q.   And did you -- were you provided any other information

22   from Verizon?

23   A.   There was a business contact name on the subscriber

24   information, and -- and that was Team Lawn.

09:30  25   Q.   And that was not new because the landline was assigned to

1  the Team Lawn, right?

2  **A.**  Correct.

3  **Q.**  Okay.  And was -- and how did Detective Freeman respond?

4  **A.**  Would you like me to read --

5  **Q.**  Yes, please.

6  **A.**  -- the response?

7  **Q.**  Yes, please.

8  **A.**  She said, "Hey, well, that name is completely out of the

9  blue.  I will check with the other detectives and see if he has

10  dealt with this lady at all with the family of the deceased

11  guy."

12  **Q.**  And when was that?

13  **A.**  February 26, 2019.

14  **Q.**  What -- the response from Detective Freeman was

15  February 20 --

16  **A.**  Oh, I'm sorry.  February 25, 2019.

17  **Q.**  All right.  And did -- did you provide any other -- did

18  you provide Detective Freeman with any other information per

19  this e-mail?

20  **A.**  I did.  The following day I e-mailed her again and

21  indicated they had provided another telephone number on the

22  Verizon subscriber information, and I just gave her that

23  number.

24  **Q.**  Okay.  And what was Detective Freeman's response?

25  **A.**  She -- would you like me to read her response again?

238

1   **Q.**   Please.

2   **A.**   Okay.  She said, "Looks like the person on the Verizon

3   bill for our target phone" -- I'm sorry.  That was my response.

4   Her response was, "Robert Coons and Nicholas Derosier

09:32   5   were the owners of Team Lawn.  They took all the websites down,

6   and actually all the electronics were conveniently reported

7   stolen now in a burglary.

8   "Robert Coons lived at XXXXXXXXXXXXXXXXXXXXXX, where

9   the business was located out of.  Robert was the man who was

09:32   10   killed in the accident.  Nicholas lives in East Grand or EGF

11   and was the reporting party on the fatal accident and also the

12   burglary into Robert's home.  It is all super weird."

13   **Q.**   And did either of these names sound familiar to you?

14   **A.**   Other than what we had talked about in these e-mails to

09:32   15   date, no.

16   **Q.**   Okay.  So this was new information for you, is that right?

17   **A.**   Correct.

18   **Q.**   Okay.  And did you do anything in response to that?

19   **A.**   Yes.

09:33   20   **Q.**   What was that?

21   **A.**   I did some public records basically through CLEAR, a

22   website.  I just did a few more checks on the name, and then I

23   also subpoenaed Google for more information.

24   **Q.**   All right.  And did you receive a response from Google?

09:33   25   **A.**   I did.

1    Q.    And when did you receive that response?

2    A.    In March.  March 8th, it appears, or on or about

3    March 8th.

4    Q.    And upon receiving that response, what did you do?

09:33    5    A.    I forwarded it to Detective Freeman.

6    Q.    And is that set forth at Government's Exhibit 86?

7    A.    Yes, it is.

8    Q.    And what is 86 specifically?

9    A.    86 is an e-mail that I sent to Detective Freeman with the

09:33    10    response from Google as an attachment.

11         MS. PUHL:  United States offers Exhibit 86, Your

12    Honor.

13         THE COURT:  Mr. Bellmore?

14         MR. BELLMORE:  No objection.

09:34    15         THE COURT:  Exhibit 86 is received.

16    Q.    (MS. PUHL CONTINUING)  What was the response from Google?

17    A.    Google provided a -- their standard subscriber information

18    that they generally provide.

19    Q.    All right.  And -- and what was that information?

09:34    20    A.    That's located on page 03825, and it's a combination of

21    some user-provided information and then information that

22    Google's system captures on its own.

23    Q.    So your request was for more information about the user

24    that was associated with that phone number -- or that was with

09:34    25    the phone number and --

240

1   **A.**   I actually requested --

2   **Q.**   -- associated with the --

3   **A.**   -- information associated with the cyber tip, and I

4   included the specific cyber tip number.

09:35   5   **Q.**   Okay.  And that's all you did.

6   **A.**   Yes.

7   **Q.**   Okay.  And you received --

8   **A.**   I received --

9   **Q.**   -- what's reflected on page 3825 in return, right?

09:35   10   **A.**   Yes.

11   **Q.**   And you received that in March of 2019.

12   **A.**   Correct.

13   **Q.**   And what type of information is this, Special Agent Arel?

14   **A.**   Again, it's Google's basic subscriber information.  They

09:35   15   provide a name, which would be provided -- or which would be

16   entered by the user of the account when it's created.

17   **Q.**   Is it verified by the provider?

18   **A.**   No.  And then an e-mail address that's used to create the

19   account or used in association with the account, the services

09:35   20   that the person is using.  There's a recovery e-mail.  There's

21   a date that the account was created, and there's an associated

22   telephone number.  In this particular case there are no IP logs

23   that they provided.

24   **Q.**   The only IP is -- that was provided was relative to when

09:36   25   the account was created, is that right?

241

1  A.   That's correct.

2  Q.   And that was from what year?

3  A.   2015.

4  Q.   And is it likely -- are you likely to find subscriber --

09:36   5  or registration or subscriber information for an IP from 2015?

6  A.   Likely not.

7  Q.   Most providers keep it for about one year, is that right?

8  A.   Yeah, most do.

9  Q.   Now, based upon this response, were -- did you determine

09:36   10  between Coons and Derosier, who the likely person was

11  associated with the cyber tip?

12  A.   Yes.

13  Q.   And what -- who was that?

14  A.   I thought at that point was -- it was Nicholas Derosier.

09:36   15  Q.   Just by virtue of the fact that his name was associated

16  with the Gmail account that was provided in the Google return,

17  is that right?

18  A.   Yes.

19  Q.   But again, you had no IP information.

09:37   20  A.   That's correct.

21  Q.   And you sent an e-mail to Detective Freeman about your

22  belief, right?

23  A.   I did.

24  Q.   And that's set forth in Exhibit 86?

09:37   25  A.   Yes, it is.

242

1    Q.    Did you receive a response from Detective Freeman?

2    A.    No.

3    Q.    Did you follow up with her?

4    A.    No.

5    Q.    Why not?

6    A.    She requested some information that I provided to her on a

7    cyber tip she was working.  It wasn't my investigation.  I was

8    assisting her on it, so once I sent the information to her, I

9    moved on.

10   Q.    And is that typical?

11   A.    Yes.  On a -- on a cyber tip that is being worked by

12   another department where we provide initial assistance on, yes.

13   Q.    So if she had wanted further assistance, it would be on

14   her to ask for that, right?

15   A.    Correct.

16   Q.    Do you have Exhibit 87 in front of you, Special Agent

17   Arel?

18   A.    I do.

19   Q.    And what is that?

20   A.    That is the e-mail from Detective Freeman to me.

21   Q.    And what is the date of that e-mail?

22   A.    July 1, 2019.

23         MS. PUHL:  United States offers Exhibit 87, Your

24   Honor.

25         THE COURT:  Mr. Bellmore?

243

1          MR. BELLMORE:  No objection, Your Honor.

2          THE COURT:  Exhibit 87 is received.

3    **Q.**  (MS. PUHL CONTINUING)  Special Agent Arel, if you could,

4    please read Exhibit 87.

5    **A.**  "Hi, Mike.  Just wondering if you ever heard back from

6    Google on the Team Lawn case.  Maybe you already updated me and

7    I missed your e-mail.  I was out of the office for a couple

8    weeks for military leave, so if you already advised, I

9    apologize.  Thanks, Jen."

10   **Q.**  So she's asking you again about the Google subpoena,

11   right?

12   **A.**  Correct.

13   **Q.**  And you previously sent it to her, as set forth in

14   Exhibit 86, is that right?

15   **A.**  Yes.

16   **Q.**  And she's asking for it again in 87, right?

17   **A.**  Yes.

18   **Q.**  What did you do upon receiving this request?

19   **A.**  I went back in my e-mails and looked to see if I could

20   find the e-mail where I sent the information to her, and I did

21   locate it, and I re-forwarded it to her on July 1st.

22   **Q.**  And directing your attention to Exhibit 88, what is that?

23   **A.**  That's another e-mail exchange between Detective Freeman

24   and me.

25   **Q.**  Is that the e-mail exchange that you just described?

244

A.   Yes.

Q.   And when -- when did you forward the Google response to Detective Freeman again?

A.   July 1st, 2019.

09:40    MS. PUHL:  United States offers Exhibit 88, Your Honor.

THE COURT:  Mr. Bellmore?

MR. BELLMORE:  No objection.

THE COURT:  Exhibit 88 is received.

09:40 Q.   (MS. PUHL CONTINUING)  Okay.  So to clarify, Detective Freeman e-mails you on July 1, 2019, asking you where the Google response is.  And that very day, as set forth in 88, you forwarded it to her again, is that right?

A.   Correct.

09:40 Q.   Did you receive a response to this e-mail?

A.   No.

Q.   And did you follow up with her?

A.   No.

Q.   Now, have you since learned that Detective Freeman never
09:40 received it?

A.   I have.

Q.   And when did you learn that?

A.   Within the last couple of weeks preparing for this hearing.

09:40 Q.   And when you did not receive a response on this, again,

1   why did you not follow up with Detective Freeman?

2   A.   It wasn't my investigation to run, so I provided the

3   assistance she asked, and then I re-provided the information to

4   her.  You know, at that point, if she would've asked me for

5   further information, I would've continued to work with her on

6   it, but I never heard back.

7   Q.   Do you move on to the next cyber tip?

8   A.   Yes.

9   Q.   And again, the ICAC gets hundreds of cyber tips a year, is

10  that correct?

11  A.   Correct.

12  Q.   And you are one of two lead investigators on those cyber

13  tips in the eastern part of the state, is that right?

14  A.   Yes.

15  Q.   Do you know if that cyber tip was ever closed?

16  A.   I have since learned that it was.

17  Q.   Do you know why it was closed?

18  A.   Detective Freeman closed it because she believed we hadn't

19  received a response from Google.

20  Q.   Detective -- or Special Agent Arel, were you aware that

21  the Grand Forks P.D. executed a search warrant on Mr.

22  Derosier's house on September 15, 2020?

23  A.   I became aware of that.

24  Q.   And when did you become aware of that?

25  A.   Sometime after it happened.

1    Q.   Did anybody ever contact you, request assistance in the

2    execution of that search warrant?

3    A.   No.

4         MS. PUHL:  No further questions, Your Honor.

5         THE COURT:  Mr. Bellmore.

6                        CROSS-EXAMINATION

7    BY MR. BELLMORE:

8    Q.   It's still Special Agent Arel?  Is that still appropriate?

9    A.   You can call me whatever you want to, I guess.  I'm -- I'm

10   retired, but whatever works.

11   Q.   I'll go with that.  You were a special agent at the time

12   of the events we've been talking about this morning, correct?

13   A.   That's correct.

14   Q.   Okay.  Special Agent Arel, you indicated that you sent a

15   final e-mail to Detective Freeman on July 1st of 2019?

16   A.   That's correct.

17   Q.   And after that e-mail you never received a response from

18   her?

19   A.   Correct.

20   Q.   And that was in reference to a follow-up e-mail you sent

21   in March of 2019, right?

22   A.   Correct.

23   Q.   Where you included the information that you had obtained

24   from Google?

25   A.   Yes.

1  **Q.**   And in that e-mail you indicated that it would be nice to
2  dump Mr. Morgan-Derosier's phone?
3  **A.**   Yes.
4  **Q.**   And you said that conversation -- there was never a
5  response specifically to that statement by Detective Freeman in
6  your e-mails, right?
7  **A.**   No.
8  **Q.**   Going back to February 27, you had an e-mail -- you had
9  e-mail correspondence with Detective Freeman regarding the
10  Verizon bill and a Sandra Simons?
11  **A.**   That's correct.
12  **Q.**   And in that e-mail you mentioned trying to talk to
13  Mr. Morgan-Derosier?
14  **A.**   Yes.
15  **Q.**   And tried to see if you can get a peek at his phone?
16  **A.**   Correct.
17  **Q.**   That e-mail, again, was back in February 27 of 2019?
18  **A.**   Yes.
19  **Q.**   And throughout this time period you were a special agent
20  for Homeland Security Investigations?
21  **A.**   Yes.
22  **Q.**   You mentioned the Internet Crimes Against Children Task
23  Force.  Were you a part of that task force?
24  **A.**   I was.
25  **Q.**   And that's a task force that's made up of state and

09:43
09:44
09:44
09:44
09:45

1   federal law enforcement officers?

2   **A.**   That's correct.

3   **Q.**   And was Detective Freeman a part of the Internet Crimes

4   Against Children Task Force?

09:45   5   **A.**   Yes.

6   **Q.**   Geographically how is that situated in North Dakota?  Is

7   it just North Dakota, or does it expand to Minnesota, South

8   Dakota?

9   **A.**   The North Dakota Internet Crimes Against Children Task

09:45   10   Force is within the state of North Dakota.  We, as HSI goes,

11   has jurisdiction obviously across state lines, so we work with

12   the Minnesota version of the Internet Crimes Against Children

13   Task Force as well.  But for the purposes of cyber tips in

14   North Dakota, it's just -- it's North Dakota law enforcement.

09:45   15   **Q.**   Okay.  And so the task force, multiple agencies are

16   working together to handle cyber tips.

17   **A.**   Correct.

18   **Q.**   But that's not the only area of cooperation between the

19   task force.  For example, the task force, both federal and

09:46   20   state, law enforcement will work together on executing search

21   warrants.

22   **A.**   Oh, correct.

23   **Q.**   That's not uncommon?

24   **A.**   No.

09:46   25   **Q.**   And so as far as Mr. Morgan-Derosier goes, your role was

1    limited to the cyber tip from 2019.

2    A.    That's correct.

3    Q.    After July you had no further contact with Detective

4    Freeman about Mr. Morgan-Derosier?

09:46    5    A.    No.

6          MR. BELLMORE:  I have no further questions.  Thank

7    you.

8          THE COURT:  Ms. Puhl, anything else?

9          MS. PUHL:  Just two questions, Your Honor.

10                    REDIRECT EXAMINATION

11    BY MS. PUHL:

12    Q.    Did you ever have any telephone conversation about this

13    cyber tip with Detective Freeman?

14    A.    Not that I can recall.

09:47    15    Q.    It was limited to the e-mails that have been introduced

16    into evidence, is that right?

17    A.    That's correct.

18    Q.    And did you ever talk to Detective Buzzo at any time about

19    this cyber tip?

09:47    20    A.    No.

21    Q.    Ever talk to Detective Buzzo about the defendant,

22    Derosier?

23    A.    No, I was not around when they were working that part of

24    the investigation.

09:47    25          MS. PUHL:  Okay.  Thank you.  No further questions.

1          THE COURT:  Do you have a question about an exhibit?

2          MS. PUHL:  I didn't offer one exhibit, I think, that

3    is in your book, Your Honor.  We can remove that.

4          THE COURT:  Okay.

09:47   5          MS. PUHL:  Was it Exhibit -- Exhibit 84.

6          THE COURT:  So Exhibit 84 we can --

7          MS. PUHL:  Right, was not offered.

8          THE COURT:  -- can consider not offered.  All right.

9    Thank you.  And may Special Agent Arel be excused?

09:47   10         MS. PUHL:  Yes, Your Honor.

11         THE COURT:  Mr. Bellmore?

12         MR. BELLMORE:  Yes, Your Honor.

13         THE COURT:  Thank you.  Why don't you call the next

14   witness, and we'll go for 15 minutes, or so, and take a break.

09:48   15         MR. SCHMITZ:  Your Honor, the United States calls

16   Detective Jen Freeman, Jennifer Freeman.

17         MR. BELLMORE:  Your Honor, may I invite Daniel Meinke

18   into the courtroom?

19         THE COURT:  You may.

09:48   20         MS. PUHL:  Likewise, Your Honor, if we may also

21   include Special Agent Jim Shaw and Jesse Smith with BCI?

22   They're both forensic -- certified forensic examiners.

23         THE COURT:  Mr. Bellmore, any objection?

24         MR. BELLMORE:  Are they witnesses?  Are they going to

09:49   25   be witnesses?

251

1          MR. SCHMITZ:  Depends on rebuttal.

2          MS. PUHL:  Yeah.

3          MR. SCHMITZ:  Depends on what we need on rebuttal,

4    Your Honor.

5          MR. BELLMORE:  I have no objection.

6          THE COURT:  All right.  Then please take an oath.

7                        JENNIFER FREEMAN,

8    having been first duly sworn, was examined and testified as

9    follows:

10         MR. SCHMITZ:  Your Honor, may it please the Court?

11         THE COURT:  Please proceed.

12                     DIRECT EXAMINATION

13   BY MR. SCHMITZ:

14   Q.   Good morning, Detective Freeman.

15   A.   Good morning.

16   Q.   Can you please state your name and spell your last name

17   for the Court?

18   A.   Jennifer Freeman, F-R-E-E-M-A-N.

19   Q.   And how are you employed, Detective Freeman?

20   A.   I work for the Grand Forks Police Department.

21   Q.   And how long have you worked for the Grand Forks Police

22   Department?

23   A.   Just under 14 years now.

24   Q.   Can you just describe for the Court your training and

25   experience with -- that you've received in the Grand Forks

1  Police Department?

2  **A.**   Sure.  Prior to being hired I was a -- I attended the

3  University of North Dakota and received my Bachelor's degree in

4  criminal justice studies, a minor in psychology.  And then

09:50  5  after being hired I attended the North Dakota Peace Officers

6  Academy and was certified as a law enforcement officer.

7        Since becoming certified I have received specialized

8  training in criminal basic and advanced investigations.  I've

9  also received specialized training in computer and cell phone

09:50  10  forensics, interviewing children, forensically interviewing

11  children, and then --

12  **Q.**   Can you take -- can you take the Court through your career

13  at the Grand Forks Police Department, what positions you've

14  held?

09:51  15  **A.**   Sure.  So when I was hired in 2009, I worked as a patrol

16  officer for three years.  And then I was promoted to a

17  detective and worked personal crimes for three years, and then

18  was selected to be the computer and cell phone forensics

19  detective in 2016.  And then I've been in that role with the

09:51  20  Criminal Investigations Bureau since 2016.

21  **Q.**   And again, what is that role?

22  **A.**   The computer and cell phone forensic detective.  I also am

23  assigned strategic investigations, so I work personal crimes,

24  violent crimes, crimes against people, crimes against children,

09:51  25  internet crimes, cyber crimes.  Financial crimes --

253

1   **Q.**   Right.

2   **A.**   -- I do most of all.

3   **Q.**   So you do a bit of everything?

4   **A.**   I do.

09:51   5   **Q.**   All right.  So what are your job duties as a computer and

6   cell phone forensic tech?

7   **A.**   I am the investigator that -- in any criminal

8   investigation that they request my assistance in imaging and

9   sometimes analyzing data related to the crimes that that case

09:52   10   agent is investigating.

11   **Q.**   Okay.  Now, as a -- as a computer forensic technician or

12   computer forensic tech, what systems are you trained on and

13   certified on?

14   **A.**   I am certified on the Forensic Tool Kit, so I initially

09:52   15   got hired -- or started with FTK, and then subsequently with --

16   **Q.**   Does that stand for Forensic Tool Kit?

17   **A.**   That is correct.

18   **Q.**   Thank you.  What else?

19   **A.**   And then subsequently was trained in AXIOM through Magnet

09:52   20   Forensics.

21   **Q.**   Are you also familiar with Cellebrite?

22   **A.**   That is correct.

23   **Q.**   All right.  And how many other computer forensic techs are

24   there in the Grand Forks Police Department?

09:53   25   **A.**   It's just me.

1  **Q.**   So if there's a case that involves fraud, would you be the

2  computer technician for that?

3  **A.**   That is correct.

4  **Q.**   Would you be the only one?

09:53   5  **A.**   I am the only one.

6  **Q.**   How about drug cases?

7  **A.**   I am the only computer forensics.

8  **Q.**   And gun cases?

9  **A.**   Yes.

09:53   10  **Q.**   And child exploitation cases?

11  **A.**   That is correct.

12  **Q.**   And fraud cases?

13  **A.**   That's correct.

14  **Q.**   Murder cases?

09:53   15  **A.**   Yes.

16  **Q.**   Okay.  So if you were called in on a specific case to work

17  computer forensics for a specific case, could you draw anything

18  from the significance about why they picked you to work that

19  particular case as to what type of case it was?

09:53   20  **A.**   I'm sorry.  Can you ask that again?

21  **Q.**   Could it have been any type of case?

22  **A.**   Correct.

23  **Q.**   Okay.  And so I'm sort of probably the person in the

24  courtroom who knows least about Grand Forks.  Can you just sort

09:54   25  of explain the Grand Forks Police Department in terms of like

1   how big it is?

2   **A.**   Sure.

3   **Q.**   All right.

4   **A.**   We have approximately 100 sworn officers, and within that

5   agency we have multiple bureaus.  There's uniform patrol.

6   There's the Education Outreach Bureau, and then there's the

7   Criminal Investigations Bureau.  Within the Criminal

8   Investigations Bureau there's approximately 12 to 14 sworn

9   officers in that capacity.

10   **Q.**   And is that the bureau you work in?

11   **A.**   That is correct.

12   **Q.**   And can you just -- what percentage of your day-to-day

13   work is doing computer forensics?

14   **A.**   It's a very small amount, actually.  I do carry a full

15   caseload, and in all investigations we know now that a lot of

16   the cases that we investigate do include cell phones or

17   computers of sorts, but it is not something I do daily.  It is

18   something that I do on a case-by-case basis.

19   **Q.**   You mentioned your caseload.  What's your caseload like?

20   **A.**   I do carry quite a few cases.  At any moment I might have

21   a handful of cyber tips open under my caseload.  I might have

22   three or four forensic interviews that are scheduled for three

23   different cases of child abuse or neglect or some other crime

24   against a child.  And then I do carry personal crimes, and

25   there could be a property crime mixed in because if we are on

09:54

09:54

09:54

09:55

09:55

1    call, we'll -- we'll catch whatever we -- we'll have to keep

2    whatever we catch if we're on call for that week, so --

3    **Q.**   As part of your duties, do you work cyber tips?

4    **A.**   Yes.

5    **Q.**   Can you explain to the Court what a cyber tip is?

6    **A.**   Sure.  It is a child exploitation case that's referred to

7    our agency from the National Center of Missing and Exploited

8    Children.

9    **Q.**   And generally what is contained in these cyber tips?

10   **A.**   Usually it's a expected image or video that was uploaded

11   or contained in an electronic service provider on the internet

12   or in a cloud-based storage or something of that -- of that

13   extent.

14   **Q.**   Okay.  And speak up for the court reporter too so she can

15   hear you.

16        So in these -- do these cyber tips sometimes involve

17   child sexual abuse materials.

18   **A.**   Yes.

19   **Q.**   Now, how many of these cyber tips generally do you wind up

20   getting?  Is it -- is it a rare thing to get a cyber tip, or is

21   it a common thing?

22   **A.**   Cyber tips are fairly common, and they've had -- they have

23   been increasing exponentially each year.  And depending on how

24   many investigators we have working those tips or available to

25   work those tips, sometimes I might be the only one receiving

257

1    them at any point in time.

2    Q.   Could you estimate about how many of these things you get,

3    cyber tips?

4    A.   On average I think on my caseload I'll have anywhere

09:57    5    between four to seven cyber tips assigned to me.

6    Q.   Are cyber tips typically or almost always like solved?  Do

7    you always figure out, get to the end of it and are able to

8    solve a cyber tip?

9    A.   No.

09:57   10    Q.   About -- is it infrequent or frequent?  I mean, about how

11    many of these things do you wind up getting to the end of the

12    cyber tip and discovering what happens?

13    A.   A lot of times the cyber tips are cleared by means of not

14    enough information.  They might be self-protection, so we clear

09:57   15    them that way, or they're unfounded, or there's not enough for

16    prosecution.  So all of them are eventually cleared, but we

17    don't ever -- a lot of times they're not resolved by

18    prosecution.

19    Q.   And would you say -- of the ones that are not resolved by

09:58   20    prosecution -- would you say there's fewer than half that are

21    resolved by prosecutions?

22    A.   Yes.

23    Q.   Okay.  About a quarter, or would you say a quarter?

24    A.   I would say that's a fair percentage.

09:58   25    Q.   So is it odd -- would it then be odd not to sort of

1  resolve one of these by prosecution?

2  **A.**   It wouldn't.

3  **Q.**   It would?

4  **A.**   It wouldn't.

09:58   5  **Q.**   Sorry.  That was a bad question.  That was my fault.

6  Would it be odd for one of these things to not be prosecuted?

7  **A.**   It would not be.

8  **Q.**   Okay.  And if one of these cyber tips that you get are

9  sort of not resolved successfully, is there any adverse

09:58   10  consequences for your employment?  Does somebody come in and

11  sort of, you know, argue with you or yell at you for not

12  closing one?

13  **A.**   No.

14  **Q.**   Okay.  All right.  So I'm going to direct your attention

09:58   15  to this case or the reason you're here.  Did you -- did you

16  work on a cyber tip in this case?

17  **A.**   I did.

18  **Q.**   And can we have Exhibit 77?  And do you have the exhibits

19  up there?

09:59   20  **A.**   Yes.

21  **Q.**   Okay.  Do you see Exhibit 77?

22  **A.**   I do.

23  **Q.**   Is this the cyber tip?  Can you tell from the cover sheet,

24  is the cyber tip you received?

09:59   25  **A.**   Yes.

1  Q.   Okay.  In this case.  Now, to -- to whom was this cyber

2  tip assigned?

3  A.   It was assigned to me.

4  Q.   Who assigned it to you?

09:59  5  A.   My sergeant, Detective Mike Jennings.

6  Q.   And when did this cyber tip initially come in?

7  A.   It was referred to Grand Forks Police Department in

8  January of 2019.

9          MR. SCHMITZ:  All right.  And can we just do the next

09:59  10  page?  And 3788, can you blow up the bottom -- after the gray

11  line on the bottom, please?

12  Q.   (MR. SCHMITZ CONTINUING)  What did -- to what did this

13  cyber tip refer?  What was this cyber tip about?

14  A.   Google reported to the National Center of Missing and

10:00  15  Exploited Children, NCMEC, an image upload to a Google Photos

16  account on November of 2018.

17  Q.   Did you review that image?

18  A.   I did.

19  Q.   What was in that image?

10:00  20  A.   From my recollection it was a image of an approximately

21  eight-to-ten-year-old girl holding a adult male penis to her

22  mouth.

23  Q.   In your training and experience, was it child sexual

24  exploitation material?

10:01  25  A.   It was.

1    Q.    What is here, Detective Freeman, in this report?

2    A.    This is the suspect information reported to NCMEC from

3    Google.

4    Q.    And what is -- what are those numbers?

10:01    5    A.    The identifier they provided appeared to be a phone

6    number.

7    Q.    And, Detective Freeman, what -- what's depicted here?

8    A.    The report came in from Google stating that the image was

9    stored in Google Photos.

10:01    10    Q.    Do you know how Google came across this photo in the

11    Google Photos structure?

12    A.    I do not.

13    Q.    Were you involved in that?

14    A.    I was not.

10:02    15    Q.    How many images were involved here?

16    A.    One file was reported.

17    Q.    And what's depicted in this section, Detective Freeman?

18    A.    This is a file name of that image and that they're

19    explaining the contents of that file, that they didn't view it,

10:02    20    and that they categorized the image.

21    Q.    So that image is just a string of characters, right?

22    A.    That is correct.

23    Q.    All right.  Can you tell from the string of characters

24    what is in that image?

10:02    25    A.    No, I cannot.

1    Q.   Okay.  Now, Detective Freeman, can you explain what this

2    section of a cyber tip is to the Court?

3    A.   This is the categorization of the photo that was reported.

4    Q.   What is it?  What -- if you had to explain why this is in

10:03   5    the cyber tip, why is this in the cyber tip?

6    A.   That it explains that it was a prepubescent minor and that

7    the categorization explains that it was child sexual abuse

8    material.

9    Q.   Okay.  And what did you do with this cyber tip, Detective

10:04   10   Freeman?

11   A.   The information from the suspect that uploaded or had the

12   upload in their Google Photos was a phone number, so just an

13   open -- I just did an open search of that phone number and

14   discovered it came back to a business name.

10:04   15   Q.   What business name did it come back to?

16   A.   Team Lawn.

17   Q.   Were you able to I.D. the owners of the Team Lawn?

18   A.   I was.

19   Q.   Who were they?

10:04   20   A.   The owners listed were Robert Coons and Nicholas Derosier.

21   Q.   At that point in your investigation did you know who the

22   cyber tip referred to --

23   A.   I did not.

24   Q.   -- whether it was one or the other?

10:04   25   A.   I did not.

1    Q.   So what did you try to do next in your investigation to

2    sort of resolve who it was, whose child sexual abuse material

3    this was?

4    A.   I reached out to Special Agent Michael Arel with Homeland

10:05    5    Security Investigations.

6    Q.   How did you reach out to him?

7    A.   Through e-mail.

8    Q.   And do you see Exhibit 83?

9    A.   Yes.

10:05    10   Q.   What is this?

11   A.   This is an e-mail that I had, an e-mail conversation with

12   Special Agent Mike Arel.

13   Q.   Why -- why did you contact Special Agent Arel?

14   A.   I was -- I asked for his assistance in a subpoena to

10:05    15   Google or Midcontinent.  First it was Midcontinent

16   Communications to determine if this number returned to a

17   landline or if there was some other explanation.

18   Q.   Why would that have -- why would that have been

19   significant to your investigation?

10:05    20   A.   To determine who the subscriber was for that phone number.

21            THE COURT:  Whenever it is convenient, we could take

22   a break.

23            MR. SCHMITZ:  Now is great, Your Honor.

24            THE COURT:  All right.  Let's reconvene at 10:20.

10:06    25            (A recess was taken from 10:06 a.m. to 10:20 a.m.,

263

1   the same day.)

2          THE COURT:  Please continue, Mr. Schmitz.

3          MR. SCHMITZ:  Thank you.

4   Q.   (MR. SCHMITZ CONTINUING)  All right.  Detective Freeman,

5   we left off talking about Exhibit -- what's already been

6   admitted as Exhibit 83, and I think you may have exhibits up

7   there now, but you can look on the screen here.  Detective

8   Freeman, I'm going to try to make Exhibit 83 a little bigger

9   here, which didn't work, but can you just describe for the

10  Court what was going on in this e-mail chain?

11  A.   Sure.  This was an e-mail I received from Special Agent

12  Arel regarding the Midcontinent phone number.  It appeared that

13  it was ported to a Verizon cell phone number -- or a cell

14  phone.  And then he explains that potentially it could be

15  somebody that is running or works for the business, and that's

16  why it returned to Team Lawn.

17  Q.   Okay.  And I'm going to show what's been admitted as

18  Exhibit 85.  There was an issue about a Sandra Simms -- or a

19  Simons address.  Can you just describe what that was for the

20  Court?

21  A.   The phone number returned through subpoena to Sandra

22  Simons out of Champlin, Minnesota.  We believed it could

23  possibly be a relative of somebody working for Team Lawn, and I

24  believe Special Agent Arel had identified Nicholas as that

25  relative.

264

1    **Q.**   And on the bottom here, your e-mail of February 26, do you

2    see that at the bottom?

3    **A.**   Yes.

4    **Q.**   That last paragraph, can you read that?

10:22    5    **A.**   Sure.  "Robert Coons lived at XXXXXXXXXXXXXXXXXXXXXX,

6    where the business was located out of.  Robert was the man who

7    was killed in the accident.  Nicholas lived in East Grand Forks

8    and was the reporting party on the fatal accident and also the

9    burglary into Robert's home.  It is all super weird."

10:22    10    **Q.**   All right.  Now let's go to what's been admitted as

11    Government 86.  Do you see what's on the screen there?

12    **A.**   I do.

13    **Q.**   Did you ever receive this e-mail?

14    **A.**   I did not.

10:23    15    **Q.**   Do you have any idea why you never received this e-mail?

16    **A.**   At the time the e-mail program that we used was Lotus

17    Notes, and it -- from my understanding, if a certain domain or

18    an attachment to an e-mail was quarantined from our virus

19    protection on those systems, we -- there was quite a few

10:23    20    e-mails that I did not receive at the time that we used Lotus

21    Notes for our mail service.

22    **Q.**   So there's -- do you see what I highlighted on the screen?

23    **A.**   Yes.

24    **Q.**   What is that?

10:23    25    **A.**   That is an attachment to the e-mail.

1  **Q.**   And is that what the Lotus -- is that what the problem was

2  with the Lotus Notes, when you got an e-mail with an

3  attachment, it wouldn't go through?

4  **A.**   That is my understanding.

10:23    5  **Q.**   Okay.  So this -- does this e-mail have an attachment?

6  **A.**   Yes.

7         MR. SCHMITZ:  Okay.  And now I'm going to show you

8  Exhibit 88, what's been already admitted, Your Honor.

9  **Q.**   (MR. SCHMITZ CONTINUING)  Do you -- do you see this e-mail

10:24   10  on your screen?

11  **A.**   Yes.

12  **Q.**   And, well, hold on.  Let me -- let me take a step back

13  before this e-mail and show you what's been admitted as

14  e-mail -- Exhibit 87 first.  Do you recognize this e-mail?

10:24   15  **A.**   I do.

16  **Q.**   When you sent this e-mail, had you received the previous

17  e-mail sending you the Google data?

18  **A.**   I had not.

19  **Q.**   So are you following up here?

10:25   20  **A.**   Yes.

21  **Q.**   And do you remember sending this e-mail?

22  **A.**   I do.

23  **Q.**   Now, at the time do you remember getting a response to

24  this e-mail?

10:25   25  **A.**   I did not.

1    Q.   You didn't remember, or you didn't get a response?

2    A.   I did not get a response.

3    Q.   Did you ever get this response?

4    A.   I did not.

10:25   5    Q.   And again, I'm highlighting something at the top.  What is

6    that?

7    A.   That is the attachment from the previous e-mail that

8    Special Agent Arel had sent.

9    Q.   Is your understanding -- well, why is it that you don't

10:25   10   think you ever received this e-mail?

11   A.   My understanding is that the e-mails containing

12   attachments coming from domains outside of grandforksgov.com

13   were quarantined due to our virus protection.

14   Q.   So at this point did you believe that you were going to

10:26   15   get a response or that you -- or it was possible to get a

16   response from Google for that subpoena?

17   A.   I believed we would get a response from Google, but I knew

18   that it took time to receive responses.

19   Q.   And had you contacted Agent -- Special Agent Arel multiple

10:26   20   times?

21   A.   Through e-mail I had.

22   Q.   Yeah, and had you received anything from Special Agent

23   Arel?

24   A.   I had not.

10:26   25   Q.   So at that point do you close the file or -- when I say

267

1  "close the file," close the cyber tip out?

2  **A.**   I filed the case inactive.

3  **Q.**   Okay.  Just describe for the Court what a case inactive

4  is.

10:26   5  **A.**   We have different case closures.  Filed inactive doesn't

6  close the case necessarily.  It keeps it inactive.  Therefore,

7  if further information comes forth, we can reopen and

8  reinvestigate.

9         MR. SCHMITZ:  Your Honor, may I approach?

10:27   10         THE COURT:  You may.

11         MR. SCHMITZ:  May I do so freely?

12  **Q.**   (MR. SCHMITZ CONTINUING)  All right.  I'm handing you

13  what's been marked for the record as Government's Exhibit 89.

14  Do you recognize that?

10:27   15  **A.**   I do.

16  **Q.**   What is it?

17  **A.**   This is my case report from the cyber tip.

18  **Q.**   Is it a fair and accurate copy of your case report?

19  **A.**   It is.

10:27   20         MR. SCHMITZ:  Your Honor, we move for admission of

21  Government's 89.

22         THE COURT:  Mr. Bellmore?

23         MR. BELLMORE:  No objection.

24         THE COURT:  Exhibit 89 is received.

10:28   25         MR. SCHMITZ:  May we publish, Your Honor?

1          THE COURT:  You may.

2    Q.   (MR. SCHMITZ CONTINUING)  Showing you the fifth page of

3    your report, can you just describe at the end here these

4    entries in your report?

10:28   5    A.   Sure.  On July 16th of 2019, I admitted a supplement to my

6    case report.  The subject line is Case Inactivated.  And then

7    in the narrative portion I wrote, "At this time Special Agent

8    Arel has not heard back from Google.  This case will be filed

9    inactive due to the lack of information."  And then I

10:28   10   continued, "This can -- case can be reopened in the event more

11   information is discovered."

12   Q.   So at this point you don't want -- you didn't use the word

13   "closed" to describe it.  You used "inactive."  What does that

14   mean?

10:29   15   A.   This is common.  Our agency has a standard operating

16   procedure to never close cases.  They're just filed inactive.

17   That way if an individual requests a copy of the report, it

18   doesn't show that the case was closed and that they feel that

19   it's an absolute, that it will never be reopened if further

10:29   20   information comes forth.

21   Q.   Okay.  So, yeah, and closed, inactive seems somewhat like

22   semantics, but at that point what, if anything, do you do on a

23   cyber tip that's inactive as it -- for -- in terms of

24   investigative steps?  Are you -- are you doing anything

10:29   25   actively there?

269

1   A.   No.

2   Q.   Now, at some time -- and when -- when was this -- I should

3   say when was this cyber tip declared inactive by you?

4   A.   On July 16, 2019.

10:30   5   Q.   After that did a complaint come in from the Eagan Police

6   Department relating to Nicholas Morgan-Derosier?

7   A.   Yes.

8   Q.   And what did the -- what was -- when did the complaint

9   come in?

10:30   10   A.   I received a phone call initially from a Detective Darrin

11   Schultz from the Eagan Police Department regarding a

12   conversation that was involving sex acts with children that

13   their suspect, Justin Langen, had with Nicholas Derosier.

14   Q.   Can you just describe what the complaint was in substance

10:30   15   to the Judge?

16   A.   The complaint was that the two were having a conversation

17   about having sexual contact with children, and in the

18   conversation they -- it was suspected that they exchanged

19   images of child pornography.  But from the forensics completed

10:31   20   on Justin Langen's phone, they were not able to recover the

21   actual images.

22        So the complaint was that they were having a

23   conversation about this, and then at some point in the

24   conversation Nicholas Derosier had shared an image of what he

10:31   25   described as XXXXXXXXXX, who at the time was five years old,

1   and in -- the conversation alluded to the effect that he would

2   like to perform or had performed sex acts on him.

3   **Q.**   On XXXXXXXXXX?

4   **A.**   On XXXXXXXXXX.

10:31   5   **Q.**   All right.  And what did you do at that point, if

6   anything, to investigate?

7   **A.**   I requested a copy of their report and that chat and any

8   forensics they were willing to provide on that investigation.

9   **Q.**   Were you also able to obtain a forensic interview of the

10:32   10   children, the XXXXXXX?

11   **A.**   Yes.  Eagan Police Department scheduled forensic

12   interviews of those children in the jurisdiction that they

13   lived, so I was just waiting on word from the outcome of that.

14   **Q.**   What was the outcome of those interviews?

10:32   15   **A.**   There were no disclosures made by the children.

16   **Q.**   And when you say "no disclosures," does that mean they --

17   they denied any inappropriate contact happened between Mr.

18   Morgan-Derosier and the XXXXXXX --

19   **A.**   That --

10:32   20   **Q.**   XXXXXXXXXXX denied anything happened, is that -- I talked

21   over you.  I apologize to the court reporter.  Yeah, what was

22   the answer to that question?

23   **A.**   They did deny that there was no sexual contact with

24   Nicholas Derosier.

10:32   25   **Q.**   All right.  So at that point --

271

1          THE COURT:  Let's clarify that one.

2          MR. SCHMITZ:  Okay.  Yes, Your Honor.

3          THE COURT:  Could you read it back, please?

4          (The following answer was read back by the court

10:32   5   reporter:  They did deny that there was no sexual contact with

6   Nicholas Derosier.)

7   **Q.**   (MR. SCHMITZ CONTINUING)  So XXXXXXXXXXX denied any sexual

8   contact between them and Mr. Derosier, correct?

9   **A.**   That is correct.

10:33   10  **Q.**   Okay.  So at that point did you observe from this Eagan

11  police complaint anything illegal that had happened that you --

12  for which you could apply for a search warrant?

13  **A.**   However gross the conversation was, I still did not have

14  enough probable cause to apply for a search warrant for devices

10:33   15  or residence at that time.

16  **Q.**   Did you also in this -- in the course of investigating

17  this Eagan Police Department seek to obtain information about

18  Mr. Derosier's address?

19  **A.**   I did.

10:34   20         MR. SCHMITZ:  Your Honor, may I approach?

21         THE COURT:  You may.

22  **Q.**   (MR. SCHMITZ CONTINUING)  All right.  I'm showing you

23  what's been marked for the -- or what's been admitted as

24  Defendant's Exhibit 18.  Do you recognize that?

10:34   25  **A.**   I do.

1   **Q.**   What is that document?

2   **A.**   This is the United States Postal Service address

3   verification form that we use.

4   **Q.**   Did you seek to obtain that?

10:34   5   **A.**   I did.

6   **Q.**   Why did you seek to obtain that?

7   **A.**   I requested the address and who was receiving mail at that

8   address in order to determine if Nicholas Derosier still lived

9   there and if there were any potential follow-up I could do with

10:34   10   that individual regarding the Eagan Police Department report,

11   and at the very least, potentially an interview.

12            MR. SCHMITZ:   Thank you.   Your Honor, may I approach

13   again?

14            THE COURT:   Yes.

10:35   15   **Q.**   (MR. SCHMITZ CONTINUING)   So what ultimately happens with

16   this Eagan Police Department complaint after all of this?

17   **A.**   I added it to my original police report, but it remained

18   inactive.

19   **Q.**   I'm showing you what's been marked for identification as

10:35   20   Government's Exhibit 90.   Do you recognize that, Detective

21   Freeman?

22   **A.**   I do.

23   **Q.**   What is it?

24   **A.**   This is a timeline of events that occurred in this case.

10:36   25   **Q.**   And do they -- does it reflect events relating to the

1    cyber tip, to the Eagan Police Department complaint, and

2    certain dates with respect to the fraud investigation?

3    A.   Yes.

4    Q.   Is it helpful in seeing the dates of the various events

10:36    5    that happened during the course of those three separate

6    investigations?

7    A.   It does.

8    Q.   Would it help and assist your testimony here today?

9    A.   It would.

10:36    10          MR. SCHMITZ:  Your Honor, we move for the admission

11    of Government's Exhibit 90 for demonstrative purposes.

12          THE COURT:  Mr. Bellmore?

13          MR. BELLMORE:  No objection for the limited purpose

14    of demonstrative purposes, Your Honor.

10:36    15          THE COURT:  Exhibit 90 is received for demonstrative

16    purposes.

17    Q.   (MR. SCHMITZ CONTINUING)  Now, Detective Freeman, I want

18    to direct your attention to the fraud investigation that

19    happened in this case as well.  Did there come a time where you

10:36    20    became aware that Mr. Morgan-Derosier was being investigated

21    for various state fraud -- fraud-related charges, I'll call

22    them?

23    A.   Yes.

24    Q.   When was that?

10:37    25    A.   I was made aware of the fraud investigation by Detective

1    Buzzo shortly before I assisted in the search warrant.  At some

2    point he had came to me and asked me for -- if I had -- or was

3    aware of Nicholas Derosier because of a case that I had worked

4    and he had done --

10:37    5    **Q.**   Do you remember what date that was or how -- a month,

6    year?

7    **A.**   It was -- yeah, it was August of 2020.

8    **Q.**   Okay.  And in August of 2020, was your cyber tip

9    investigation already inactive?

10:37    10    **A.**   It was.

11    **Q.**   For how long had it been inactive, about?

12    **A.**   Over a year.

13    **Q.**   And what was the conversation between you and Detective

14    Buzzo about this fraud investigation?  What did he say?  What

10:38    15    did you say?

16    **A.**   There was very little conversation.  Detective Buzzo asked

17    if I had an address for Nicholas Derosier, and I said I did,

18    actually.  I had just completed a United States Postal Service

19    address verification.

10:38    20    **Q.**   Okay.  And did you provide Detective Buzzo with that

21    postal service verification?

22    **A.**   I did.

23    **Q.**   Did you mention the cyber tip to Detective Buzzo at that

24    point?

10:38    25    **A.**   I don't believe I did.

1   Q.   And at some point did Detective Buzzo ask if you could
2   participate in the investigation as the computer forensic tech?
3   A.   He did.
4   Q.   Are you the only game in town in Grand Forks for that
10:38   5   business?
6   A.   I am.
7   Q.   All right.  Now, as part of that investigation, did
8   Detective Buzzo seek a search warrant?
9   A.   He did.
10:39   10   Q.   Were you asked to participate in that search warrant?
11   A.   I was.
12   Q.   When were you notified of that search warrant?
13   A.   The day before.
14   Q.   And when you say "the day before," the day before what?
10:39   15   A.   The search warrant was initiated.
16   Q.   Okay.  So the day before the search warrant gets executed
17   at the house, you're notified of it.
18   A.   That's correct.
19   Q.   Okay.  Now, was that September 15, 2020?
10:39   20   A.   That's correct.
21   Q.   And so that would mean -- were you notified September 14,
22   2020?
23   A.   Correct.
24   Q.   Okay.  Now, how are -- just explain to the Court how
10:39   25   search warrants are staffed, organized and executed at the

1  Grand Forks Police Department.

2  **A.**   Within the Criminal Investigations Bureau, search warrants

3  usually elicit the help of everybody available on that day, so

4  all detectives, all hands on deck usually assist in the

5  execution of a search warrant.  Usually it helps with

6  processing evidence.  It makes it go by a little bit faster,

7  and then also for safety.

8  **Q.**   Were you briefed before the execution of the search

9  warrant?

10  **A.**   Yes.

11  **Q.**   And can you just describe what the briefings -- what was

12  discussed in that briefing?

13  **A.**   In the briefing Detective Buzzo goes over the search

14  warrant, the items that we're authorized to search for, who

15  lives in the residence, a little bit about the location,

16  depending on if schools are close by, and then if we would have

17  Altru standing by or the hospital, the closest hospital.  We go

18  over logistics, the radio channel we'll be on.  And then he

19  usually provides an ops, an operations plan to each detective.

20  That includes a copy of the search warrant.

21  **Q.**   And does the -- does -- the number of residents in the

22  house, is that important to officer safety?

23  **A.**   It is.

24  **Q.**   Why?

25  **A.**   Then we can have a better understanding of how many

10:40
10:40
10:40
10:40
10:41

1    officers we may need in the event there's multiple people in

2    the house to make sure that we're able to secure and clear the

3    house before we go in to search.

4    **Q.**   And how many residents were in this house?

10:41    5    **A.**   There were three residents at the house --

6    **Q.**   Okay.

7    **A.**   -- at the time of the search warrant.

8    **Q.**   All right.  And are -- are you sure there were three?

9    **A.**   There -- from my memory, I think there were three when we

10:41    10    initiated the search warrant.

11    **Q.**   Now, was the cyber tip mentioned at the briefing?

12    **A.**   It was.

13    **Q.**   How was it mentioned?  Were -- did you mention it?

14    **A.**   I did not.

10:41    15    **Q.**   Was -- were there any reminders about what evidence you

16    were looking for given at the briefing, like what types of

17    evidence you could seize at the briefing?

18    **A.**   Yes.

19    **Q.**   What -- just describe for the Court what that briefing was

10:41    20    like.

21    **A.**   We were allowed to search for items that were evidence of

22    the crimes that were listed on the search warrant, were

23    construction fraud, items that were evidence of operating

24    without a contractor license, and then violation of a judicial

10:42    25    order.  And that included items that could store media,

1  computers, electronics that could store media, cell phones,

2  papers, documents identifying the businesses that were

3  conducting construction fraud.

4  **Q.**   Did they specifically brief you on what to do if you found

5  evidence of other crimes while you were searching for that

6  crime?

7  **A.**   They did.

8  **Q.**   What was that?  What was that briefing?

9  **A.**   Just before we finished, Detective Mike Jennings had

10  stated that if we were to locate any other items of evidence

11  such as something that would -- like for the cyber tip, if

12  something were to come up with images, that you were not

13  allowed to -- illegal images, we would immediately have to stop

14  and reapply for another search warrant.

15  **Q.**   So did you execute the warrant then or help execute the

16  warrant on September 15th?

17  **A.**   I did.

18  **Q.**   Can you just describe for the Court what happened that day

19  with the execution of the search warrant?

20  **A.**   Sure.  On that day we -- officers approached.  We knocked

21  and announced our presence.  We were met by -- I believe it was

22  three individuals that were in the home.  We secured those

23  individuals, cleared the scene.  And then officers were able to

24  take overall photographs of the home and then conduct our

25  search.

279

1  Q.   Okay.  And what happened during the search?  What was your

2  job during the search?  I'll put it that way.

3  A.   I was the evidence log, so I -- any time somebody would

4  find an item to collect, I was the person that after it was

10:43  5  photographed and documented where it was found, they would

6  bring the item to me, and I would create an evidence log or a

7  receipt to leave with the homeowner.

8  Q.   Okay.  So I'm showing you what's been admitted as

9  Government's Exhibit 76.  Do you recognize that?

10:44  10  A.   Yes.

11  Q.   What is that?

12  A.   This is the Evidence Inventory and Receipt that I

13  completed on that date.

14  Q.   Okay.  And we're going to get to that in a minute.  Were

10:44  15  there residents in the home that were cleared that -- when it

16  was cleared?

17  A.   Yes.

18  Q.   And did you set up an area to sort of package this

19  evidence?

10:44  20  A.   I did.

21  Q.   And to your knowledge, were the residents of the home

22  interviewed?

23  A.   They were not formally interviewed.

24  Q.   And when you say "the residents," you're talking about --

10:44  25  let's -- let's be specific.  So there was Mr. Derosier, and

1  then there were other residents in the home, so were the other

2  residents of the home formally interviewed?

3  **A.**   No.  At the time of the execution of the search warrant,

4  the residents that were there did not include Nicholas

5  Derosier.  From my understanding, Nicholas Derosier did end up

6  coming to the residence, but it was after we initiated --

7  **Q.**   And when he came to the residence, was he interviewed at

8  that point?

9  **A.**   Yes.

10  **Q.**   Now, you mentioned the other residents were informally

11  talked to, though, correct?

12  **A.**   The other roommates that were in the home were not

13  formally interviewed.

14  **Q.**   Yeah.  Sorry.  I asked that the wrong way.  They were

15  informally -- officers talked to them.

16  **A.**   Yes, we had conversations with them.

17  **Q.**   All right.  What information was provided, to your

18  knowledge, or relayed to you about what the other residents

19  were saying about items of evidence in the house?

20  **A.**   One of the roommates in the home had made a statement to

21  an officer that there was a thumb drive that had contained

22  images of boys.

23  **Q.**   Did you know -- did he say where that thumb drive was?

24  **A.**   Yes.

25  **Q.**   Where did he say that thumb drive was?

281

1   A.   In a safe that belonged to Nicholas.

2   Q.   Now, when you says "images of boys," was he more specific

3   than that?

4   A.   Not that I -- I don't believe so.

10:46   5   Q.   So did you know -- well, did you -- did you have any

6   confidence at that point that images of boys meant child sexual

7   exploitation material?

8   A.   There was a chance.

9   Q.   Okay.  But you -- did you know for sure?

10:46   10   A.   I did not.

11   Q.   Okay.  Now, was there any discussion by the residents

12   about relationships that Mr. Derosier had with XXXXXXXXXX?

13   A.   Yes.

14   Q.   What were those conversations?

10:46   15   A.   One of the roommates had made a statement to officers that

16   he -- I believe he said he raped XXXXXXXXXX.

17   Q.   Okay.  So were a number of digital media taken from the

18   residence that day?

19   A.   Yes.

10:46   20   Q.   Is this the inventory list?

21   A.   That is the first page.

22   Q.   Okay.  First page of the inventory list, so this includes

23   some of the -- some of the items.

24   A.   Yes.

10:47   25   Q.   Now, were you doing onsite forensics at this search

1    warrant?

2    **A.**    No.

3    **Q.**    Can you just describe for the Judge what onsite forensics

4    are?

10:47    5    **A.**    Sure.  We can on scene have a forensics preview of the

6    devices there, so we're able to preview contents related to the

7    search warrant if we wanted to onsite.

8    **Q.**    If this had been a search warrant for child sexual

9    exploitation material, would you have been doing onsite

10:47    10   forensics?

11   **A.**    Yes.

12   **Q.**    Hundred percent.

13   **A.**    Yes.

14   **Q.**    Why?

10:47    15   **A.**    That way we can include the contents that we find in an

16   interview when we're talking to the suspect and ask him about

17   what we're finding on those devices.

18   **Q.**    So if you're interviewing a suspect, you can ask him

19   specific questions about specific child pornography or child

10:48    20   sexual exploitation files on his devices?

21   **A.**    That is correct.

22   **Q.**    Now, is it also for purposes -- for -- is onsite forensics

23   also for the purpose of discovering and rescuing live victims?

24   **A.**    That is correct.

10:48    25   **Q.**    Is it also for the purpose of potentially, if necessary,

1   affecting an arrest onsite?

2   **A.**   That is correct.

3   **Q.**   And again, were you doing onsite forensics during this

4   search warrant?

10:48   5   **A.**   No.

6   **Q.**   Okay.  Now let's talk about the items that were seized at

7   least in Item 76.  Can you just talk -- tell the Court on this

8   exhibit what digital devices were seized during the course of

9   this search warrant?

10:48   10   **A.**   Sure.  The items listed here, Item 1 is a Dell Inspiron.

11   That was a desktop computer.  Item 2 is a Samsung Galaxy.  That

12   is a cell phone.  Three is an external thumb drive.  Four is an

13   Apple MacBook.  Five is another Android cell phone.  Six is an

14   Alcatel cell phone.  Seven is an HP laptop.  Eight is a

10:49   15   2-gigabyte Lexar thumb drive.  Nine is a Samsung TracFone, as

16   well as 10.  Eleven is an HTC phone.  Twelve is a Seagate

17   2-terabyte external hard drive.  Thirteen is a marker board,

18   and 14 was a Samsung hard drive disk.

19   **Q.**   Okay.  And I'm going -- I'm going to direct your attention

10:49   20   specifically to the Lexar device.  I'm showing you what's been

21   admitted as Government's 57.  Do you see that?

22   **A.**   Yes.

23   **Q.**   Do you -- what is that?

24   **A.**   That is the Lexar 2-gigabyte thumb drive.

10:50   25   **Q.**   Do you know whose hand that is?

1   **A.**   I believe I -- that was Special Agent Dan Casetta.

2   **Q.**   And I'm showing you what's been admitted as Government's

3   56.  Do you recognize that?

4   **A.**   Yes.

10:50   5   **Q.**   What is that?

6   **A.**   That is the safe.

7   **Q.**   And where was the Lexar thumb drive recovered?

8   **A.**   From the safe.

9   **Q.**   And was it recovered close to documents that were labeled

10:50   10   "Team Lawn"?

11   **A.**   Yes.

12   **Q.**   Same safe?

13   **A.**   Yep.

14   **Q.**   I'm showing you what's been marked -- or what's been

10:50   15   admitted as Government's 35.  Do you recognize that picture?

16   **A.**   Yes.

17   **Q.**   Can you describe what that picture is for the Court?

18   **A.**   Sure.  This was the main living area of the residence.

19   This photo was taken aimed at a desk that was in that room with

10:51   20   a tower computer, which is the Item Number 1, the Inspiron Dell

21   with the thumb drive still in it and then the monitor in front

22   of it.

23   **Q.**   So if Mr. Morgan-Derosier in his interview, if he said

24   something like "main floor," is this the main floor of the

10:51   25   house?

1  **A.**   Yes.

2  **Q.**   What's depicted in that call -- that blow-up?

3  **A.**   This is the same item, Number 1, the Dell Inspiron tower

4  computer with the thumb drive in it.

10:52  5  **Q.**   Okay.  And when you say "the thumb drive," is that that

6  red object?

7  **A.**   Yes.

8  **Q.**   And I don't want to jump too far ahead, but was child

9  pornography found on that?

10:52  10  **A.**   Yes.

11  **Q.**   Was it found on the -- on the tower?

12  **A.**   Yes.

13  **Q.**   Was it also found on the thumb drive?

14  **A.**   Yes.

10:52  15  **Q.**   Okay.  So do you remember approximately what time you

16  arrived at the house to execute the search warrant that day?

17  **A.**   I initiated the evidence inventory at ten-hundred hours.

18  **Q.**   Okay.  That's 10 o'clock?

19  **A.**   10:00 a.m.

10:52  20  **Q.**   And did you leave -- when did you leave?

21  **A.**   We closed that same inventory at 12:00 p.m. the same day.

22  **Q.**   Were you assigned to do forensics for this case?

23  **A.**   Yes.

24  **Q.**   When did you start doing that?

10:53  25  **A.**   That same afternoon.

1   Q.   So you get home -- you get to the police station in Grand

2   Forks from the search warrant, and you go pretty much right

3   into the forensics, or was there any lag there?

4   A.   We probably broke for lunch, and then I got into the

10:53   5   forensics.

6   Q.   Okay.  We're going to talk about your forensic review in

7   this case, but first I want to talk about the scope of the

8   warrant that you were executing to do the forensic review,

9   okay?  I'm showing you what's been admitted as Government's 13.

10:53   10   Do you recognize this?

11   A.   Yes.

12   Q.   What is it?

13   A.   This was the search warrant that authorized us the search

14   of the residence on September 15th.

10:54   15   Q.   So at the time you start your forensic review, are you

16   executing this search warrant?

17   A.   Yes.

18   Q.   At the time you executed your search warrant in the fraud

19   case, were you looking for child pornography?

10:54   20   A.   No.

21   Q.   Now let's talk about what you were looking for.  Can you

22   read the first paragraph of Exhibit A on this exhibit?

23   A.   "By forensic or other means of examination:  Files

24   containing evidence of the crimes of contractor license

10:54   25   required, construction fraud, and violation of a judicial order

287

1    in any form wherever they may be stored."

2    **Q.**    And can you read this paragraph?

3    **A.**    "Information, correspondence, records, documents or other

4    materials pertaining to the possession, receipt or distribution

5    of visual depictions of projects, job sites, communications,

6    account data, timesheet information, customer information,

7    address and accounts that were transmitted or received using

8    the digital media, including but not limited to electronic

9    mail, chat logs, and electronic messages or any other forms of

10   transmission."

11   **Q.**    All right.  I'm highlighting a couple words here.  Can you

12   just read those words?

13   **A.**    "Visual depictions."

14   **Q.**    Were you looking for visual depictions in your search

15   warrant?

16   **A.**    Yes.

17   **Q.**    As a forensic technician, what types of files include

18   visual depictions?

19   **A.**    Images, videos, receipts in PDF.

20   **Q.**    And what specific types of files, so -- so JPG?

21   **A.**    Yep.

22   **Q.**    What is a JPG file?

23   **A.**    An image.

24   **Q.**    Okay.  What's a -- what's an MP4 file?

25   **A.**    A video.

288

1   **Q.**   And were you looking for those in connection with visual

2   depictions of projects, job sites, those sorts of things?

3   **A.**   Yes.

4   **Q.**   And do PDFs contain visual depictions sometimes?

10:56   5   **A.**   Yes.

6   **Q.**   And can you just read this for the Court, Ms. Freeman?

7   **A.**   "Records evidencing ownership of digital media devices and

8   removable storage, to include evidence of who used or

9   controlled the computer at the time the items described in this

10:56   10   warrant were created, edited or deleted, such logs, registry

11   entries, saved user names and passwords, documents and browsing

12   history, evidence of software that allowed others to control

13   the computer."

14   **Q.**   Okay.  Okay.  I think we get the point, and the Court's

10:57   15   heard this particular paragraph numerous times.  So as a

16   forensic tech, what is the significance of records evidencing

17   ownership of digital media devices?  What is that?

18   **A.**   It shows who had control of that device.

19   **Q.**   So as a forensic technician, if you wanted to prove that

10:57   20   this was my cell phone, what types of things would you be

21   looking for?

22   **A.**   I would look at the user names, the e-mails, pictures,

23   videos.

24   **Q.**   How -- let's talk about pictures and videos.  How would

10:57   25   pictures in my phone and videos in my phone prove that this

1  phone was mine?

2  **A.**   If you had pictures of yourself or your family, that would

3  prove that you had control of that device.

4  **Q.**   And when somebody is engaged in fraudulent business

10:57   5  practices, is it important to show that that individual is the

6  one who was conducting those fraudulent activities?

7  **A.**   Yes.

8  **Q.**   Why is that important?

9  **A.**   It shows attribution.  It shows that they had control of

10:58   10  that device and that they are the ones doing it.

11  **Q.**   And in your training and experience in law enforcement, do

12  defendants sometimes raise a defense that it wasn't them who

13  did it?

14  **A.**   Yes.

10:59   15       MR. SCHMITZ:  Your Honor, may I have a moment?

16       THE COURT:  Yes.

17       MR. SCHMITZ:  I apologize, Your Honor.  I thought I

18  could do this myself.  Apparently -- all right.

19  **Q.**   (MR. SCHMITZ CONTINUING)  So, Detective Freeman, can you

11:00   20  read paragraph 19 of the affidavit?

21  **A.**   Sure.  "Your affiant advises searching the computer system

22  for the evidence of crimes may require a range of data analysis

23  techniques.  In some cases it is possible for investigators to

24  conduct carefully targeted searches that can locate evidence

11:00   25  without requiring a time-consuming manual search through

1    unrelated materials that may be commingled with criminal

2    evidence."

3    **Q.**   Okay.  And that last part of that sentence?

4    **A.**   "For example, investigators may be able to execute a" --

11:01    5    **Q.**   Okay.  Please continue.

6    **A.**   -- "keyword search that searches through the files stored

7    in a computer for special words that are likely to appear only

8    in the materials covered by a warrant."

9    **Q.**   So can you use keyword searches?

11:01    10    **A.**   Yes.

11    **Q.**   And if you use the keyword search, is that going to give

12    you relevant JPGs?

13    **A.**   No.

14    **Q.**   Why not?

11:01    15    **A.**   A keyword search is only going to search the file name.

16    It would not be able to search the image.

17    **Q.**   So if some of the search that you're supposed to do is

18    searching images, would a keyword search help you?

19    **A.**   Say that again.  Sorry.

11:01    20    **Q.**   So if you're searching for images, is a keyword search

21    going to help you?

22    **A.**   It is not.

23    **Q.**   All right.  So can you just -- when you get back to the

24    police station, what's the first thing you do to start your

11:02    25    forensics on this fraud case?

291

1    **A.**   I started with Item Number 1, the Dell Inspiron tower

2    computer.  I removed the internal hard drive of that device,

3    and I started an image, a copy through my Tableau.

4    **Q.**   Why did you start there?

11:02  5    **A.**   That part of the process is the most time-consuming for

6    the devices that were seized.

7    **Q.**   And when you say "that part of the process," do you mean

8    imaging that large hard drive?

9    **A.**   Yes.

11:03  10   **Q.**   Okay.  And what'd you do next?

11   **A.**   Then I started on the thumb drive.

12   **Q.**   And when you say "the thumb drive," is that the Lexar

13   thumb drive that we -- about which you previously discussed?

14   **A.**   Yes.

11:03  15   **Q.**   And why did -- why would you start your search with the

16   smaller thumb drives then at that point?  When I say "start,"

17   after you hook up the larger device.

18   **A.**   The larger device takes a lot of time to image, so in the

19   meantime I thought I would start on a smaller device to finish

11:03  20   those.  Once that first device was complete, then I would move

21   on to that one.

22   **Q.**   And are you familiar with -- are you familiar with a write

23   -- something called a write blocker?

24   **A.**   Yes.

11:03  25   **Q.**   What is -- can you just describe for the Court what a

292

1   write blocker is?

2   **A.**   It allows -- it's a device that allows the user to have

3   read-only access to another device.

4   **Q.**   And why is it -- is it important to use a write blocker?

11:04   5   **A.**   It is.

6   **Q.**   Why?

7   **A.**   It maintains the integrity of the contents of the

8   originating storage device.

9   **Q.**   And when you say "integrity" -- well, we're going to get

11:04   10   to that in a minute, but is it best forensic practice to use a

11   write blocker?

12   **A.**   Yes.

13   **Q.**   Why didn't you use a write blocker when you were looking

14   at the thumb drive?

11:04   15   **A.**   I made the mistake of not using a write blocker in this

16   case.

17   **Q.**   Okay.  It was just -- was it just a mistake?

18   **A.**   It was.

19   **Q.**   Okay.  Now let's talk about specifically what happened

11:04   20   with the search of this thumb drive then.  I want to talk about

21   exhibit -- actually, it's not admitted yet.  All right.  I'm

22   handing you what's been marked for identification as

23   Government's Exhibit 91.  Do you recognize that?

24   **A.**   I do.

11:05   25   **Q.**   What is it?

293

1   **A.**   This is a portion of an AXIOM report.

2   **Q.**   And again, just real brief, you described before what

3   AXIOM was a little bit.  And, actually, I don't think you got

4   to it.  Can you just describe for the Court what AXIOM is?

11:05   5   **A.**   Yes.  It is a software that law enforcement uses to parse

6   through data that was imaged from a device.

7   **Q.**   And is that report -- have you reviewed that report?

8   **A.**   Yes.

9   **Q.**   Is that a portion of the report?  I know when you print it

11:05   10   out, you sort of lose something in translation.  Is that a --

11   is that a portion of the report?

12   **A.**   Yes.

13   **Q.**   Okay.  And is that a fair and accurate representation of

14   the data that was encompassed -- some of the data that was

11:06   15   encompassed in that report?

16   **A.**   Yes.

17          MR. SCHMITZ:  Your Honor, we move for admission of

18   Government's 91.

19          THE COURT:  Mr. Bellmore?

11:06   20          MR. BELLMORE:  Your Honor, this is 164 pages of a --

21   what's been described as a partial report.

22          MR. SCHMITZ:  Your Honor, if it -- if it please the

23   Court, we can reduce it to two.  We're only going to be using

24   two pages of this report.

11:06   25          THE COURT:  Which two pages might those be?

294

1        MR. SCHMITZ:  The first page and the 17th page.

2        MR. BELLMORE:  I have no objection to Exhibit 91 as

3    amended, to include page 1 and page 17 only.

4        THE COURT:  I'm sorry.  Did you say you have no

5    objection?

6        MR. BELLMORE:  No.  No, with -- with the government's

7    stipulation that it would be pages 1 and 17 only, I have no

8    objection.

9        THE COURT:  Okay.  Then we will receive the two pages

10   of Exhibit 91, those numbered 1 and 17, and we will return the

11   balance to you.

12       MR. SCHMITZ:  Thank you, Your Honor.

13   Q.   (MR. SCHMITZ CONTINUING)  All right.  So I'm publishing

14   page 1 of Government's 91.  So what categories of this report

15   -- well, let me ask you this:  How many columns are there on

16   this report?

17   A.   Five columns.

18   Q.   And what are the columns?  And take me from left to right.

19   A.   File name, created date and time, last accessed date and

20   time, last modified date and time, and source.

21   Q.   So I want to talk about write blockers now.  Well, let me

22   -- let me take a step back.  What is a file name?

23   A.   That is the name of that file.  I guess the name of the

24   file.

25   Q.   Okay.  That's fine.  And does it also include dot and then

1   three letters after it?

2   A.   It does.

3   Q.   Do the three letters indicate the type of file it is?

4   A.   It does.

11:08   5   Q.   Okay.  Now, the created date, I know there's a lot to be

6   said on this, and I'm not going to go too deep into it, but

7   just very briefly, what is a created date?

8   A.   The original date that that file was introduced to the

9   operating system.

11:09   10   Q.   All right.  And the last accessed date?

11   A.   That is the date that the file was last accessed in terms

12   of opened or was on the operating system when a virus scan

13   happens or some other function on the operating system.

14   Q.   And a last modified date?

11:09   15   A.   I am not a hundred percent sure what last modified date

16   means.

17   Q.   Okay.  And then how about source there?

18   A.   That is -- on this category it shows the device that that

19   file was found on.

11:09   20   Q.   All right.  So when you talk about not using a write

21   blocker, in this case were you able to determine what, if

22   anything, was changed about the data of the thumb drive?

23   A.   Yes.

24   Q.   What was changed?

11:10   25   A.   The last accessed date.

1   Q.   Okay.  So let me move to page 17 of Government's 19, I

2   hope.  Okay.  So this middle column here where it says -- and

3   I'm showing you the line -- for the record, the middle column

4   is the last accessed date, and can you just read what the last

11:11   5   accessed date is?

6   A.   9/17 of 2020 at 12:00 a.m.

7   Q.   All right.  So at what point did you seize this thumb

8   drive from Mr. Derosier's house?  What date was that?

9   A.   9/16 of 2020.

11:11   10   Q.   The search warrant's executed 9/15/22?

11   A.   Sorry.  9/15 of 2020.

12   Q.   Okay.  And you put it -- plugged -- you plugged this thumb

13   drive into the machine later that date on 9/15?

14   A.   That is correct.

11:11   15   Q.   And does it stay in your machine?  Does the thumb drive

16   stay plugged into your machine?

17   A.   Yes.

18   Q.   Is that because you found child pornography and stopped

19   your search?

11:11   20   A.   It is.

21   Q.   And then you leave -- you left the thumb drive in your

22   machine, and do you know why the last accessed date would be

23   reflected as 9/17?

24   A.   Due to a function on the operating system, most likely my

11:12   25   virus scan --

1   **Q.**   Okay.

2   **A.**   -- ran at that time.

3   **Q.**   And when you say your virus scan, are there lots of

4   housekeeping programs that run on your hard drive to sort of

11:12   5   maintain your systems?

6   **A.**   Yes.

7   **Q.**   Can those hard drives change the last accessed date?

8   **A.**   Yes.

9   **Q.**   Because those hard drive programs, are they accessing

11:12   10   those files?

11   **A.**   Yes.

12   **Q.**   Okay.  In an involuntary way, but did you access that file

13   on 9/17?  Did you click it open?

14   **A.**   No.

11:12   15   **Q.**   And why didn't -- why would -- why did you not click that

16   file open that day?

17   **A.**   I was applying for a search warrant.

18   **Q.**   Okay.  Did any other data besides that last accessed date

19   change on this thumb drive because you didn't use a write

11:13   20   blocker?

21   **A.**   No.

22   **Q.**   How do you know that?  Well, let me ask it this way:  Did

23   you plant this file on that device?

24   **A.**   No.

11:13   25   **Q.**   How do you know you didn't plant this file on the device?

1   How -- how does the Court know you didn't plant this file on

2   the device?  Do you see -- do you see the created date, file

3   created date?

4   **A.**   Yes.

5   **Q.**   What -- what date was that?

6   **A.**   9/7 of 2020.

7   **Q.**   And what's the significance of a created date again?

8   **A.**   That was the date that that image was introduced to the

9   operating system on that device.

10  **Q.**   Did you have physical possession of that device on

11  September 7th of 2020?

12  **A.**   No.

13  **Q.**   Who had physical possession of it?  Who, if anybody, had

14  physical possession of it?

15  **A.**   Nicholas Derosier.

16  **Q.**   So could you have plant -- could you have planted that

17  file on there even if you wanted to on September 7th?

18  **A.**   No.

19  **Q.**   Okay.  So let's return to your search.  So you plug in the

20  thumb drive on September 15th, and what does the -- what does

21  -- what does it look like on your screen when you plug in the

22  thumb drive and you're looking through it?

23  **A.**   It shows the contents of the first file path of that

24  device.

25  **Q.**   All right.  I'm showing you what's been marked for

1    identification as Government's 79.  Do you recognize that?

2    **A.**   Yep.

3    **Q.**   What is it?

4    **A.**   This is a screenshot of the contents of the first file

5    path of the 2-gigabyte Lexar thumb drive.

6    **Q.**   And is it -- well, I understand you probably don't know --

7    remember exactly what you were looking at on 9/15, but is that

8    the accurate contents of that drive?

9    **A.**   Yes.

10   **Q.**   So do you know whether it was organized in that way, or do

11   you just know that that's the contents of the drive?

12   **A.**   I just know that this is the contents of the drive.

13   **Q.**   Okay.  And does it fairly and accurately depict all of the

14   contents of that drive that you -- well, not -- screenshots of

15   portions of that drive?

16   **A.**   Yes.

17          MR. SCHMITZ:  Okay.  Your Honor, we move for

18   admission of Government's 79.

19          THE COURT:  Mr. Bellmore?

20          MR. BELLMORE:  No objection.

21          THE COURT:  Exhibit 79 is received.

22   **Q.**   (MR. SCHMITZ CONTINUING)  I'm going to publish the first

23   page of Exhibit 79.  Do you recall how large this thumb drive

24   was, how much storage it had?

25   **A.**   I do not.  I know that the capacity was 2 gigabytes.

300

1    Q.   That's what I meant.  The capacity was 2 gigabytes, but do

2    you know -- so you don't know how much of that was filled?

3    A.   I do not.

4    Q.   Okay.  But the capacity is 2 gigabytes?

11:16    5    A.   That is correct.

6    Q.   All right.  So when you opened this file to search it,

7    is -- did you see all these files there?

8    A.   Yes.

9    Q.   Eventually do you see a file there named Mega?

11:17    10   A.   Yes.

11   Q.   Are you familiar with the program Mega?

12   A.   Yes.

13   Q.   All right.  And before we get to Mega, in your training

14   and experience or your experience in law enforcement, is

11:17    15   2-gigabyte -- is a 2-gigabyte thumb drive something that you

16   would consider to be massive?

17   A.   No.

18   Q.   It's fairly small?

19   A.   Yes.

11:17    20   Q.   Is there a reason you would need to run a keyword search

21   over this thumb device -- thumb drive device besides just

22   looking through it, you know, file by file?

23   A.   I don't see a reason to use a keyword search.

24   Q.   If you had a thumb drive with two files on it, would you

11:17    25   need to run a keyword search?

301

1   A.   No.

2   Q.   So going back to Mega, are you familiar with the function

3   of Mega, what it is?

4   A.   Yes.

11:17   5   Q.   What is it?

6   A.   It is a cloud-based storage service that is usually

7   encrypted.

8   Q.   All right.  And can you just describe what "encrypted"

9   means?

11:18   10   A.   It is protected and secured from intruders or, I guess,

11   people being able to access that without proper passwords or

12   tokens.

13   Q.   And what is the cloud?

14   A.   The cloud is a storage area that is usually accessed

11:18   15   through the internet.

16   Q.   So if you have a lot of data, you can store it on a big

17   old hard drive, or you can hire or use a service like Mega

18   that's going to store all this data on a server somewhere else.

19   A.   That is correct.

11:18   20   Q.   Now, is Mega's functionality conducive to trading illegal

21   material?

22   A.   That is not its only functionality, but it is.

23   Q.   Right.  So what -- so what is its functionality?  Can you

24   send documents using the Mega -- can you send doc -- can you

11:19   25   send Mega documents to somebody else?

1   **A.**   Yes.

2   **Q.**   And can you do that by sending them a link?

3   **A.**   Yes.

4   **Q.**   And when the receiver of that link receives the link, can

11:19   5   they click on that link and access your documents?

6   **A.**   That is correct.

7   **Q.**   And can you send links that are secure so that that user,

8   when they click on the link, can't modify your file?

9   **A.**   That is correct.

11:19   10   **Q.**   Now, what types of files can you send over Mega?  Is there

11   any restriction of the types of files you can send?

12   **A.**   Not that I'm aware of.

13   **Q.**   So are you aware that you can send documents over Mega?

14   **A.**   Yes.

11:19   15   **Q.**   And can you send JPGs over Mega?

16   **A.**   Yes.

17   **Q.**   And it's encrypted, so is it -- is it possible to send

18   illegal documents over those platforms?

19   **A.**   Yes.

11:20   20   **Q.**   All right.  And in your training and experience

21   investigating -- specifically I'm talking about child

22   pornography cases.  Have you seen cases where defendants

23   accused of possessing or receiving child sexual abuse materials

24   have used Mega?

11:20   25   **A.**   Yes.

1   Q.   Okay.  Have -- is it also possible to use Mega if you're

2   committing fraud?

3   A.   Yes.

4   Q.   And if you didn't want somebody to see your fraudulent

11:20   5   business documents in a transfer to somebody else, could you

6   use Mega?

7   A.   Yes.

8   Q.   Okay.  Now, do you know, when you saw that Mega folder,

9   what was in there?

11:20   10   A.   No.

11   Q.   But did you suspect there might be child exploitation

12   materials in there?

13   A.   I did.

14   Q.   Why did you suspect that?

11:20   15   A.   From my training and experience working cases.

16   Q.   Had you heard what the roommate had said about the boys?

17   A.   Yes.

18   Q.   And had you heard -- had you seen the previous cyber tip?

19   You were aware of that, right, that involved Mr. Coons and Mr.

11:21   20   Derosier?

21   A.   Yes.

22   Q.   And had you seen the Eagan Police Department complaint

23   about Mr. Derosier -- Mr. Derosier's nephews that XXXXXXXXXXX

24   denied?

11:21   25   A.   Yes.

304

1   **Q.**   And had you seen -- and you knew about this use of Mega.

2   **A.**   I did.

3   **Q.**   Okay.  So did you still have to look in that folder to see

4   what was in it?  Did you know what was in it before you clicked

11:21   5   on it?

6   **A.**   No.

7   **Q.**   And pursuant to the fraud search warrant, which directed

8   you to search for visual depictions of evidence of business

9   fraud, did you have to look in that folder?

11:21   10   **A.**   I did.

11   **Q.**   So I'm going to page 2 of that exhibit, Exhibit 79 for the

12   record.  Do you recognize this, Detective Freeman?

13   **A.**   I do.

14   **Q.**   And what is that?

11:22   15   **A.**   This is the contents of the Mega folder.

16   **Q.**   Now, what types of files are these?

17   **A.**   There are mostly JPG and one MP4.

18   **Q.**   So the JPGs, again, are those images?

19   **A.**   Yes.

11:22   20   **Q.**   And the MP4, is that a video?

21   **A.**   Yes.

22   **Q.**   Now let's talk about that video first.  That file name,

23   what is that file name?

24   **A.**   A bunch of letters and numbers.

11:22   25   **Q.**   All right.  So did you know -- did you have any clue what

1   that file name meant?

2   **A.**   No.

3   **Q.**   Okay.  Now let's talk about the files that you did click

4   on.  Do you remember what the name of the files that you

11:22   5   clicked on first -- that first -- where you first found there

6   was child exploitation material in this folder?

7   **A.**   Yes.

8   **Q.**   What files -- or what file was it?

9   **A.**   Klein 33.

11:23   10  **Q.**   And when you clicked on Klein 33, did you know whether

11  Klein was one of Mr. Derosier's customers?

12  **A.**   No.

13  **Q.**   Did you know who Klein was?

14  **A.**   No.

11:23   15  **Q.**   All right.  And you clicked on Klein.  What did you see?

16  **A.**   It was an image of child sexual abuse material.

17  **Q.**   I apologize, but do you remember what it depicted?

18  **A.**   Yes.

19  **Q.**   Can you describe to the Court what it depicted?

11:23   20  **A.**   It was a boy, prepubescent, approximately seven to

21  nine years old with his mouth -- mouth against an adult male

22  erect penis.

23  **Q.**   What did you do?

24  **A.**   I stopped my search.

11:23   25  **Q.**   Okay.  And who, if anybody, did you contact at that point?

1    A.    I contacted an assistant state's attorney.

2    Q.    What did the assistant state's attorney tell you to do?

3    A.    They said to verify, just open another image to verify,

4    and then apply for a search warrant.

11:24    5    Q.    Is that what you did?

6    A.    Yes.

7    Q.    What did -- which file did you open next?

8    A.    Klein 35.

9    Q.    What happened after -- well, take a step back.  What was

11:24    10    depicted on the screen when you clicked open Klein 35?

11    A.    It was another image of child sexual abuse material of a

12    boy approximately seven to nine years old with -- I believe

13    holding a male erect penis.

14    Q.    Did you continue searching for child pornography at that

11:24    15    point?

16    A.    No.

17    Q.    What'd you do at that point?

18    A.    I stopped, and I applied for a search warrant.

19    Q.    All right.  So the defendant is saying that you were

11:25    20    rummaging through the defendant's digital devices.  How much

21    rummaging happened here before you got the search warrant for

22    child pornography?

23    A.    I was searching the thumb drive for approximate -- just

24    minutes before I came upon child sexual abuse material.

11:25    25    Q.    The same day you executed the search warrant on

1    September 15th, you hook up the big computer drive.  The first

2    thumb drive you come to, how many files -- do you remember

3    about how many files you clicked through before you hit child

4    pornography?

11:25    5    A.   It was just a few files.

6    Q.   Okay.  So a few.  Do you remember exactly, or do you -- I

7    mean, you know, a long time ago.  I understand.

8    A.   I don't remember exactly, just a handful of files.

9    Q.   Do you remember if it was the first file?

11:26   10    A.   It wasn't the first file.

11    Q.   Okay.  So if it's not the first file -- well, okay.  Take

12    a step back.  Had you abandoned your search for fraud documents

13    when you opened this Mega file?

14    A.   No.

11:26   15        MR. BELLMORE:  Your Honor, I'm going to object to

16    that.  That's calling for a legal conclusion.

17        MR. SCHMITZ:  Your Honor, may I respond?

18        THE COURT:  Yes.

19        MR. SCHMITZ:  I believe the defendant has used

11:26   20    "abandoned" in his brief in a non-legal sense.

21        THE COURT:  That's overruled.

22    Q.   (MR. SCHMITZ CONTINUING)  Okay.  So --

23        THE COURT:  Did you respond?

24    Q.   (MR. SCHMITZ CONTINUING)  Do you have an answer?

11:26   25        THE COURT:  Go ahead.

308

1  **Q.**  (MR. SCHMITZ CONTINUING)  All right.  So just describe for

2  the Court what happened when you decided to get the second

3  search warrant.

4  **A.**  I drafted an affidavit and sent that to an assistant

5  state's attorney.

6  **Q.**  Did you ultimately get a second search warrant?

7  **A.**  I did.

8  **Q.**  And did that search warrant authorize you to search Mr.

9  Derosier's devices for child sexual exploitation material?

10  **A.**  It did.

11  **Q.**  At that point were you only searching for child sexual

12  exploitation material, or were you searching for both child

13  sexual exploitation material and for fraud, evidence of the

14  fraud -- state fraud crimes for Detective Buzzo?

15  **A.**  I was doing both.

16  **Q.**  Okay.  So you hadn't abandoned the search for the fraud

17  material even after you got the second search warrant.

18  **A.**  That is correct.

19  **Q.**  Okay.  Now, at the end of your search, I understand other

20  forensics have been done on these devices.  Was other child

21  sexual exploitation material found?

22  **A.**  Yes.

23  **Q.**  All right.  So let's talk about that.  Now, on the HP

24  laptop, was there child pornography -- well, do you remember

25  how many files were found on each device?  Take a step back.

309

1  **A.**   I don't remember, but I do have my report I could

2  reference, if that's allowed.

3          MR. SCHMITZ:  Your Honor --

4  **Q.**   (MR. SCHMITZ CONTINUING)  And would that refresh your

11:28  5  recollection as to how many images of child pornography you

6  found on those devices?

7  **A.**   Yes.

8          MR. SCHMITZ:  May I refresh the witness's

9  recollection, Your Honor?

11:28  10         THE COURT:  You may.

11         THE WITNESS:  So the question was, how many images --

12  **Q.**   (MR. SCHMITZ CONTINUING)  Yeah, and I -- I'm sorry.  I

13  didn't mean to cut you off.  I can ask you device by device, if

14  that'll help, Detective Freeman.

11:29  15  **A.**   I have -- I could go device by device, or I could go

16  total.

17  **Q.**   I think we're going to wind up doing both, Detective

18  Freeman --

19  **A.**   Okay.

11:30  20  **Q.**   -- for the record.  So child sexual abuse material, now,

21  these are images generally of children, including children

22  being raped.  The HP laptop, how many of those images were

23  there?

24  **A.**   And I just want to be clear -- be sure of what item number

11:30  25  that is, the HP laptop.

310

1   **Q.**   Well, okay.  Let's -- let's start with this thumb drive --

2   **A.**   The 2-gigabyte.

3   **Q.**   -- the Lexar laptop -- or the Lexar thumb drive.

4   **A.**   There were 60 files of child sexual abuse material on that

11:30
5   device.

6   **Q.**   Sixty files.  Okay.  Let's go to the tower in Exhibit 57

7   -- or, no, excuse me, Exhibit 35.  This tower right here that

8   Mr. Derosier claimed to use for business purposes, how many

9   images of child pornography were found on that?

11:31
10   **A.**   There were two images and one video of child sexual abuse

11   material found on the tower.

12   **Q.**   On that tower.  And if you had searched that tower first

13   for visual depictions of job sites, would you have found those

14   images?

11:31
15   **A.**   Yes.

16   **Q.**   Okay.  How about that red thumb drive that's sticking out

17   of Mr. Derosier -- what Mr. Derosier claimed was his business

18   computer?  How many images of child sexual exploitation

19   material were on that?  And that's 1A, I think.

11:31
20   **A.**   So on -- the thumb drive that was plugged into Item 1 was

21   1A.  That one there was a total of 1,410 files of child sexual

22   abuse material.

23   **Q.**   And I don't think I need to go device by device, but were

24   you able to search right after the search warrant -- or right

11:32
25   after you got the second search warrant for child sexual

311

1    exploitation material, were you able to search his phone right

2    afterwards?

3    **A.**   After the second search warrant, yes.

4    **Q.**   Was it locked?

5    **A.**   It was.

6    **Q.**   Did it take a while to get in there?

7    **A.**   It did.

8    **Q.**   Okay.  And eventually were you able to access the cell

9    phone?

10   **A.**   Yes.

11   **Q.**   How many images of child sexual exploitation material, if

12   you know -- I know this was sent off to BCI to do other

13   forensics, but do you know how much -- how many child sexual

14   exploitation material, images and videos, were found on Mr.

15   Derosier's phone?

16   **A.**   Yes.

17   **Q.**   How many?

18   **A.**   2,623 files.

19   **Q.**   In total on all of Mr. Derosier's devices -- and we don't

20   have to go device by device, but how many images and videos of

21   child sexual exploitation material were there?

22   **A.**   3,474 files.

23   **Q.**   Now I want to talk a little bit about inevitable discovery

24   here.  We already talked about this desktop.  If you had

25   searched any of the devices that had child pornography images

1   on them for visual depictions of job sites or visual depictions

2   of documents, would you have found child pornography?

3   **A.**   Yes.

4   　　　　MR. SCHMITZ:  Can I have a moment, Your Honor,

11:34   5   please?

6   **Q.**   (MR. SCHMITZ CONTINUING)  And just going back, Detective

7   Freeman, when you said 3,474 total images of child pornography,

8   was that -- that was -- was that exclusive of the phone?  So

9   those are just on the devices that were seized from the house

11:35   10   before you got into the phone?

11   **A.**   That is correct.  It does not include the images found on

12   the phone.

13   　　　　THE COURT:  Which phone are you referencing?

14   　　　　MR. SCHMITZ:  The cell phone that -- or, excuse me.

11:35   15   Sorry.  I guess I have to get it through the witness, Your

16   Honor.

17   **Q.**   (MR. SCHMITZ CONTINUING)  So when you say "the cell

18   phone," what cell phone was that?

19   **A.**   The cell phone that was found on Nicholas Derosier's

11:35   20   person.

21   **Q.**   And that cell phone, was it locked at the time that it was

22   found off of Mr. Derosier's person?

23   **A.**   It was.

24   **Q.**   And did Mr. Derosier provide the password -- provide the

11:35   25   password to that phone?

1   **A.**   He did not.

2   **Q.**   And were -- was law enforcement later able to get into

3   that phone through other means?

4   **A.**   Yes.

11:36   5        MR. SCHMITZ:  Your Honor, those are all the questions

6   I have for Detective Freeman.  Thank you.

7        THE COURT:  Thank you.  Can we return to you pages 2

8   through 16 and the balance of what was marked as Exhibit 91?

9   And Exhibit -- there's a document that was marked as Exhibit 84

11:37   10   the United States does not intend to offer, is that correct?

11        MR. SCHMITZ:  That's correct, Your Honor.

12        THE COURT:  Then we'll return that one to you also.

13   Mr. Bellmore.

14                    CROSS-EXAMINATION

15   BY MR. BELLMORE:

16   **Q.**   Good morning, Detective Freeman.

17   **A.**   Good morning.

18   **Q.**   Can you hear me okay?

19   **A.**   Yes.

11:37   20   **Q.**   I'm going to make sure I'm in the right spot with the

21   microphone.  How long have you been a Grand Forks County police

22   detective?

23   **A.**   Grand Forks Police Department for just under 14 years.

24   **Q.**   And you're a member of the Internet Crimes Against

11:38   25   Children Task Force?

1   **A.**   Correct.

2   **Q.**   And that is a organization that's made up of different law

3   enforcement officers from different agencies?

4   **A.**   Correct.

11:38   5   **Q.**   And that includes state and federal agencies?

6   **A.**   That is correct.

7   **Q.**   Including Homeland Security Investigations?

8   **A.**   Yes.

9   **Q.**   You mentioned on direct examination that back in 2019 you

11:38   10   worked with Special Agent Arel on the cyber tip?

11   **A.**   That is correct.

12   **Q.**   Is that an example of the sort of cooperation that takes

13   place with the task force?

14   **A.**   Yes.

11:38   15   **Q.**   But as far as your role in Grand Forks, you're the only

16   detective who handles computer forensics?

17   **A.**   That is correct.

18   **Q.**   Homeland Security Investigations, they do computer

19   forensics as well?

11:39   20   **A.**   I don't believe they have an agent.  I'm not familiar with

21   if they have an agent currently doing forensics.

22   **Q.**   What about North Dakota BCI?

23   **A.**   Yes.

24   **Q.**   Are North Dakota BCI agents a part of the Internet Crimes

11:39   25   Against Children Task Force?

1   **A.**   Yes.

2   **Q.**   And North Dakota BCI, they're able to assist in computer

3   forensic investigations?

4   **A.**   That is correct.

11:39   5   **Q.**   Perform a forensic analysis on electronic devices?

6   **A.**   Yes.

7   **Q.**   And eventually in this case they did just that.

8   **A.**   That is correct.

9   **Q.**   So just to go back to 2019, and I'll be brief here, but

11:39   10   you did receive a cyber tip indicating that there was a image

11   of suspected child pornography associated with a phone later

12   determined to be associated with Mr. Morgan-Derosier?

13   **A.**   I was aware of it coming back to a phone number associated

14   to a business that Nicholas Derosier was an owner of, that is

11:40   15   correct.

16   **Q.**   You were -- you did not act on that.  There were no formal

17   charges sought based on that cyber tip.

18   **A.**   That is correct.

19   **Q.**   You were missing some information from Google that you

11:40   20   needed for your investigation?

21   **A.**   Yes.

22   **Q.**   And that was for an IP address?

23   **A.**   The Google search warrant or subpoena that Special Agent

24   Arel had served, I believe, was for subscriber data, which

11:40   25   would eventually include an IP.

1   **Q.**   So once you had subscriber data, you had an IP address,

2   phone number and names, that's getting pretty close to the

3   point in an investigation where you might seek a search

4   warrant?

11:41   5   **A.**   That is correct.

6   **Q.**   But in 2019, with respect to the cyber tip that the

7   government discussed with you, it never made it that far.

8   **A.**   It did not.

9   **Q.**   About a year later Mr. Morgan-Derosier's name came across

11:41   10   your desk again?

11   **A.**   That is correct.

12   **Q.**   And that's based off of reports from Eagan, Minnesota, a

13   police investigation there?

14   **A.**   Yes.

11:41   15   **Q.**   A individual named Justin Langen had his phone dumped by

16   officers?

17   **A.**   Correct.

18   **Q.**   Mr. Morgan's name -- excuse me.  Mr. Morgan-Derosier's

19   name came up in those chats?

11:41   20   **A.**   Correct.

21   **Q.**   You described some of the conversations that were alleged

22   to have happened between Mr. Morgan-Derosier and Mr. Langen

23   were concerning?

24   **A.**   Yes.

11:42   25   **Q.**   I think you said the word "gross"?

317

1    A.    Yes.

2    Q.    They involved conversations about child sexual abuse?

3    A.    Yes.

4    Q.    Beyond pornography?

11:42    5    A.    Yes.

6    Q.    And those are -- I mean, that's a serious concern as a law

7    enforcement officer you have, correct?

8    A.    That is correct.

9    Q.    You got some information that the suspected victims in

11:42    10    those cases denied being abused?

11    A.    Yes.

12    Q.    Were you still concerned even after learning that

13    information?

14    A.    Yes.

11:42    15    Q.    We have on -- July of 2020 you reached out to the United

16    States Postal Service to try to verify who lived at an address

17    on Fifth Avenue in Grand Forks?

18    A.    That is correct.

19    Q.    And that was tied to -- that was tied to your inquiry into

11:43    20    Mr. Morgan-Derosier?

21    A.    Yes.

22    Q.    You got a response back on July 29 of 2020?

23    A.    I don't remember the exact date that I got a response

24    back, but it was in July of 2020.

11:43    25    Q.    And when you learned of Detective Buzzo's investigation

1    into Mr. Morgan-Derosier's business, that was in August

2    of 2020.

3    **A.**    Correct.

4    **Q.**    It's one month later.

11:43    5    **A.**    Yes.

6    **Q.**    And so that information that you have -- had attained from

7    the postal service, you provided that to Detective Buzzo.

8    **A.**    That is correct.

9    **Q.**    Just a couple weeks later you helped him out executing the

11:44    10    search warrant on Fifth Avenue.

11    **A.**    Yes.

12    **Q.**    And you were aware that Detective Buzzo had sought a

13    search warrant for that residence?

14    **A.**    Yes.

11:44    15    **Q.**    A district judge in North Dakota signed off on it?

16    **A.**    That is correct.

17    **Q.**    You didn't participate in writing that warrant?

18    **A.**    No.

19    **Q.**    Are you familiar with that warrant?

11:44    20    **A.**    Yes.

21    **Q.**    When did you learn of that, Detective Buzzo's warrant?

22    **A.**    It was the day before we executed the search warrant.

23    **Q.**    Did you have a chance to read it?

24    **A.**    Yes.

11:45    25    **Q.**    What about the affidavit that was associated with it?

1  A.   I did not review the affidavit.

2  Q.   Just the single-page search warrant?

3  A.   I believe there was an attachment to the search warrant as

4  well.

11:45  5  Q.   And what do you mean by "attachment"?

6  A.   There was an Attachment A to the original search warrant

7  with the items listed as authorized to search.

8  Q.   Could that have been called an exhibit?

9  A.   Yes.

11:45  10  Q.   So this happened on -- the warrant was executed on the

11  15th of September?

12  A.   That is correct.

13  Q.   You had a briefing beforehand?

14  A.   Correct.

11:45  15  Q.   And again, at that briefing were you provided the

16  affidavit that established probable cause for the search?

17  A.   No, I was not.

18  Q.   How many officers were at the -- that briefing before the

19  search took place?

11:46  20  A.   I am not sure about the exact number of officers that

21  attended the briefing.

22  Q.   What time during the day of September 15th did you arrive

23  at the house on Fifth Avenue?

24  A.   It was approximately just before 10:00 a.m. on that date.

11:46  25  Q.   And there were three individuals, occupants of the

1   residence when you arrived?

2   A.   I believe there were three total.

3   Q.   And you do not formally interview any of those occupants?

4   A.   I did not.

11:46   5   Q.   Did you speak to them in any way?

6   A.   I don't believe I had conversations with the roommates.

7   Q.   So were you assigned a specific location within the

8   residence, or were you searching throughout the -- throughout

9   the residence?

11:47   10   A.   I completed the evidence intake in the main living area of

11   the residence.

12   Q.   Would that be near a number of desks that were adjacent to

13   one another?

14   A.   There was a desk, in my memory.

11:47   15   Q.   Where there was a desktop computer on that?

16   A.   That is correct.

17   Q.   With a number of papers scattered throughout the top of

18   the desk?

19   A.   That is correct.

11:47   20   Q.   And so you were -- you were collecting the evidence?   Is

21   that what your role was, to be clear?

22   A.   Not collecting.   I was logging and doing an inventory of

23   the evidence that was collected.

24   Q.   So logging it, you're ultimately writing a list down of

11:48   25   what was taken, correct?

1    **A.**    Yes.

2    **Q.**    By what officer?

3    **A.**    Yes.

4    **Q.**    And some information about where those items were found,

5    correct?

6    **A.**    Yes.

7    **Q.**    Were there officers from agencies other than from the

8    Grand Forks Police Department at the search?

9    **A.**    Yes.

10   **Q.**    Do you remember who all outside of your agency was there?

11   **A.**    Yes.

12   **Q.**    Could you say who you remember being there?

13   **A.**    Yes, Special Agent Dan Casetta from Homeland Security

14   Investigations.

15   **Q.**    At some point was there somebody from the sheriff's

16   office?

17   **A.**    Yes, there was.  I recall the sheriff's office sent an

18   individual regarding a device that was located where a bomb

19   analysis had to be conducted, so I don't remember if it was --

20   I don't remember who it was.

21   **Q.**    But that officer from the sheriff's office did not

22   participate, help out with the search.

23   **A.**    They did not.

24   **Q.**    And you mentioned the federal officer was Special Agent

25   Casetta?

11:48

11:48

11:48

11:49

11:49

1   **A.**   That is correct.

2   **Q.**   And he's from Homeland Security Investigations?

3   **A.**   Yes.

4   **Q.**   The same agency that you work with on the Internet Crimes

11:49   5   Against Children Task Force?

6   **A.**   That is the same agency.

7   **Q.**   You logged in total 16 items from the entire residence?

8   **A.**   Yes.

9   **Q.**   One of the objects was a sheet of paper that you described

11:50   10   as a password document?

11   **A.**   Yes.

12   **Q.**   There was an item listed at 13 that you described as a

13   marker board?

14   **A.**   That is correct.

11:50   15   **Q.**   What was the marker board?

16   **A.**   It was a list of business associates and jobs, from my

17   understanding, that were current under Nicholas Derosier's

18   business.

19   **Q.**   Like a white board?

11:50   20   **A.**   Yes, a marker board.

21   **Q.**   Not a piece of paper?

22   **A.**   No.

23   **Q.**   Okay.  Other than those two, everything else was an

24   electronic device?

11:50   25   **A.**   That is correct.

1   Q.   You didn't inventory any boxes of records?

2   A.   No.

3   Q.   None of the paperwork that was on the desktop computer

4   desk?

11:51   5   A.   They were not collected.

6   Q.   Did you go down to the basement at all when you were

7   searching the residence?

8   A.   No, I don't believe I was downstairs.

9   Q.   At some point you're handed a thumb drive by Special Agent

11:51   10   Casetta.  Do you recall that?

11   A.   Yes.

12   Q.   That was a flash drive with a -- I would say a metal

13   cover?

14   A.   Yes.

11:51   15   Q.   And it was otherwise white when it was open?

16   A.   I believe so.

17   Q.   I'm going to show you Government's Exhibit 57.

18       MS. PUHL:  Your Honor, we can display it on the

19   screen if that would make it easier.

11:52   20       MR. BELLMORE:  That might be easier.

21       MS. PUHL:  Okay.

22       MR. BELLMORE:  Thank you.

23       THE COURT:  Thank you.

24   Q.   (MR. BELLMORE CONTINUING)  I'm going to move things along.

11:53   25   We might -- we may return to that, Detective Freeman.  I was

1    merely going to show you what the -- a picture of the USB

2    device, but that was handed to you personally by Special Agent

3    Casetta?

4    **A.**    That is correct.

11:53   5    **Q.**    Did he tell you where he located that --

6    **A.**    Yes.

7    **Q.**    -- thumb drive?  Detective Freeman, Government's Exhibit

8    57 is now on the screen.  Do you see that?

9    **A.**    Yes.

11:53   10   **Q.**    Is that the device that was handed to you by Special Agent

11   Casetta?

12   **A.**    Yes.

13   **Q.**    And in your inventory log, I don't know if you have those

14   exhibits in front of you, but you have that listed as Item

11:54   15   Number 8?

16   **A.**    I don't have that in front of me, but I believe that was

17   the item number.

18        MR. BELLMORE:  And could I get 76, please?  Thank

19   you.

11:54   20   **Q.**    (MR. BELLMORE CONTINUING)  All right.  Detective Freeman,

21   I have on the screen Government's Exhibit 76.  Do you see that?

22   **A.**    Yes.

23   **Q.**    I'm going to refer you to Number 8 on the inventory list.

24   Is that referencing the thumb drive from the previous

11:54   25   photograph?

325

1  **A.**   Yes.

2  **Q.**   And as far as the "found by" section, that refers to the

3  officer who found it, correct?

4  **A.**   That is correct.

11:54   5  **Q.**   And it's small, but for Item 8, does that say "Casetta"?

6  **A.**   It does.

7  **Q.**   All right.  Is his name there instead of a number because

8  he's not a Grand Forks police officer?

9  **A.**   The original badge number I put in there was incorrect,

11:55   10  and I was -- they clarified who found it, and so I scribbled

11  out the badge number and then wrote his name.  He doesn't have

12  a number assigned, so we just went with his first -- or his

13  last name.

14  **Q.**   Okay.  And while we have this document up, at the top

11:55   15  there's a date and time the search was initiated, and you

16  previously testified that it was around 10:00 a.m., right?

17  **A.**   That is correct.

18  **Q.**   And that's -- that's reflected in the document, Exhibit

19  76?

11:55   20  **A.**   Yes.

21  **Q.**   And to the right of that states when the search was

22  terminated.  Do you see that?

23  **A.**   Yes.

24  **Q.**   And is it the same day, September 15th?

11:55   25  **A.**   That is correct.

1  **Q.**  And you indicated that the search ended about noon?

2  **A.**  Yes.

3  **Q.**  So when Special Agent Casetta handed you the thumb drive,

4  he told you where he found it, right?

11:56  5  **A.**  Correct.

6  **Q.**  It was found in a safe?

7  **A.**  Yes.

8  **Q.**  And inside of a bedroom?

9  **A.**  That is correct.

11:56  10  **Q.**  Did he provide you any more details about that thumb

11  drive?

12  **A.**  No.

13  **Q.**  Did Special Agent Casetta ever tell you about a

14  conversation he had about -- that he had with Julia Anderson?

11:56  15  **A.**  No, I don't believe so.

16  **Q.**  Special Agent Casetta never told you that Julia Anderson

17  told him that she believed Mr. Morgan-Derosier raped XXXX

18  XXXXXX?

19  **A.**  I don't remember if I heard that on scene on that day or

11:57  20  at some point after the search warrant.

21  **Q.**  All right.  Did Special Agent Casetta ever tell you that

22  another occupant said that there were some images of boys --

23  **A.**  Yes.

24  **Q.**  -- on that thumb drive?

11:57  25  **A.**  I heard that, yes.

1   Q.   Okay.  And to be specific, that thumb drive that he had

2   found?

3   A.   They had -- at that time I overheard them say that there

4   was a thumb drive with images of boys that would be in a safe.

11:57   5   Q.   When you're logging the evidence, what -- what order are

6   you going in?  How are you -- how are you ranking them as far

7   as 1 through 16?

8   A.   They are in order of being found.

9   Q.   Okay.

11:57   10  A.   Or collected, I should say.

11  Q.   So we have, Number 1 is -- it says "Dell."  That's the

12  desktop computer?

13  A.   Yes.

14  Q.   And that was right in the living room?

11:58   15  A.   That is correct.

16  Q.   And that's generally where you were --

17  A.   Yes.

18  Q.   -- stationed, is that correct?

19  A.   That is correct.

11:58   20  Q.   Okay.  So that makes sense that that was the first item

21  you'd seized?

22  A.   Yes.

23  Q.   And going to Number 3, that's another -- well, I'm sorry.

24  Let's go to 1.  One -- one has some blank lines underneath it,

11:58   25  before we get to Item 2.  Do you see that?

1   **A.**   Yes.

2   **Q.**   On the second and third lines below the first line -- I

3   guess the second and third lines there's reference to a

4   16-gigabyte external drive.  Do you see that?

11:58   5   **A.**   Yes.

6   **Q.**   Was that -- was that a storage device?

7   **A.**   Yes.

8   **Q.**   Was that a storage device that was connected or attached

9   to the desktop computer --

11:59   10   **A.**   Yes.

11   **Q.**   -- when you found it?

12   **A.**   Yes.

13   **Q.**   Okay.  And is that why you left that all as one?

14   **A.**   That is correct.

11:59   15   **Q.**   Okay.  Going to Item 3, that is another thumb drive?

16   **A.**   Yes.

17   **Q.**   And that was found by you.

18   **A.**   Correct.

19   **Q.**   We should clarify, 624, is that your number?

11:59   20   **A.**   Yes.

21   **Q.**   You found that in the -- on the desk in the living room

22   area?

23   **A.**   That is correct.

24   **Q.**   By my count, as far as thumb drives go, you seized three?

11:59   25   **A.**   Yes.

1  **Q.**   Do you recall how much storage was on Item Number 3?  It

2  just says external thumb drive.

3  **A.**   I do not.

4        THE COURT:  Mr. Bellmore, when it's convenient, we

12:00  5  can take a lunch break.

6        MR. BELLMORE:  Your Honor, that's probably all the

7  questions I have with this document, so I think it would be a

8  good time.

9        THE COURT:  Okay.  Then what can you tell me about

12:00  10  the afternoon schedule, Mr. Bellmore?

11        MR. BELLMORE:  Let's check my e-mail briefly, Your

12  Honor.

13        THE COURT:  Sure.

14        MR. BELLMORE:  I do believe my office had -- had my

12:00  15  2:30 hearing rescheduled, but I don't see that it's been done

16  just yet.

17        THE COURT:  The clerk says it's still on the

18  calendar.

19        MR. BELLMORE:  Okay.  I will go check with my office

12:01  20  right away, and I -- we can send an e-mail back to chambers or

21  send a phone call.

22        THE COURT:  Well, how about if for now we plan to

23  reconvene at 1 o'clock?  Is that okay?

24        MR. BELLMORE:  Yes, Your Honor.

12:01  25        THE COURT:  All right.  We'll see you then.

330

1          (A lunch recess was taken from 12:01 p.m. to

2    12:59 p.m., the same day.)

3          THE COURT:  Mr. Bellmore, what's the situation with

4    your schedule this afternoon?

01:00    5          MR. BELLMORE:  Your Honor, the district court has

6    continued my hearing for this afternoon, so my schedule is

7    open.

8          THE COURT:  Okay.  Please resume your cross-exam of

9    Detective Freeman.

01:00   10    Q.   (MR. BELLMORE CONTINUING)  Hello again, Detective Freeman.

11    A.   Hello.

12    Q.   Detective Freeman, I have back on the screen your

13    inventory sheet.  Do you see that?

14    A.   Yes.

01:01   15    Q.   It's going to look a little different, but is this the

16    same representation of the inventory sheet that you had

17    completed on September 15th of 2020?

18    A.   It is.

19    Q.   Okay.  We were talking earlier about the order of the

01:01   20    devices being seized, and you had testified that the items in

21    order are based on when you seize the items -- or when the

22    items were delivered to you by other officers, is that correct?

23    A.   Yes.

24    Q.   Okay.  And so Number 8, the thumb drive, that was seized

01:02   25    by Special Agent Casetta?

1   A.   That is correct.

2   Q.   And that is the first item that Special Agent Casetta

3   handed to you?

4   A.   I actually am not sure if I received it from -- directly

5   from Special Agent Casetta.  It might've been delivered by

6   another officer, but I was told that that thumb drive was

7   collected by Special Agent Casetta.

8   Q.   And all of the items collected by Special Agent Casetta

9   were from the northeast bedroom safe?

10  A.   Yes.

11  Q.   Okay.  And let's just be sure.  We'll go to the -- we'll

12  go to the next page.  There's Items 15 and 16.  Do you see item

13  15 also refers to Casetta?

14  A.   Yes.

15  Q.   And that also says the northeast bedroom safe?

16  A.   That is correct.

17  Q.   So you got done with the residence at noon, right?

18  A.   Yes.

19  Q.   Well, let's -- after you collected the evidence, how did

20  you -- how did you gather the evidence, and how did you sort it

21  other than writing down a description?

22  A.   Each individual item would have been packaged and then

23  labeled with the corresponding number on the receipt in

24  individual bags or boxes depending on what we had available.

25  Q.   And with the -- with the phones, were any of them powered

01:02

01:02

01:03

01:03

01:03

1   on when they came into your possession?

2   **A.**   The only one that I can recall I believe was the one that

3   was seized from Nicholas Derosier, on his person.

4   **Q.**   Okay.  And how did you handle that particular device?

01:04   5   **A.**   I would've handled it similarly to the other ones,

6   packaged it and labeled it.

7   **Q.**   You weren't going through it at that time?

8   **A.**   No, I was not.

9   **Q.**   And you weren't intentionally touching the screen or

01:04   10   pressing buttons?

11   **A.**   No, I was not.

12   **Q.**   So you go through the process of inventorying and

13   collecting all of this evidence, and why do you go through

14   those steps as a -- as a police officer?

01:04   15   **A.**   To make sure we have a proper log of all the items seized

16   from that search warrant to provide it to the Court.

17   **Q.**   What about the integrity of the evidence?  Is that

18   important?

19   **A.**   Yes.

01:04   20   **Q.**   And the government asked you some questions about a write

21   block.  Do you recall that from earlier?

22   **A.**   Yes.

23   **Q.**   You know that a write block is -- allows -- I should say

24   prevents anything happening to a device that is attached to it.

01:05   25   **A.**   That is correct.

1   Q.   Okay.  So when a write block is used, it makes sure that

2   no other electronics or computers are communicating with the

3   device that you are analyzing.

4   A.   Yes.

01:05

5   Q.   And if that's -- if that's not done, there's the potential

6   that the computer could be altering information on a thumb

7   drive.

8   A.   Yes.

9   Q.   You mentioned on direct examination that the flash drive

01:06

10  had an operating system.  Did I understand that correctly?

11  A.   I did say that, yes.

12  Q.   What was -- what can you tell me about the operating

13  system on the Lexar thumb drive?

14  A.   Sometimes --

01:06

15       MR. SCHMITZ:  Your Honor, object to the question,

16  very nonspecific.

17       THE COURT:  Mr. Bellmore?

18       MR. BELLMORE:  Your Honor, my understanding is

19  Detective Freeman testified referencing the operating system of

01:06

20  a flash drive.  I'm just trying to follow up on that and get

21  more information about the flash drive's operating system.

22       MR. SCHMITZ:  Your Honor, asking a witness for

23  information isn't really a specific question.

24       THE COURT:  Can you make your question more specific,

01:07

25  Mr. Bellmore?

1    Q.   (MR. BELLMORE CONTINUING)  Detective Freeman, can you tell

2    me what you knew about the flash drive's operating system?

3              MR. SCHMITZ:  Same objection, Your Honor.

4              MR. BELLMORE:  It's her personal knowledge, Your

01:07   5    Honor.

6              THE COURT:  Detective Freeman, can you describe the

7    operating system of the Lexar drive?

8              THE WITNESS:  When I said that there was -- it was an

9    operating system, sometimes there are programs loaded --

01:07  10    software programs loaded on the device that potentially could

11    encrypt or secure it or other items that talk about the device

12    manufacturer and details of the device.

13    Q.   (MR. BELLMORE CONTINUING)  Does a flash drive -- able to

14    do anything on its own, without a computer?

01:07  15    A.   No.

16    Q.   So you didn't use the write block on the flash drive.

17    A.   On -- no, I did not.

18    Q.   You plugged it into a computer at your workstation?

19    A.   Yes.

01:08  20    Q.   Detective Freeman, do you -- well, I'm showing Exhibit 79

21    to you.  Can you see that?

22    A.   Yes.

23    Q.   This is an image of -- showing the contents of the Lexar

24    thumb drive, right?

01:09  25    A.   That is correct.

1   **Q.**   If you look towards the left of the document, you can see

2   in gray background something entitled "Local Disk (F)"?

3   **A.**   Yes.

4   **Q.**   What is that?

01:09   5   **A.**   That is the drive path that this USB was loaded.

6   **Q.**   So the thumb drive was titled Local Disk (F)?

7   **A.**   No.

8   **Q.**   Is that a drive on your computer?

9   **A.**   This is a screenshot of the drive that I have a forensic

01:09   10   image of, the thumb drive.  This is a copy of the contents of

11   what was on the Lexar.

12   **Q.**   Before or after a forensic image?

13   **A.**   I'm not understanding the question.

14   **Q.**   Did you do a forensic image of the thumb drive?

01:10   15   **A.**   I did.  I had -- I had a copy -- or a forensic copy of the

16   contents of the Lexar.

17   **Q.**   Okay.  If you go up to the top, you can see Local (F) one

18   more time?

19   **A.**   Yes.

01:10   20   **Q.**   Following that to the right it says, "20106220 Derosier

21   Electronics."  Do you see that?

22   **A.**   Yes.

23   **Q.**   By the way, is that series of numbers -- is that your case

24   file number?

01:10   25   **A.**   That is correct.

1  **Q.**   To the next -- and what is that?  That's a folder?  That's

2  describing a folder?

3  **A.**   On the file path?

4  **Q.**   The series of numbers and then "Derosier Electronics," is

01:11  5  that a folder?

6  **A.**   Yes.

7  **Q.**   To the right it says, "Item#8, 2-gigabyte Lexar thumb

8  drive."  Do you see that?

9  **A.**   Yes.

01:11  10  **Q.**   Is that a folder?

11  **A.**   Yes.

12  **Q.**   And then the last one says -- to the right says "Raw

13  Evidence."  Is that a folder?

14  **A.**   Yes.

01:11  15  **Q.**   Is that an image of Mr. Derosier's thumb drive, those

16  folders?

17  **A.**   Yes.

18  **Q.**   When you plugged in the thumb drive to your computer,

19  there was a folder entitled "Raw Evidence"?

01:12  20  **A.**   No.

21  **Q.**   So what is that folder, Raw Evidence?

22  **A.**   This is the name of the folder that the image is located.

23  **Q.**   That is one -- Raw Evidence is one folder within another

24  folder system called "Item#8"?

01:12  25  **A.**   Yes.

1   **Q.**   You -- you testified that your reason for going into a

2   thumb drive is that there wasn't a whole lot of storage space,

3   they're smaller storage spaces, and it'd be easier for you to

4   go through.  Is that accurate description of your testimony

01:13   5   earlier?

6   **A.**   It would take less time, correct.

7   **Q.**   It would take less time because 2 gigabytes is a fewer --

8   a lesser amount than some other devices?

9   **A.**   Yes.

01:13   10   **Q.**   And 2 gigabytes is, relatively speaking in this day and

11   age, to you not -- not that much --

12   **A.**   That is correct.

13   **Q.**   -- storage space.

14   **A.**   That is correct.

01:13   15   **Q.**   Okay.  Compared to -- so there's not going to be a lot of

16   video files that are going to fit on a 2-gigabyte thumb drive.

17   **A.**   A lot less than a typical cell phone storage or what we

18   typically see for storage now.

19   **Q.**   Because video files tend to be larger in size?

01:13   20   **A.**   Correct.

21   **Q.**   They're larger in size than photos?

22   **A.**   Correct.

23   **Q.**   It depends on the type of video file, right?

24   **A.**   Yes.

01:14   25   **Q.**   And the length of the video?

338

1  **A.**    Yes.

2  **Q.**    But can you say, generally speaking, that a video file is

3  a larger file compared to other media -- other media files?

4  **A.**    Yes.

01:14    5  **Q.**    And even compared to text documents, a video file would be

6  much larger than a text document?

7  **A.**    In most cases, yes.

8  **Q.**    So if it follows that there would be fewer video files on

9  a 2-gigabyte hard drive, there could potentially be many text

01:14    10  files.

11  **A.**    Can you ask that again?

12  **Q.**    Well, text files -- text files can be quite small, right?

13  **A.**    Yes.

14  **Q.**    What would you say an average 10-page Word document --

01:15    15  what would the file size be of that?

16  **A.**    I don't know.

17  **Q.**    But a 2-gigabyte flash drive does still have the capacity

18  to hold thousands of document files.

19  **A.**    Sure.

01:15    20  **Q.**    And if there are thousands of document files, that would

21  take a considerable amount of time to sift through, correct?

22  **A.**    Yes.

23  **Q.**    You testified too that there was no way to search for

24  business-related terms or -- let me rephrase that and make sure

01:15    25  I'm characterizing your testimony right.  I want to make sure I

1   understand.  It would've been difficult for you or not useful

2   to search business terms to index the contents of these

3   devices.

4   **A.**   Correct.

01:16   5   **Q.**   Because a keyword search was only going to find the name

6   of a file.

7   **A.**   Yes.

8   **Q.**   And a file name is not automatically accurate.

9   **A.**   That is correct.

01:16   10   **Q.**   People can change the name of a file to be anything,

11   right?

12   **A.**   Yes.

13   **Q.**   If they're trying to hide a document, they could mislabel

14   it.

01:16   15   **A.**   Yes.

16   **Q.**   Back to the write blocker issue here, not using that write

17   blocker affected the data on that thumb drive, right?

18   **A.**   That is correct.

19   **Q.**   You had left the thumb drive inside your work computer?

01:17   20   **A.**   Yes.

21   **Q.**   And at midnight of September 17th, something in your

22   computer changed the accessed date on all the files?

23   **A.**   I am not sure if it changed the accessed date on all of

24   the files.  I know that the files that -- on the AXIOM report

01:18   25   that I saw, they changed those files.

1  **Q.**   But do you know what else was changed by the -- your work

2  computer?

3  **A.**   I do not.

4  **Q.**   You -- when you were going through this on September 15th,

01:18   5  you opened the thumb drive, and this is what you're saying you

6  saw (indicating)?

7  **A.**   I saw these contents, not necessarily sorted or in this

8  view.  This is a screenshot of the current view when I open it

9  up on my computer.

01:18   10  **Q.**   Okay.  So Exhibit 79 doesn't accurately depict what you

11  encountered on September 15, 2020?

12  **A.**   That's correct.

13  **Q.**   But you recognize some of the items that are listed on

14  this document on the screenshot?

01:19   15  **A.**   Yes.

16  **Q.**   Including the folders?

17  **A.**   Yes.

18  **Q.**   And you clicked on the folder entitled "Mega," correct?

19  **A.**   Yes.

01:19   20  **Q.**   Mega is a cloud-storage platform?

21  **A.**   Yes.

22  **Q.**   Online platform?

23  **A.**   That is correct.

24  **Q.**   So it's not something that's available as manual software

01:19   25  that is installed on a computer?

1    **A.**   Not that I'm aware of.

2    **Q.**   It's internet-based?

3    **A.**   That is correct.

4    **Q.**   And it is -- it is encrypted?

01:20    5    **A.**   Yes.

6    **Q.**   They call it end-to-end encryption?

7    **A.**   I'm not sure if that's what they call it.

8    **Q.**   Do you know if Mega is a United States company?

9    **A.**   I believe it is based out of Australia --

01:20    10   **Q.**   Okay.

11   **A.**   -- or New Zealand.

12   **Q.**   And Mega is popular among child pornography collectors?

13   **A.**   It's one of the cloud-based storage platforms that they do

14   use.

01:20    15   **Q.**   Because of the encryption?

16   **A.**   I would assume, yes.

17   **Q.**   In your years as a computer forensics officer, how many

18   cases involved business records off of the Mega cloud-sharing

19   system?

01:21    20   **A.**   I have not had any cases.

21        MR. BELLMORE:  Could you scroll to the next page,

22   please?  Thank you.

23   **Q.**   (MR. BELLMORE CONTINUING)  Okay.  Detective Freeman, this

24   is the same exhibit, but this is the second page.  Can you see

01:21    25   it okay?

1   **A.**   Yes.

2   **Q.**   This is where -- inside the Mega folder is where you

3   clicked on one of the Klein photos?

4   **A.**   That is correct.

01:22   5   **Q.**   Which one, to be clear?  Do you remember which one was the

6   first one?

7   **A.**   The first one was Klein with parentheses around 33.

8   **Q.**   And when you opened that, you saw what you believed to be

9   child pornography.

01:22   10   **A.**   That is correct.

11   **Q.**   And out of concern you called an assistant state's

12   attorney?

13   **A.**   Yes.

14   **Q.**   Out of Grand Forks County?

01:22   15   **A.**   Yes.

16   **Q.**   Do you recall which assistant state's attorney you had

17   spoken with?

18   **A.**   I do not recall.

19   **Q.**   And you were instructed to open another photo?

01:22   20   **A.**   Yes.

21   **Q.**   And you did?

22   **A.**   That is correct.

23   **Q.**   And that was Klein 35?

24   **A.**   Yes.

01:23   25   **Q.**   And again, upon seeing that video, you saw what you

1    believed to be an image of child pornography?

2    **A.**   It was not a video.

3    **Q.**   Oh, okay.  You saw an image that you believed to be child

4    pornography?

01:23    5    **A.**   Yes.

6    **Q.**   Before this, how many text documents did you open?

7    **A.**   I'm not aware how many text documents I opened.

8    **Q.**   Before the Klein files, you don't remember how many you

9    looked at?

01:23    10    **A.**   I do not.

11    **Q.**   So based on seeing the second image and on the advice of

12    the state's attorney's office, you applied for a warrant to

13    search the devices that you had seized for child pornography.

14    **A.**   That is correct.

01:24    15    **Q.**   So instead of business records, you were now looking --

16    seeking to look for child pornography.

17    **A.**   I continued both searches.

18    **Q.**   Well, you got the warrant first, right?

19    **A.**   Yes.

01:24    20    **Q.**   Okay.  And in doing so you -- you wrote an affidavit that

21    was attached to the warrant.

22    **A.**   Yes.

23    **Q.**   That's something that you wrote out, yourself?

24    **A.**   That is correct.

01:25    25         MR. BELLMORE:  Your Honor, we are --

344

1        THE COURT:  It may be Exhibit 82.  It was attached to

2    your brief, I believe, as --

3        MR. BELLMORE:  Well, we -- Your Honor, we have it.  I

4    guess it's just another question I have about what we're doing

01:25    5    with the record here today because I'm going to be referring to

6    what's been marked as Defendant's Exhibit 7 that was contained

7    within --

8        THE COURT:  Yeah, it's in the docket at 73-7, so

9    that's fine if you want to refer to it that way.

01:25    10       MR. BELLMORE:  I want to make sure the Court's --

11   that when considering this motion, that the Court is

12   considering the exhibits that were contained within the

13   memoranda.

14       THE COURT:  Well, let's just clarify that.  Ms. Puhl,

01:26    15   is there any objection to any of the exhibits to either of Mr.

16   Morgan-Derosier's briefs being considered for purposes of this

17   suppression motion?

18       MS. PUHL:  Your Honor, I guess I'd prefer that we

19   address it as we go along because I'm not -- as I sit here, I

01:26    20   don't know that I can recall every exhibit that was attached to

21   the memo, but I wouldn't have an objection, but do you have a

22   copy for us?

23       MR. BELLMORE:  Yeah.

24       THE COURT:  Well, I think you're talking about what

01:26    25   has been received as Government's Exhibit 82.

345

1    MS. PUHL:  Yeah, and I don't have an objection to

2  that, but if that's -- and if that's the last one, then we

3  would have no --

4    THE COURT:  No, I'm wrong.  It's been marked, but

01:27    5  it's not been received, but it's in the docket at 73-7, so I

6  will consider it as part of the evidence for purposes of this

7  hearing.

8  Q.   (MR. BELLMORE CONTINUING)  Okay.  Detective Freeman, can

9  you see the document on the screen clearly?

01:27   10  A.   Yes.

11  Q.   This is a affidavit?

12  A.   That is correct.

13  Q.   It is addressed to the -- or it states County of Grand

14  Forks?

01:28   15  A.   Yes.

16  Q.   I'm going to scroll down to the last page.  Do you see

17  your name on the bottom of page 8?

18  A.   Yes.

19  Q.   And you see the date of 16th September 2020?

01:28   20  A.   Correct.

21  Q.   Is this -- is this enough to recognize this as that search

22  warrant affidavit?

23  A.   Yes.

24  Q.   All right.  Paragraph 13 mentions Nicholas Derosier,

01:29   25  right?

1  **A.**    Yes.

2  **Q.**    Okay.  And then the devices that you obtained searching

3  the residence?

4  **A.**    What was the question?

01:29  5  **Q.**    You recognize the devices that are listed in paragraph 13

6  as the devices that you obtained at the execution of the search

7  warrant?

8  **A.**    Yes.

9  **Q.**    This section of your search warrant is described as

01:30  10  Attachment A?

11  **A.**    Yes.

12  **Q.**    And that is requesting items specifically to be searched

13  as a part of the warrant?

14  **A.**    That is correct.

01:30  15  **Q.**    All right.  And then the top paragraph that is -- starts

16  with "Information," can you see that?

17  **A.**    Yes.

18  **Q.**    And that states that you were looking for, "Information,

19  correspondence, records, documents or other materials

01:30  20  pertaining to the possession, receipt or distribution of visual

21  depictions of minors engaged in sexually explicit conduct."

22  **A.**    Yes.

23  **Q.**    That's what you wrote in the attachment?

24  **A.**    Yes.

01:31  25  **Q.**    When you were talking about visual depictions of minors

1    engaged in sexually explicit conduct, is that child

2    pornography?

3    **A.**    Images or videos of child sexual abuse material, yes.

4    **Q.**    So child pornography in either a image or a video format?

01:31    5    **A.**    Or it could be in other formats as well too, if the image

6    was a PDF or text file.  I don't know if they are in text file,

7    but --

8    **Q.**    It could be --

9    **A.**    -- other formats.

01:31    10    **Q.**    That would be the file type, right?

11    **A.**    Correct.

12    **Q.**    But within that would be an image?

13    **A.**    Yes.

14    **Q.**    Or a video?

01:31    15    **A.**    Yes.

16    **Q.**    Those that are engaged in child pornography, obviously

17    they possess it.  They can possess it.

18    **A.**    Yes.

19    **Q.**    Possess it on storage devices?

01:32    20    **A.**    Yes.

21    **Q.**    Electronic storage devices?

22    **A.**    That is correct.

23    **Q.**    And all sorts of electronic devices?

24    **A.**    Yes.

01:32    25    **Q.**    And those involved in child pornography can receive other

1   child pornography.

2   **A.**   Yes.

3   **Q.**   From users directly via the internet?

4   **A.**   That is correct.

01:32   5   **Q.**   And today's day and age, the child pornography trade is

6   almost entirely digital, internet-based.

7   **A.**   I would agree with that.

8   **Q.**   So a user of child pornography can receive it from another

9   person via the internet.

01:33   10   **A.**   Yes.

11   **Q.**   And that's the type of evidence that you were looking for

12   with this warrant.

13   **A.**   Yes.

14   **Q.**   Just as somebody can receive child pornography, they can

01:33   15   also distribute it, correct?

16   **A.**   Yes.

17   **Q.**   By sending it to others.

18   **A.**   Yes.

19   **Q.**   In your training and experience, you have the means to

01:33   20   gather evidence about how an image was received, how the child

21   pornography image or video was received onto a computer.

22   **A.**   Sometimes, yes.

23   **Q.**   So not just the image, itself, but evidence that it was

24   actually sent out, correct?

01:33   25   **A.**   Yes.

349

**Q.**   Or sent in, right?

**A.**   Yes.

**Q.**   Is that all generally just common knowledge as a detective who investigates child pornography offenses?

01:34

**A.**   Yes.

**Q.**   Have you used that language in other search warrants for child pornography?

**A.**   Yes.

**Q.**   Prior to the 16th of September of 2020?

01:34

**A.**   I'm sure I have, yes.

MR. BELLMORE:  Can I have one moment, Your Honor?

**Q.**   (MR. BELLMORE CONTINUING)  When you're going through the evidence in this case, you mentioned that searching by file type just wasn't practical, right?

01:36

**A.**   That is correct.

**Q.**   But there are other ways to limit what kind of data you can see on a device when you're searching through it.

MR. SCHMITZ:  Your Honor, I don't believe there's a pending question.  I think that was just a statement.

01:36

THE COURT:  Is that a question, Mr. Bellmore?

MR. BELLMORE:  I don't remember the question, Your Honor.  I will rephrase it, though.

**Q.**   (MR. BELLMORE CONTINUING)  So we'll try this a different way.  You know how to image a device?

01:37

**A.**   Yes.

1  **Q.**   And that is a forensic copy of a device?

2  **A.**   Yes.

3  **Q.**   And when it is imaged, it is imaged before it is -- goes

4  through an analysis?

01:37  5  **A.**   That is correct.

6  **Q.**   And at that analysis phase you are able to index the data?

7  **A.**   Yes.

8  **Q.**   Where you can set date ranges on what you're looking for?

9  **A.**   Yes.

01:37  10  **Q.**   Were you aware of the relevance of the date, October 15,

11  2019, in this case?

12  **A.**   No.

13  **Q.**   You -- when you were going through the thumb drive, the

14  Lexar thumb drive, you didn't limit what dates you were looking

01:38  15  for files?

16  **A.**   No.

17  **Q.**   There, I suppose, wasn't that many files on the thumb

18  drive, right?

19  **A.**   That's correct.

01:38  20  **Q.**   I mean, is that -- and if you agree, does that -- does

21  that makes sense, that there just wasn't that many files to

22  index it?  There really wasn't much point.  Would you agree?

23  **A.**   Yes.

24  **Q.**   And was that, in fact, the case here?  Was that what you

01:38  25  decided?

351

1    **A.**   That it was less time-consuming just to go through each

2    file individually.

3    **Q.**   And when you were done going through the files and when

4    you went to go get the search warrant, how long was the thumb

01:39   5    drive in your computer?

6    **A.**   When I initially searched it?

7    **Q.**   Yes.

8    **A.**   Well, I left it in my computer until after I received the

9    search warrant, the second search warrant.

01:39   10   **Q.**   You received the warrant on September 16th, correct?

11   **A.**   Yes.

12   **Q.**   So it's the following -- the day following when the

13   evidence was seized.

14   **A.**   The evidence was seized on the 15th of September.

01:40   15   **Q.**   Correct.  You got the warrant the next day, right?

16   **A.**   That's correct.

17   **Q.**   And again, as a result of not having the write blocker and

18   having the thumb drive remain in your computer, the last

19   accessed dates were affected?

01:40   20   **A.**   That is correct.

21   **Q.**   Do you know how they were changed?

22   **A.**   The process of changing them?

23   **Q.**   No, what happened when -- what happened with the accessed

24   date as a result?

01:40   25   **A.**   They were changed.

1   Q.   Do you recall to what?

2   A.   It was the 17th of September, at midnight, I believe.

3   Q.   And when did you discover that problem?

4   A.   That it changed the dates?

01:41   5   Q.   Yes.

6   A.   I learned it from Special Agent Jesse Smith with North

7   Dakota Bureau of Criminal Investigation.

8   Q.   What was his role in this case?

9   A.   He received the evidence from my case shortly after to

01:41   10   review the forensics on it.

11   Q.   Okay.  Last topic I have, Detective Freeman, let's go back

12   to the 15th, inside the house.  When you learned that Special

13   Agent Casetta had spoken with the occupants and there was some

14   concerning information about what Mr. Morgan-Derosier was

01:42   15   doing, you didn't include that in your written reports.

16   A.   No, I did not.

17   Q.   You disclosed that to the U.S. Attorney's Office in April

18   of 2023?

19   A.   Disclosed that I heard that he was --

01:43   20   Q.   Yes.

21   A.   Sorry.  What was the original --

22        THE COURT:  I'm sorry.  I think that question is

23   confusing.  It confuses me.  What are you asking?

24   Q.   (MR. BELLMORE CONTINUING)  Detective Freeman, did you --

01:43   25        THE COURT:  What may have been disclosed in April of

1   2023 to the United States Attorney's Office?  Why don't you

2   just restate your question?

3          MR. BELLMORE:  Yes, Your Honor.

4   **Q.**   (MR. BELLMORE CONTINUING)  Did you disclose to the U.S.

01:43   5   Attorney's Office in April of 2023 that Casetta -- Special

6   Agent Casetta told you that he had talked to the occupants of

7   Mr. Morgan-Derosier's residence?

8   **A.**   I don't think I disclosed it to them initially.  I think

9   they were already aware of that.

01:44   10   **Q.**   Did you confirm that with them?

11   **A.**   Yes.

12   **Q.**   And from now, back until -- back to September of 2020, was

13   that documented any place else?

14   **A.**   I did not document it.

01:44   15          MR. BELLMORE:  I have no further questions.

16          THE COURT:  I have one.  You've been talking about a

17   write blocker.  Is that a physical device?

18          THE WITNESS:  Yes, Your Honor.

19          THE COURT:  And write is W-R-I-T-E?

01:44   20          THE WITNESS:  That is correct.

21          THE COURT:  All right.  Thank you.  Mr. Schmitz.

22          MR. SCHMITZ:  Thank you, Your Honor.

23                      REDIRECT EXAMINATION

24   BY MR. SCHMITZ:

01:44   25   **Q.**   Good afternoon, Ms. Freeman.

1   **A.**   Good afternoon.

2   **Q.**   While I'm putting this on, can you just describe what a

3   write blocker looks like to the Judge, what it physically looks

4   like?

01:45   5   **A.**   Sure.  There are a couple different versions of it, but it

6   is sometimes as small as a USB, but the USB plugs into it, and

7   then that device then is plugged into the computer, so it's got

8   two ends.  It's kind of a longer device.

9   **Q.**   And if you know, do sometimes you ever have problems with

01:45   10   a write blocker working?

11   **A.**   Sometimes they don't mount on the computer.

12   **Q.**   And that wasn't a problem this -- well, do you believe

13   that was a problem this time?

14   **A.**   No.

01:45   15   **Q.**   Okay.  So and did -- are you aware -- if you're aware --

16   you've been with the Grand Forks police for 13 years.  Have

17   write blockers been in existence since you've been there?

18   **A.**   Yes.

19   **Q.**   Okay.  Were write -- were write blockers, if you know,

01:45   20   always in existence when we've had forensic evidence, computer

21   forensic evidence?

22   **A.**   No, not always.

23   **Q.**   In other words, was there a time where we did forensic --

24   digital forensic analysis when we didn't have these write

01:46   25   blockers?

1   **A.**   Yes.

2   **Q.**   And okay.  So I want to talk about this whole line of

3   questioning about searching by created date.  It wasn't --

4   defense attorney didn't use the word "created date," but

01:46   5   restricting your search by date.  So if you -- well, let me ask

6   you this, is there a reliable way to do an exhaustive search by

7   sorting by created date?

8   **A.**   No.

9   **Q.**   If you sorted -- if you sort a device by created date,

01:46   10   what types of evidence would you miss?

11   **A.**   Items that don't have a date or items that were deleted or

12   unallocated.

13   **Q.**   So let's talk about unallocated.  Can you explain to the

14   Judge what unallocated space is?

01:46   15   **A.**   This is a space where potential items that were deleted

16   sit until a forensic exam pulls them out, but it is unallocated

17   space.  It's space that the user maybe doesn't have access to,

18   but it is in the computer.

19   **Q.**   So when you delete a document, in other words, does it

01:47   20   just -- does it automatically go away?

21   **A.**   No.

22   **Q.**   So can you still recover that document from a computer's

23   unallocated space?

24   **A.**   You could.

01:47   25   **Q.**   And if you sorted that computer by created date, that

1   document won't show up, will it?

2   A.   No.

3   Q.   And what significance is it to find a document in

4   unallocated space?  Does that mean it's been deleted?

5   A.   Yes.

6   Q.   So if the user wanted to delete, let's say, fraudulent

7   documents for a business that they're not supposed to be

8   running, would that go into unallocated space?

9   A.   Yes.

10   Q.   And if you sorted that computer by file created date,

11   would you find that document?

12   A.   No.

13   Q.   Okay.  Would you get stuff in -- do you know what thumb

14   cache is, like a computer's thumb cache?

15   A.   No.

16   Q.   Or a cache, when images get cached in a computer?

17   A.   No.

18   Q.   Okay.  Do you know what a PST file is?

19   A.   No.

20   Q.   Like an e-mail file?

21   A.   Sure.

22   Q.   Okay.  So an e-mail file, what -- is it a file that

23   collects basically all of your e-mails that you can transfer

24   from computer to computer to get your files over?  Is that what

25   an e-mail file is?

357

1   **A.**   Yes.

2   **Q.**   All right.  An e-mail file created date, is that going to

3   be the first date that the PST file was set up?

4   **A.**   No.

01:48   5   **Q.**   Okay.  When is it going to be?

6   **A.**   The date of the e-mail --

7   **Q.**   Right.

8   **A.**   -- most likely.

9   **Q.**   Right, but the -- okay.  So the PST file is going to be

01:48   10   dated when the e-mail file starts, the first e-mail file, and

11   it's going to continue?

12   **A.**   Yes.

13   **Q.**   Okay.  Now, to be sure you have a document that is created

14   after a certain date, do you need to open the document to find

01:49   15   out what's in it?

16   **A.**   Yes.

17   **Q.**   And even then, can you conclusively determine when that

18   document was created?

19   **A.**   No.

01:49   20        MR. SCHMITZ:  Can I get Exhibit 91, page 17, please?

21   **Q.**   (MR. SCHMITZ CONTINUING)  All right.  So do you remember

22   the defendant asking you about this -- this date?  I think it

23   was December 15, 2019.

24   **A.**   I think it was October --

01:50   25   **Q.**   Well, I apologize.  October 15, 2019.

358

1    **A.**    Yes.

2    **Q.**    And that's the date that the defendant lost his business

3    license -- or, excuse me, the date of the injunction?

4    **A.**    Yes.

01:50    5    **Q.**    And my question to you is this:  So if you had sorted the

6    thumb drive -- the Lexar thumb drive by created date after --

7    for documents created after that date, October 15, 2019, would

8    this Klein file -- would you still have sorted this -- searched

9    this Klein file?

01:50    10    **A.**    Yes.

11    **Q.**    Why?

12    **A.**    That date is after.

13    **Q.**    And just to be clear, what date is this document?  What's

14    the created date for this document?

01:50    15    **A.**    September 7th of 2020.

16    **Q.**    So if you had sorted this thumb drive by created date, you

17    still would've looked at that document, is that right?

18    **A.**    Yes.

19    **Q.**    And do you remember the defendant asking you questions

01:51    20    about doing a keyword search for business terms?

21    **A.**    Yes.

22    **Q.**    All right.  If you do a keyword search for business terms,

23    is that going to return -- is that going to search the contents

24    of a JPG?

01:51    25    **A.**    No.

1   Q.   Right, because there's no -- are there any words in a JPG?

2   A.   Besides the file name, no.

3   Q.   So if you were looking for an image of stolen art, for

4   example, in a JPG, or pirated -- a pirated picture and you did

01:51   5   keyword searches that were relevant to that picture, is that

6   going to help you find on that device the JPG of that pirated

7   picture?

8   A.   No.

9   Q.   Okay.  We need to switch tracks a little bit to the Eagan

01:52   10  Police Department complaint.  Do you remember being asked some

11  questions about that on cross-examination?

12  A.   Yes.

13  Q.   And do you remember being asked about your use of this

14  term "gross"?

01:52   15  A.   Yes.

16  Q.   Why did -- what conversation -- or why did you use the

17  term "gross" to describe the conversation you were describing?

18  A.   Quite literally, because I thought it was gross.  The

19  conversation that they had was in relation to sex with

01:52   20  children.

21  Q.   Do you remember specifically what was said during that

22  conversation?

23  A.   I don't remember exactly how the conversation went.  I

24  remember --

01:52   25  Q.   Would anything refresh your recollection?

1  A.   I could refresh my memory if I could look at my report.

2       MR. SCHMITZ:  Your Honor, may the witness refresh her

3  recollection with the report?  It's been turned over in

4  discovery.

01:53   5       THE COURT:  Any objection, Mr. Bellmore?

6       MR. BELLMORE:  No, Your Honor.

7       THE COURT:  Yes.

8       THE WITNESS:  So in that conversation they discuss --

9  specifically they use the word kinky and pervi (ph) and that's

01:53  10  there's no limits.  Nick had -- Nicholas Derosier had stated he

11  loved hot-boy pussy and that 9 to 13 was his favorite.  And

12  then Justin Langen responded --

13       MR. BELLMORE:  Your Honor, I'm going to object.  It

14  appears the witness is reading from her report.  She is to be

01:53  15  recalling her recollection.

16       MR. SCHMITZ:  That's --

17       THE COURT:  Good point.  Why don't you take whatever

18  time that might -- that might be needed to review your report.

19       THE WITNESS:  Okay.  After reviewing or refreshing my

01:54  20  memory, the conversation, they talked about the age 9 to 13.

21  And then Justin Langen had made statements that he even likes

22  them younger.  And then at that point Nicholas Derosier shared

23  an image of what he said was XXXXXXXXXX and that he was five

24  years old.  And they talked about their arousal to that image

01:55  25  and the five-year-old.

1          And then they later discussed a video that was

2     shared.  The video was never recovered, but they talked about

3     the video, saying that it was a video of a toddler where an

4     adult male penis was, in their words, forced in, and they liked

01:55    5     the talk -- or they heard in the video the crying whimper of

6     the child, and they -- they discussed enjoying that part of the

7     video.

8     Q.   (MR. SCHMITZ CONTINUING)   To you, was that gross?

9     A.   That is very gross.

01:55   10     Q.   Let's switch gears.  Okay.  So do you remember being asked

11     questions about whether not using a write blocker altered data

12     on the thumb drive?  Do you remember those questions?

13     A.   Yes.

14     Q.   So September 17, 2020, is the last accessed date at

01:56   15     12:00 a.m.  First, do you know that 12:00 a.m. was the date

16     that file was accessed, or was it accessed at some point during

17     September 17th and it just -- the time defaulted to 12:00 a.m.?

18     Do you know?

19     A.   I do not know.

01:56   20     Q.   Okay.  Now, besides that last accessed date being

21     September -- changed to September 17, 2020, was any data on the

22     thumb drive altered, to your knowledge?

23     A.   No.

24     Q.   Was any data essentially added to that thumb drive, to

01:57   25     your knowledge?

1  **A.**   No.

2  **Q.**   Was your search of this thumb drive made any more

3  extensive or invasive because of the change of that accessed

4  date?

01:57   5  **A.**   Can you ask that again?

6  **Q.**   Sorry.  That was a bad -- that was a bad question.  Did

7  your search of this device change in any way because of the

8  change in that date?

9  **A.**   No.

01:57  10  **Q.**   Okay.  Do you remember being asked questions on

11  cross-examination about Mega?

12  **A.**   Yes.

13  **Q.**   All right.  And you testified that you hadn't seen Mega

14  used in any fraud cases?

01:58  15  **A.**   I have not.

16  **Q.**   Okay.  You have not.  Let me get a sense for you.  How

17  many fraud cases does the Grand Forks P.D. generally handle?

18  Is it a heavy part of their docket?

19  **A.**   No, it is not.

01:58  20  **Q.**   Can you just sort of elaborate on that?  I mean, how

21  much -- what part of -- part of the police force is it?

22  **A.**   We do have a detective that is assigned to handle fraud

23  cases, but his caseload includes that, as well as theft and

24  burglary and property crimes, so he is specialized to do --

01:58  25  which was Detective Buzzo at the time, but now another

1   detective took over that position.

2   **Q.**   Okay.  Now, again, did you know what was in that Mega

3   folder for sure before you opened it up and looked at some --

4   looked at some of the files?

01:59   5   **A.**   No.

6   **Q.**   All right.  Now, if you had come across this Mega folder

7   and said, "Oh, there might be child pornography in here," and

8   then stopped and went to the state's attorney and tried to get

9   a search warrant, do you think you would've gotten one?

01:59   10   **A.**   No.

11   **Q.**   Why not?

12   **A.**   I would've had to have developed probable cause to search

13   for child porn in the --

14   **Q.**   But you -- sorry.  I just cut you off.  I'm sorry.  I

01:59   15   wasn't even looking at you.

16   **A.**   The file folder name in itself doesn't go to probable

17   cause.

18   **Q.**   Okay.  And to your knowledge, can -- based on what you

19   know about Mega's functionality, can it be used in business?

01:59   20   **A.**   Yes.

21   **Q.**   And in all the business crimes that the Grand Forks Police

22   Department has investigated, do those crimes sometimes involve

23   the use of online storage, like cloud storage?

24   **A.**   Yes.

02:00   25   MR. BELLMORE:  I'm going to object, Your Honor,

1  foundation.

2           MR. SCHMITZ:  Your Honor, he opened the door.  He

3  asked her about the Grand Forks Police Department's practices

4  and --

02:00
5           MR. BELLMORE:  Your Honor, it was a foundational.  We

6  have no -- established that Detective Freeman is aware in a

7  general sense of fraud cases involving Mega.

8           MR. SCHMITZ:  Your Honor, what's good for the goose

9  is good for the gander.  He literally asked if Mega was used in

02:00
10  other fraud cases.

11           MR. BELLMORE:  I asked from her personal experience,

12  whether she had encountered that.  Whether she knows that's

13  possible for any other law enforcement officer or agency is not

14  something she has personal knowledge of.  If not, there needs

02:00
15  to be more -- if that's not the case, there needs to be more

16  foundation laid to establish that.

17           THE COURT:  Detective Freeman, do you know the extent

18  to which the Grand Forks Police Department may have been

19  involved in fraud cases where Mega was involved?

02:01
20           THE WITNESS:  I am not aware of any.

21           THE COURT:  Thank you.

22  Q.   (MR. SCHMITZ CONTINUING)  Okay.  Do you remember being

23  asked about why you didn't search any text files?

24  A.   Yes.

02:01
25  Q.   Do you see any text files in this directory right there?

365

1  **A.**  No.

2      MR. SCHMITZ:  No.  Can you go from the -- scroll

3  down, the next page?

4  **Q.**  (MR. SCHMITZ CONTINUING)  Do you see -- do you see any

5  text files in there?

6  **A.**  No.

7  **Q.**  So if you had searched for text files in there, how many

8  files would you have searched?

9  **A.**  None.

10  **Q.**  And this was the -- was this the first -- was this the

11  first device you searched besides hooking up Item Number 1 to

12  image it?

13  **A.**  Yes.

14      MR. SCHMITZ:  Your Honor, may I have a moment?  Your

15  Honor, those are -- those are all my questions.  Thank you.

16  Those are all my questions.  Thank you very much.

17      THE COURT:  Mr. Bellmore, any last questions?

18      MR. BELLMORE:  Yes, Your Honor.

19                    RECROSS EXAMINATION

20  BY MR. BELLMORE:

21  **Q.**  Detective Freeman, the government just asked you questions

22  about the contents of the Mega folder, and you said that there

23  were no text files within that folder, correct?

24  **A.**  That is correct.

25  **Q.**  How many folders were in the thumb drive?

02:01

02:01

02:02

02:03

366

1   **A.**   Six folders.

2   **Q.**   We've gone back and forth on looking for different file

3   types, but my question is, was there anything that you knew

4   preventing you from searching for images?  Did the warrant, as

02:03   5   you knew it, did that prevent you from going and looking at

6   images?

7   **A.**   No.

8   **Q.**   Did you -- did you have a copy of the warrant with you

9   when you were going through this?

02:04   10   **A.**   Yes.

11   **Q.**   Did anything in that warrant limit what timeframe you

12   could search for any sort of document?

13   **A.**   There was no timeframe.

14   **Q.**   Just any electronic file you were allowed to go through,

02:04   15   right?

16   **A.**   Listed in the warrant.

17   **Q.**   Listed in the warrant as to the -- all of the devices that

18   were seized?  Is that what you are referring to?

19   **A.**   Yes.

02:04   20   **Q.**   Okay.  When you stumbled on the Mega folder, you didn't

21   call the state's attorney's office at that point, right?

22   **A.**   No.

23   **Q.**   You waited until you saw -- you clicked on a file and saw

24   what you believed to be child pornography?

02:05   25   **A.**   Yes.

1  **Q.**   That's when you called the state's attorney's office?

2  **A.**   Yes.

3  **Q.**   And when you were inside the home and you were able to

4  observe the desk with the desktop computer on it, there were a

02:05   5  number of papers on the desk, right?

6  **A.**   Yes.

7  **Q.**   And those were related to a business?

8  **A.**   I don't recall.

9  **Q.**   Okay.  Was there anything in the affidavit talking about

02:06   10  Mr. Morgan-Derosier's business being a secret operation?

11  **A.**   I didn't read the affidavit.

12        MR. BELLMORE:  That's all the questions I have.

13        THE COURT:  May Detective Freeman be excused?

14        MR. SCHMITZ:  Yes, Your Honor.  Thank you.

02:06   15        THE COURT:  Mr. Bellmore --

16        MR. BELLMORE:  Yes, Your Honor.

17        THE COURT:  -- any objection?  Thank you.  You are

18  excused.

19        Ms. Puhl, why don't we begin with your next witness.

02:06   20        MS. PUHL:  The United States has no further

21  witnesses, Your Honor.  We may have a rebuttal witness.

22        THE COURT:  Mr. Bellmore?

23        MR. BELLMORE:  Your Honor, the defense calls Special

24  Agent Casetta.

02:06   25        THE COURT:  Agent Casetta, would you come forth and

368

1    take a --

2            MS. PUHL:  Your Honor, before we do that, can we have

3    just a short break?  I need to use the restroom.

4            THE COURT:  Well, why don't we take a break and come

02:07    5    back at 2:25.

6            MS. PUHL:  Thank you.

7            (A recess was taken from 2:07 p.m. to 2:25 p.m., the

8    same day.)

9            THE COURT:  Ms. Puhl.  Oh, I'm sorry.  Mr. Bellmore,

02:26   10    you had called Agent Casetta.

11            MR. BELLMORE:  Yes, Your Honor.

12            THE COURT:  Agent Casetta, would you come forward and

13    be sworn, please?

14                           DANIEL CASETTA,

15    having been first duly sworn, was examined and testified as

16    follows:

17                         DIRECT EXAMINATION

18    BY MR. BELLMORE:

19    Q.   Good afternoon, sir.  Could you state your name and your

02:26   20    title for the record, please?

21    A.   Special Agent Daniel Casetta, Homeland Security

22    Investigations.

23    Q.   And how long have you been in that role?

24    A.   I've been with Homeland Security Investigations since June

02:26   25    of 2018.

1   Q.   And how long have you been in law enforcement?

2   A.   I've been in law enforcement pretty much my entire adult

3   life.  Started out in 1998 in the Air Force, where I attended

4   security forces law enforcement academy.  I was in the Air

5   Force from '98 to 2005.  After that I got hired on by the Grand

6   Forks Police Department in -- I believe it was May of 2005, and

7   I worked for them until June of 2018, when I joined Homeland

8   Security Investigations.

9        THE COURT:  Was it '18 or 2019?

10        THE WITNESS:  In 2018.

11        THE COURT:  '18.  Okay.  You went to HSI in 2018.

12        THE WITNESS:  Yes.

13        THE COURT:  Thank you.

14   Q.   (MR. BELLMORE CONTINUING)  So in September of 2020 you

15   were employed with HSI?

16   A.   Yes.

17   Q.   And that has a law enforcement agency that investigates,

18   among other things, child pornography offenses?

19   A.   We have a plethora of investigations, but, yes, child

20   pornography is one of the investigations that we conduct.

21   Q.   And how did you get involved in this case back in

22   September of 2020?

23   A.   The morning of September 15, 2020, I was sitting in my

24   office at the narcotics task force.  Detective Buzzo gave me a

25   call, asked me if I wanted to assist with a financial crimes

370

1    search warrant, and I had nothing going on.  He said the

2    briefing is in about 15 or 20 minutes.  I said I'll head over

3    to the police department.

4    Q.   And do you know Detective Buzzo from your time at the

02:28   5    Grand Forks Police Department?

6    A.   I knew him from the police department, and we served in

7    the Air Force together.

8    Q.   So was there -- was there a meeting to discuss what was

9    going to happen with the search?

02:28  10    A.   Yes, there was a briefing, a search warrant briefing prior

11    to the search warrant.

12    Q.   And was it discussed at that meeting what the reasons for

13    the search were?

14    A.   Yes, it was.

02:28  15    Q.   And this was a search of a home, a house.

16    A.   It was the search of a residence that was used as a

17    business.

18    Q.   In Grand Forks?

19    A.   Yes.

02:29  20    Q.   I don't think I asked, is that where you are stationed, in

21    Grand Forks?

22    A.   Yes, in Grand Forks office.

23    Q.   So about what time do you arrive to this residence in

24    Grand Forks?

02:29  25    A.   I arrived with all the other officers, so it would've been

1   approximately 10:00 a.m. in the morning.

2   Q.   And you've been present in the courtroom throughout the

3   testimony in this hearing?

4   A.   Yes.

02:29   5   Q.   But to be clear, that was XXXXXXXXXXXXXXXX in Grand Forks?

6   A.   XXXXXXXXXXXXXXXX South in Grand Forks, North Dakota.

7   Q.   Were you the only federal officer that was present for the

8   search?

9   A.   Yes, I was.

02:29   10   Q.   Were there any other occupants in the house when you

11   arrived?

12   A.   When we arrived there were three occupants of the house.

13   Q.   Would that be a Blake Thorson, Julia Anderson, and

14   Christyan Logan?

02:29   15   A.   Yes.

16   Q.   Did you speak with any of them?

17   A.   I did.

18   Q.   Which ones?

19   A.   I spoke with all three, Anderson, Logan, and Thorson.

02:30   20   Q.   Did you explain to them why you were there?

21   A.   Actually, when I was talking to them, it was just after

22   the scene was secured.  They were sitting in the kitchen-living

23   area at the table, and it was just casual conversation,

24   learning where they were from and then kind of learning who was

02:30   25   dating who, because it was Christyan Logan and Julia Anderson

1   were a couple, and just getting to know who they were.

2   **Q.**   Was it at that point that Ms. Anderson told you that Mr.

3   Morgan-Derosier had raped XXXXXXXXXX?

4   **A.**   I asked the question, "What are your feelings about

02:30   5   Nicholas Derosier?"  And Julia Anderson just spurted out, "He

6   raped his eight-year-old XXXXXX in Minnesota."  I was actually

7   taken back by the statement.

8   **Q.**   And did one of the males give you information about a

9   thumb drive?

02:31   10   **A.**   Both Christyan and -- Christyan Logan and Blake Thorson

11   were kind of speaking simultaneously.  They were talking about

12   a thumb drive that they had found because they were looking to

13   get paid, and on that thumb drive they had found a file that

14   said "boys."  Christyan said that he did not look at any of the

02:31   15   pictures.  Blake Thorson said he opened up the -- a picture and

16   saw a young male and then closed it right away.  He didn't go

17   into any further description about it at all.

18   **Q.**   Well, did either of them describe where the thumb drive

19   was?

02:31   20   **A.**   They had said it was in a safe.

21   **Q.**   Did they say where the safe was located?

22   **A.**   They said the safe was in the bedroom of Nicholas

23   Derosier's residence.

24   **Q.**   Did you search that bedroom?

02:31   25   **A.**   When I had heard about this information, I asked if

1   anybody had gone up to search the bedroom yet to pass along the

2   information.  I had found out no one had gone up to that

3   bedroom to search it yet, so I grabbed Detective Sergeant Suby,

4   and we went up to the bedroom to search the bedroom together.

5   **Q.**   You said you passed along the information.  The

6   information about the image?

7   **A.**   I believe I said -- I asked if anybody had searched the

8   bedroom yet so I could pass along the information that there's

9   a safe up there that does have computer equipment in it and

10   that there is a possibility of an unknown image with a child.

11   **Q.**   What about what Ms. Anderson said?  Did you share that

12   with other officers?

13   **A.**   I shared it with other officers.  I couldn't tell you

14   exactly who.

15   **Q.**   And there were -- well, do you know for sure how many

16   officers were present there with you?

17   **A.**   Off the top of my head there was myself, Detective Buzzo,

18   Detective Freeman, Sergeant Rory Suby, Detective Rob Starr,

19   Detective Caitlin Stromberg, Detective Steve Conley, and

20   Detective Darrin Johnson showed up a little bit later.  And at

21   one point I believe it was -- I think he's captain or deputy.

22   Sheriff Stromberg (sic) had showed up when we found the

23   explosive device.

24   **Q.**   So some of those you may have told the -- some of those

25   officers you may have told what you had learned from the

02:32
02:32
02:32
02:33
02:33

1   occupants of the house about Mr. Morgan-Derosier and the thumb

2   drive?

3   **A.**   Yes.

4   **Q.**   And you -- so you searched that bedroom.

02:33   5   **A.**   I did.  I searched the bedroom with the assistance of

6   Detective Suby.

7   **Q.**   Detective Suby taking photographs?

8   **A.**   No, Detective Steve Conley was taking the photographs.

9   **Q.**   So what was that about?  So you saw something you wanted

02:34   10  to photograph.  You'd just call for him to take a photograph,

11  or was he following you, staying with you the whole time?

12  **A.**   So normal -- the way the normal thing works is overalls

13  are taken, and then people break off and search separate rooms.

14  And then if you find an item of evidence, you'll call for a

02:34   15  photograph.  If you're finding multiple items of evidence, then

16  usually the person taking photographs will stay in that room.

17  This way when you're looking at the photographs later, they go

18  in somewhat of a chronological order.  This way you're not

19  going it was in this bedroom and then the next photo is a

02:34   20  different bedroom, so Detective Conley stayed with me for a

21  little bit.

22  **Q.**   Did you alert him because you had located that safe that

23  was referenced by the occupants?

24  **A.**   Yes.

02:34   25  **Q.**   Was that safe open, or did you have to do something to

1  gain access to it?

2  A.   The safe was locked, and I don't recall if it was Blake

3  Thorson or Christyan Logan stated where the key was.  It was

4  either in a jacket pocket on the entry door for the bedroom or

02:35  5  hanging on the entry door itself.  I can't recall which one it

6  was, but they pointed out the key to me.

7  Q.   Did you also go through a dresser in a bedroom?

8  A.   As part of the search, yes, I did.

9  Q.   Was that the same bedroom that you found the safe in?

02:35  10  A.   Yes, it was.

11  Q.   Before we go too far, what was your understanding of what

12  the purpose of the search was?  Well, let me change that

13  question.  What were the offenses being investigated with the

14  search warrant?

02:35  15  A.   They were fraud offenses, contracting without a license,

16  violation of a judicial order, and construction fraud.

17  Q.   Did you have the warrant while you were at the residence?

18  A.   While I was at the residence, no, I did not have the

19  warrant.

02:36  20  Q.   Was it discussed at the briefing beforehand?

21  A.   Yes, the details of the warrant was discussed at the

22  briefing.

23  Q.   Special Agent Casetta, I'm showing you Government's

24  Exhibit 65.  Do you see that?

02:36  25  A.   Yes.

1   **Q.**   Do you recognize that photo?

2   **A.**   Yes, I do.

3   **Q.**   What is it?

4   **A.**   It appears to be a pullup-style diaper for toddlers that

02:36   5   are in potty-training.

6   **Q.**   And that was located in a bedroom within the residence?

7   **A.**   Yes, it was located in Nicholas Derosier's bedroom.

8   **Q.**   All right.  I'm showing you Government's Exhibit 63.  Can

9   you see that?

02:37   10   **A.**   Yes, I can.

11   **Q.**   Do you recognize it?

12   **A.**   Yes.

13   **Q.**   Is that the dresser that we've been talking about?

14   **A.**   Yes, it is.

02:37   15   **Q.**   Is that where the diaper that was in the previous photo

16   came from?

17   **A.**   Yes, it was.

18   **Q.**   I'm showing you now Exhibit 56.  Can you see that?

19   **A.**   Yes.

02:37   20   **Q.**   Do you recognize it?

21   **A.**   Yes.

22   **Q.**   Is that the safe?

23   **A.**   Yes, it is.

24   **Q.**   Okay.  And that's the inside of the safe?

02:37   25   **A.**   Yes.

1   **Q.**   And that's -- you located a thumb drive in that safe?

2   **A.**   Yes, I did.

3   **Q.**   This is Government's Exhibit 57.  Do you recognize this

4   photo?

02:38   5   **A.**   Yes.

6   **Q.**   Is this a picture of a thumb drive?

7   **A.**   Yes, it is.

8   **Q.**   Is that the thumb drive that was located in the safe?

9   **A.**   Yes.

02:38   10   **Q.**   Did -- after you continued in that bedroom, what did you

11   do with the evidence that you intended to keep?

12   **A.**   The evidence that was seized, I believe at the time I had

13   given it to Detective Rory Suby, and he took it down to

14   Detective Freeman to get processed into evidence.

02:38   15   **Q.**   It wasn't just the thumb drive.  That was other devices as

16   well?

17   **A.**   Yes, there was multiple items that were taken from the

18   safe.

19   **Q.**   At some point in the search did you go outside?

02:38   20   **A.**   Yes, I did.

21   **Q.**   I apologize.  I forgot one item going back to the safe.

22   Did you locate some documents within the safe?

23   **A.**   There were several documents in the safe.

24   **Q.**   All right.  Was one of those a birth certificate?

02:39   25   **A.**   Yes, it was.

1  **Q.**   With Mr. Morgan-Derosier's name on it?

2  **A.**   Yes.

3  **Q.**   And then you photographed that as well?

4  **A.**   Yes.

02:39    5  **Q.**   You didn't seize that, though?

6  **A.**   No, we did not.

7  **Q.**   Okay.  So at some point you exited the -- during the

8  search, you left the house.

9  **A.**   Yes.

02:39  10  **Q.**   Okay.  While the search was still ongoing?

11  **A.**   I'm not sure if they were wrapping up, but my portion of

12  the search would've been completed.

13  **Q.**   And when you went outside, Mr. Morgan-Derosier was outside

14  as well?

02:39  15  **A.**   Yes, he was.

16  **Q.**   And you had a conversation with him?

17  **A.**   Yes, I did.

18  **Q.**   And that also involved Detective Buzzo?

19  **A.**   Yes, it did.  And Detective Darrin Johnson was out there

02:40  20  as well.

21  **Q.**   Now, Detective Buzzo wasn't inside searching that bedroom

22  with you, was he?

23  **A.**   He was not.

24  **Q.**   Okay.  So when you joined the conversation, you told

02:40  25  Mr. Morgan-Derosier that you had spoken to Logan, Thorson and

1   Anderson.

2   **A.**   Yes, I did.

3   **Q.**   And you said that they -- those three had a lot to say

4   about Mr. Morgan-Derosier.

02:40   5   **A.**   Yes, I did.

6   **Q.**   And you asked Mr. Morgan-Derosier about the diapers that

7   you found in the bedroom.

8   **A.**   Yes, I did.

9   **Q.**   You also said that you were finding a lot of interesting

02:40   10   stuff inside the house.

11   **A.**   Yes.  I was referring to the diapers.

12   **Q.**   You also asked about electronic devices, though, too,

13   right?

14   **A.**   I believe there was a question about that.

02:40   15   **Q.**   You asked him if there was any picture-related evidence?

16   **A.**   I believe I asked if there's anything that we'd find on

17   any of the devices.

18   **Q.**   That you should be concerned with?

19   **A.**   Yes, it was a question like that.

02:41   20   **Q.**   Okay.  And I -- to clarify, when I say "you," I meant

21   yourself.  Anything law enforcement should be concerned with?

22   **A.**   I'd have to listen to it or look at the transcript, but

23   the question was -- I believe it was, "Is there anything that

24   we need to know about that you'd be concerned about," something

02:41   25   along those lines.

1    Q.   Okay.  You talked about -- if you can recall, you

2    mentioned internet crimes a few times to Mr. Morgan-Derosier?

3    A.   I did say that we investigate internet crimes.

4    Q.   But you didn't -- you never said the words "child

02:41    5    pornography."

6    A.   No, I did not.

7    Q.   During that conversation Mr. Morgan-Derosier started

8    asking about the warrant?  Do you recall that?

9    A.   Yes.

02:42    10    Q.   And do you recall telling him that you didn't have a

11    chance -- you didn't have a chance to review the warrant?

12    A.   I did tell him that.

13    Q.   And that you believed it was a state warrant?

14    A.   Yes.

02:42    15    Q.   And was it you who then responded with, you were looking

16    for business records, electronics, anything like that?

17    A.   I don't recall if it was myself that said that or

18    Detective Darrin Johnson.

19    Q.   Did Mr. Morgan-Derosier ask for a warrant at that point?

02:42    20    A.   At some point he did.  And again, I don't know if it was

21    myself or Detective Darrin Johnson said that he will get a

22    copy, and it actually may have been Sergeant Suby that said,

23    "You'll be provided a copy of the warrant."

24    Q.   You personally never provided a copy of the warrant to

02:43    25    Mr. Morgan-Derosier?

1  **A.**   I was not the case agent or the lead detective, so I would

2  not provide him with a copy of the warrant.

3  **Q.**   In your role as a special agent with HSI, is it a part of

4  your duties to investigate child pornography cases?

02:43  5  **A.**   It is one of our investigations that we do.

6  **Q.**   Is it one that you do?

7  **A.**   At the time I was assigned to the Grand Forks narcotics

8  task force, so my primary area of investigations was narcotics.

9  And then I also worked some financial crime.

02:43  10  **Q.**   What about today?

11  **A.**   Today I've been assigned to the Internet Crimes Against

12  Children Task Force.

13  **Q.**   And in your role are you familiar with the platform called

14  Mega?

02:43  15  **A.**   Yes, I am.

16  **Q.**   And that that is a cloud storage service platform?

17  **A.**   Yes.

18  **Q.**   And that's based out of Auckland, New Zealand?

19  **A.**   Yes.

02:43  20  **Q.**   And that is a popular format for child pornography --

21  child pornography traders?

22  **A.**   Child pornography traders do use it, as well as legitimate

23  -- legitimate people use it as well.

24  **Q.**   Did you submit an affidavit in this case?

02:44  25  **A.**   I did.

1   **Q.**   Do you recall writing that Mega is a popular cloud-storage

2   and file-hosting service among collectors of child pornography

3   because data on its services is end-to-end encrypted?

4   **A.**   I would have to actually look at it and see if that's what

5   was written.

6           MR. BELLMORE:  Your Honor, these are my last

7   questions, but I would like to give Mister -- excuse me,

8   Special Agent Casetta a chance to refresh his recollection.

9           THE COURT:  Certainly.

10          MS. PUHL:  Your Honor, it would be helpful -- there

11  were several search warrants, I think, in this case, so if you

12  could identify which one.

13  **Q.**   (MR. BELLMORE CONTINUING)  Special Agent Casetta, I may

14  have said search warrant affidavit.  I'm referring to a

15  probable cause affidavit.

16  **A.**   You just said affidavit.

17  **Q.**   Okay.  Probable cause affidavit.  You did -- you did draft

18  a probable cause affidavit related to this case?

19  **A.**   Yes.

20  **Q.**   For a criminal complaint filed in federal court?

21  **A.**   Yes.

22          MR. BELLMORE:  May I approach, Your Honor?

23          THE COURT:  You may.

24          THE WITNESS:  Yes, I wrote that.

25          MS. PUHL:  Which -- which paragraph are you --

383

1          MR. BELLMORE:  Fifteen.

2          MS. PUHL:  Fifteen?

3          MR. BELLMORE:  That's all the questions I have, Your

4    Honor.  May I approach to retrieve the document?

02:46    5          THE COURT:  You may.  Ms. Puhl.

6                        CROSS-EXAMINATION

7    BY MS. PUHL:

8    Q.    Good afternoon, Special Agent Casetta.

9    A.    Good afternoon, ma'am.

02:47   10    Q.    In 2002 (sic) you were not assigned to the Internet Crimes

11    Against Children Task Force, were you?

12    A.    In 2002 or --

13    Q.    Or 2020.  I'm sorry.

14    A.    No, I was not, not in 2020.

02:47   15    Q.    You were assigned to the drug task force in 2020, isn't

16    that right?

17    A.    Yes.

18    Q.    And because you were assigned to the drug task force in

19    2020, you didn't even office at HSI, is that right?

02:47   20    A.    I had an office there, but my primary office was at the

21    task force.

22    Q.    And where was that?

23    A.    Across the street, maybe a half a block away.

24    Q.    And did you have other assigned duties in 2020?

02:47   25    A.    I had worked financial crimes with Detective Buzzo, and I

1   can't remember if that was 2019, 2020, but my primary focus

2   would've been narcotics.

3           THE COURT:  You were half a block away from the

4   police department?

02:47

5           THE WITNESS:  Sorry.  From the HSI office to the

6   Grand Forks narcotics task force office.

7           THE COURT:  Thank you.

8   **Q.**   (MS. PUHL CONTINUING)  Your duties were drug

9   investigations and white-collar fraud, is that right, in 2020?

02:48

10  **A.**   Yes.

11  **Q.**   And up until this case you had never led -- you'd never

12  been a lead investigator on a child exploitation case, is that

13  right?

14  **A.**   That is correct.

02:48

15  **Q.**   And that includes child pornography, is that right?

16  **A.**   That is correct.

17  **Q.**   Now, when you were called on September 15, 2020, by

18  Detective Buzzo, what did you know about the investigation

19  during that phone call?

02:48

20  **A.**   Absolutely nothing, just that, do you want to come for a

21  financial search warrant.

22  **Q.**   And is that typical?

23  **A.**   Yes, like, you know, calling for mutual aid because the

24  police department is a smaller agency in the grand scheme of

02:48

25  things, and they need people, so they'd call and ask for

1   assistance.

2   **Q.**   And HSI is not precluded from assisting local law

3   enforcement on local matters, is that right?

4   **A.**   That is correct.  We're actually encouraged.

02:48   5   **Q.**   You've assisted on burglary matters, is that right?

6   **A.**   Yes.

7   **Q.**   Drug matters.

8   **A.**   Yes.

9   **Q.**   Gun matters.

02:48   10   **A.**   Yes.

11   **Q.**   Fraud matters, as you've described, right?

12   **A.**   Yes.

13   **Q.**   Anything else that --

14   **A.**   We've assisted on homicides as well.

02:49   15   **Q.**   And occasionally a case does turn into a federal

16   investigation, is that right?

17   **A.**   Yes.

18   **Q.**   But that's not always the case, is that right?

19   **A.**   That is correct.

02:49   20   **Q.**   Now, when you -- and you said you attended the briefing,

21   is that right?

22   **A.**   Yes.

23   **Q.**   And at that briefing you would've reviewed the search

24   warrant, right?

02:49   25   **A.**   Yes.

1    Q.    So at the time that you arrive on scene for the execution

2    of the search warrant, what is the sum total of your

3    involvement in this case?

4    A.    Minimal.  From when I got the call to when we arrived on

02:49    5    scene at the search warrant, I'm probably an hour and

6    15 minutes to an hour and 20 minutes.

7    Q.    And when you arrived on the scene, your job was what?

8    A.    My job was just to assist, kind of a leftover person.

9    Usually you'll help with assisting or searching or taking care

02:50   10    of the people that are found in the house.  Not all search

11    warrants the people are cooperative, so sometimes somebody

12    actually has to sit and babysit them, for lack of a better

13    term.

14    Q.    And did you do that here?

02:50   15    A.    I talked with them, the individuals that were in the

16    house.  They were extremely cooperative, so I went on to seeing

17    if we could assist with searching some rooms.

18    Q.    And it was during the time that you gathered these three

19    individuals in the living area of the residence that you had a

02:50   20    conversation with them, right?

21    A.    Yes.

22    Q.    And that wasn't a formal conversation -- or that wasn't a

23    formal interview, was it?

24    A.    Nope, it was just casual conversation.

02:50   25    Q.    If you were going to conduct a formal interview, you would

1    do it separately, right?

2    A.    Yes.

3    Q.    Okay.  So it was during this conversation you asked an

4    open question about what you think about Mr. Derosier, is that

02:50   5    right?

6    A.    Yes.

7    Q.    And Julia Anderson, is that right --

8    A.    Yes.

9    Q.    -- told you that --

02:51   10    A.    He had raped his eight-year-old XXXXXX in Minnesota.

11    Q.    And were you trying to elicit that information?

12    A.    I was not.

13    Q.    Was it unexpected?

14    A.    It was extremely unexpected.  Like I said, I was taken

02:51   15    back by it.

16    Q.    Are you required to ignore that information when you hear

17    it?

18    A.    No.

19    Q.    And as a sworn peace officer, should you ignore it?

02:51   20    A.    No.

21    Q.    Should you ask questions about it?

22    A.    Yes.

23    Q.    And you did that.

24    A.    Yes.

02:51   25    Q.    Now, one of the other roommates also talked about finding

1    an image of a boy on a thumb drive in a safe, is that right?

2    **A.**   Yes.

3    **Q.**   And the safe was in the bedroom, right?

4    **A.**   Yes.

02:51  5    **Q.**   And that was relevant information because the safe

6    contained electronic media, right?

7    **A.**   Yes.

8    **Q.**   And you were there to search for electronic media.

9    **A.**   Yes.

02:51  10   **Q.**   So as a result of that, you told the officers about the

11   safe, right?

12   **A.**   Yes.

13   **Q.**   And you wanted to ensure that the officers were going to

14   search that safe so they would find the electronic media, is

02:52  15   that right?

16   **A.**   Yes.

17   **Q.**   Now, inside that safe you found some electronic media, and

18   we've talked about that, or that's been discussed a lot during

19   the suppression hearing, right?

02:52  20   **A.**   Yes.

21   **Q.**   And you also found a ring, right?

22   **A.**   Yes.

23   **Q.**   And you found that ring.

24   **A.**   Yes.

02:52  25   **Q.**   And you found a birth certificate.

1    **A.**    Yes.

2    **Q.**    And why did you take pictures of those items?

3    **A.**    To show that it belonged -- the safe belonged to Nicholas

4    Derosier.

02:52    5    **Q.**    And more specifically, the electronic evidence in the

6    safe, right?

7    **A.**    Yes.

8    **Q.**    And you were authorized to do that under the search

9    warrant, right?

02:52    10    **A.**    Yes.

11    **Q.**    Now, you also found diapers, right?

12    **A.**    I did.

13    **Q.**    And you took a picture of those diapers because Julia

14    Anderson just told you that the defendant raped XXXXXXXXXX,

02:52    15    right?

16    **A.**    Yes.

17    **Q.**    And then you went downstairs, and you exited the residence

18    and asked the defendant a question, is that right, about those

19    diapers?

02:53    20    **A.**    Yes.

21    **Q.**    Special Agent Casetta, you located, as you just testified

22    to, a number of items in the safe, right?

23    **A.**    Yes.

24    **Q.**    Did you -- you didn't give those items directly to

02:53    25    Detective Freeman, right?

1  A.   Correct.  I believe I gave them to Detective Suby, and he

2  took them down to her.

3  Q.   Okay.  And so is that noted on this evidence inventory?

4  A.   It is not.

02:53   5  Q.   Is there a -- is there a mistake on Line 8?

6  A.   It looks like it, yes.

7  Q.   And what is that?

8  A.   It's Detective Suby's badge number, and then it's crossed

9  out, and then my name is over it.

02:53   10  Q.   Okay.  And that's because Detective Suby gave the item to

11  Detective Freeman, right?

12  A.   Yes.

13  Q.   And then it was clarified that it wasn't Detective Suby

14  that found it, but it was you that found it.

02:54   15  A.   Yes.

16  Q.   Okay.  So you find the items.  You give them to Detective

17  Suby, and Suby, in turn, gives them to Detective Freeman,

18  right?

19  A.   Yes.

02:54   20  Q.   So you didn't give Detective Freeman the item and then

21  tell her about what was said, is that right?

22  A.   No, I did not.

23  Q.   When you left the residence and you asked -- you left the

24  residence and went outside to talk to Mr. Derosier during the

02:54   25  interview, and you asked him about the diapers.  You said you

1  did that because Julia Anderson told you about his raping XXXX

2  XXXXXX, right?

3  **A.**   Yes.

4  **Q.**   Okay.  You also asked the defendant whether law

02:54    5  enforcement would find anything on the devices that they

6  shouldn't, right?

7  **A.**   Yes.

8  **Q.**   Okay.  That's not an unusual question to ask, is it?

9  **A.**   That's a question I ask almost every time, whether you're

02:54   10  searching a car, even searching a person, a electronic device,

11  a house.  It's a common question to ask.

12  **Q.**   And what's your experience when you -- what do -- in your

13  -- when you're training -- or, excuse me.  In your experience

14  as a law enforcement officer who's conducted lots of

02:55   15  interviews, what do individuals on occasion say to -- respond

16  to that question?

17  **A.**   They sometimes actually give up -- whether it'd be like a

18  car, going, "Yes, I do have drugs in here"; "yes, there is a

19  gun under the seat"; or if there's something stolen they may

02:55   20  give up a confession to you; or they may say, "No"; or they may

21  say something along the line of, "I don't know" or "There

22  shouldn't be," and it's just all kind of clues when you're

23  talking to somebody.

24  **Q.**   But oftentimes you're asking that question, and you don't

02:55   25  even have any reason to ask the question, right?

1   **A.**   Correct.

2   **Q.**   But in this case you did have a reason, is that right?

3   **A.**   Yes.

4   **Q.**   And that's because one of the roommates told you that they

02:55   5   found an image of a young boy on a thumb drive in the safe,

6   right?

7   **A.**   Yes.

8   **Q.**   And again, you're not required to ignore that, right?

9   **A.**   Correct.

02:56   10   **Q.**   During the inter -- during the interview of the defendant,

11   you can be heard telling him that you didn't review the

12   warrant.  Do you remember hearing that?

13   **A.**   Yes.

14   **Q.**   And is that a true statement?

02:56   15   **A.**   No, it's not.

16   **Q.**   Why did you say it?

17   **A.**   It's something that you'll say to a suspect or even

18   sometimes a witness when you're not the lead agent, because I

19   don't know what Detective Buzzo has told him about everything

02:56   20   in the investigation, so if I say I didn't review it, it's an

21   easy out where they're not going to continue asking me

22   questions about it.

23   **Q.**   And you did, as you previously testified, review the

24   warrant, is that right?

02:56   25   **A.**   Yes, during the search warrant briefing.

393

1  **Q.**   And during this same interview you asked -- you and

2  Detective Buzzo asked questions about the defendant's safe,

3  right?

4  **A.**   Yes.

5  **Q.**   And he acknowledged there would be business documents in

6  that safe, didn't he?

7  **A.**   Yes.

8  **Q.**   Or business records, rather.

9  **A.**   Yes.

10        MS. PUHL:  No further questions, Your Honor.

11        THE COURT:  Do I understand you to say that at the

12  time of the briefing you did review the warrant itself?

13        THE WITNESS:  The warrant that was handed out at the

14  briefing.

15        THE COURT:  Did you review the exhibit to that

16  warrant?

17        THE WITNESS:  Yes.

18        THE COURT:  Did you review the affidavit?

19        THE WITNESS:  I did not review the affidavit.

20        THE COURT:  Did you review the affidavit at any time

21  on September 5 (sic) of 2020?

22        THE WITNESS:  On September 15th, ma'am?  No.

23        THE COURT:  Thank you.  Mr. Bellmore?

24        MR. BELLMORE:  Thank you, Your Honor.

25        ///

1                    REDIRECT EXAMINATION

2    BY MR. BELLMORE:

3    Q.   Special Agent Casetta, Ms. Puhl just asked you about a

4    conversation at the scene you had with Mr. Morgan-Derosier

02:58    5    where he told you that there was business records in a safe?

6    A.   It was something along those lines, yes.

7    Q.   Okay.  Did Mr. Morgan-Derosier ever consent to having that

8    residence searched by you?

9    A.   He never consented to me to search the residence.  We had

02:58   10    a search warrant to search the residence.

11   Q.   So you were there for a search warrant?

12   A.   Yes.

13   Q.   And what was authorized to be searched was directed by the

14   search warrant?

02:58   15   A.   The search warrant gave us the address, and then on the

16   attachment or the exhibit - I'm not sure what it's labeled -

17   said what we were looking for within the search warrant.

18   Q.   So your mid-search conversation with Mr. Morgan-Derosier

19   did not give you the authority to search for any particular

02:58   20   object in the safe, right?

21   A.   I'm kind of confused by your question.

22   Q.   Was it Mr. Morgan-Derosier's words to you, or was it the

23   warrant that let you search that residence?

24   A.   It was the warrant that let us search the residence.

02:59   25   Q.   You already had a warrant before you talked to Mr.

1    Morgan-Derosier, right?

2    **A.**    Detective Buzzo had a search warrant for the residence

3    prior to me speaking with Mr. Derosier.

4            MR. BELLMORE:  I have no further questions.

5            THE COURT:  Ms. Puhl, anything else?

6            MS. PUHL:  Nothing further.  Thank you, Your Honor.

7            THE COURT:  Thank you, sir.

8            THE WITNESS:  Thank you.

9            THE COURT:  Mr. Bellmore, do you have other

10   witnesses?

11           MR. BELLMORE:  Yes, Your Honor.  We will call Daniel

12   Meinke.

13           THE COURT:  Good afternoon, sir.  Would you come

14   forward and take an oath, please?

15                        <u>DANIEL MEINKE</u>,

16   having been first duly sworn, was examined and testified as

17   follows:

18           THE COURT:  Mr. Bellmore.

19                     <u>DIRECT EXAMINATION</u>

20   <u>BY MR. BELLMORE</u>:

21   **Q.**    Good afternoon, sir.  Could you state your name for the

22   record, please?

23   **A.**    Daniel Meinke.

24   **Q.**    How are you currently employed?

25   **A.**    I am the senior partner of Computer Forensic Resources in

1    Sioux Falls, South Dakota.

2    **Q.**    And how long have you been in that position?

3    **A.**    I founded the company in 2006, and I've been with the

4    company full-time since.

03:01    5    **Q.**    And what does that company do?

6    **A.**    We provide digital forensic services for both criminal and

7    civil cases regarding basically any type of device that can

8    store digital content ranging from computer systems, cell

9    phones, storage devices, cloud repositories, vehicles,

03:01    10    surveillance systems.

11    **Q.**    And what is your educational background with respect to

12    that role?

13    **A.**    I have several -- several hundred hours of formal training

14    in the field of computer forensics and certifications

03:02    15    associated with that training.

16    **Q.**    Could you describe some of those certifications?

17    **A.**    The primary certification, the most widely recognized

18    certification would be that of the ENCE, the EnCase Certified

19    Examination Certification that I've held for a number of years.

03:02    20    **Q.**    And have you -- in your role have you -- have you

21    testified in a court before?

22    **A.**    Yes, I have been qualified as an expert in state and

23    federal courts in North Dakota, South Dakota, Iowa, Nebraska,

24    Louisiana, Mississippi, and Florida.

03:02    25        MR. BELLMORE:  Your Honor, I have what has been

1    marked as Exhibit 25, Defendant's Exhibit 25.  May I approach

2    the witness?

3            THE COURT:  You may.

4    Q.   (MR. BELLMORE CONTINUING)  Mr. Meinke, do you have a copy

5    -- or, excuse me.  Do you have the document marked Defendant's

6    Exhibit 25 in front of you?

7    A.   Yes, sir.

8    Q.   Do you recognize it?

9    A.   I do.

10   Q.   What is it?

11   A.   It is a copy of my professional résumé or curriculum

12   vitae.

13   Q.   That explains your education, employment, and training?

14   A.   Yes.

15           MR. BELLMORE:  Your Honor, I would offer Defendant's

16   Exhibit 25 at this time.

17           THE COURT:  Ms. Puhl?

18           MR. SCHMITZ:  No objection, Your Honor.

19           THE COURT:  Exhibit 25 -- Defense Exhibit 25 is

20   received.

21   Q.   (MR. BELLMORE CONTINUING)  In your line of work do you do

22   both civil and criminal --

23   A.   Yes.

24   Q.   -- cases?

25   A.   Yes.

1   **Q.**   Have you handled cases involving business records?

2   **A.**   Yes.

3   **Q.**   How many?  Could you estimate?

4   **A.**   Several.  In excess of a hundred.

03:04   5   **Q.**   As to child pornography offenses, about how many cases do

6   you think you've worked on?

7   **A.**   Over a thousand.

8   **Q.**   And going back how many years do you have experience

9   handling child pornography cases?

03:04   10   **A.**   Since they came into -- into my world early on in my

11   career, as early as in 2006.

12   **Q.**   So you got your start with those type of cases?

13   **A.**   I did.

14   **Q.**   And how has it expanded since then?

03:05   15   **A.**   Exponentially.  I have -- the cases that I work on

16   involving child sex abuse material, child pornography, I am

17   required to work on in a lab-type environment in an office

18   inside of the secure area of the U.S. Attorney's building in

19   Sioux Falls.  The federal government has provided me with that

03:05   20   office, that my staff and I are the only ones that have access

21   to since the duration, since we began processing these cases.

22   I currently have several active cases that I'm working on in

23   that office as we speak.

24   **Q.**   Why does it have to be secure?

03:05   25   **A.**   Due to various state and federal laws and primarily the

1   Adam -- the Adam Walsh Act.

2   **Q.**   Do you maintain a separate workstation for non-child

3   pornography cases?

4   **A.**   A completely separate office across town.  So my primary

03:06   5   office we process all of our civil cases and any criminal cases

6   that don't -- aren't alleged to involve contraband material.

7   So the cases that I process in the office -- in the U.S.

8   Attorney's Office are the child sex abuse cases or alleged to

9   contain child sex abuse material.

03:06   10   **Q.**   But you're able to work on cases outside of South Dakota

11   within that South Dakota workstation?

12   **A.**   Correct.  We are -- I have been contracted, I have open

13   cases out -- well outside of our jurisdiction, including places

14   like Florida and Nevada.

03:06   15   **Q.**   And you started doing this back in 2006.  Have you been

16   keeping up with training over the years?

17   **A.**   In -- in the various disciplines, yes.

18   **Q.**   And emerging disciplines?

19   **A.**   Pardon me?

03:07   20   **Q.**   In emerging disciplines as well?

21   **A.**   Yes.

22   **Q.**   Can you give an example of that?

23   **A.**   When you say "an emergent discipline," most recently we've

24   been involved in vehicle forensics.  It's becoming more and

03:07   25   more important all the time, and so that's the newest part of

1    our offerings, is the preservation analysis and reports of

2    findings of vehicles.

3    **Q.**    So when you're analyzing digital evidence, can you explain

4    to the Court what the first steps are in that process?

5    **A.**    First steps in analyzing?

6    **Q.**    Right.  When you're approaching a case and you're about to

7    analyze digital forensics, just kind of going through the steps

8    here, what -- how do you begin?

9    **A.**    Well, if we're the -- if we're the primary firm that is

10   tasked with doing the preservation, the first step would be to

11   identify the items that are -- that we've been authorized to

12   retrieve.  And following best practices we then preserve that

13   digital data by using various forensic process to preserve.

14   Once the preservation is complete, at that point then -- then

15   we would begin analysis.

16   **Q.**    Why do you need to preserve the devices?

17   **A.**    Why do we preserve?

18   **Q.**    Yes.

19   **A.**    We preserve the devices to maintain the integrity of the

20   digital data and to make sure that anything that -- that we're

21   doing is -- is following best practices and not potentially

22   altering that digital data.

23   **Q.**    Could you explain how data might get altered if it's not

24   preserved appropriately?

25   **A.**    Well, it depends on the type of device that we're

401

1  analyzing, the type of digital dataset.  In the case of

2  something like an external hard drive, just the mere fact of

3  plugging it into a computer will alter the data on that source

4  drive.

03:09  5          So there are -- in our world there are passive

6  devices and there are active devices.  So passive devices would

7  be those types of things such as flash drives, SD cards, CDs,

8  things like that that aren't actively processing data.  Active

9  devices, examples of those would be computer systems, cell

03:09  10  phones and those sorts of things that may be actively running.

11  **Q.**  So with -- with respect to a flash drive, if you are in

12  the task of preserving it, what would you do exactly?

13  **A.**  After the flash drive was physically secured, it would be

14  inventoried.  It would then be connected to a write blocker,

03:10  15  oftentimes combined with a forensic drive duplicator, and a

16  forensic image would be made of that flash drive.  And then any

17  review or analysis would be conducted on that forensic image,

18  and the original source media would be put back in our evidence

19  cabinet.

03:10  20  **Q.**  Why is the write blocker necessary?

21  **A.**  Write blockers are essential in our world.  They are

22  necessary to prevent either intended or unintended alteration

23  of data on the source media.

24  **Q.**  Source media could be an example of a computer?

03:10  25  **A.**  Source media could be a computer, correct.  It could be a

402

1   flash drive.  It could be any number of devices.

2   **Q.**   And so after -- with -- and I just want to stick with a

3   flash drive.  You have the write blocker.  You're able to make

4   an image of the evidence.  Can you explain what that means?

03:11   5   **A.**   Sure.  The typical process of creating an image of a flash

6   drive would be to plug it into a write blocking device.  And

7   then using either a controlled panel on the device that we're

8   using or software, we instruct it to make a bit stream image of

9   the entire contents of that physical volume, so our -- the

03:11   10   program that's creating that image will start from the very

11   first byte of data that's on that device and make a complete

12   read-only image that is saved to an unalterable forensic image.

13         And there is a process called a hash verification

14   that forensic examiners commonly use to verify the integrity,

03:12   15   to validate that the data that was on the source drive and the

16   forensic image, the hash values need to match to prove that no

17   data was altered during that copying process.

18   **Q.**   The hash values, is that -- could that be likened to DNA

19   in a organism?

03:12   20   **A.**   It's very similar to human DNA except it is 10,000 times

21   more accurate.  It is very reliable.

22   **Q.**   Is there any special equipment that is necessary to do a

23   proper imaging --

24   **A.**   Yes.

03:12   25   **Q.**   -- of a device?  Could you explain?

1  A.    The equipment can vary.  It can -- it can vary from a
2  small write blocking device that can be attached to a regular
3  Windows computer or Mac computer, for that matter, and that
4  small piece of hardware will prevent that data from being
5  written to that source media.

6          In our lab, our preferred method would be a device
7  called a Neo Falcon, which is a standalone drive duplicator
8  that has write blocking capabilities built into it, so it can
9  either be a standalone box that duplicates and makes a forensic
10 image or it can be equipment connected to a regular computer.
11 Q.    And it's the imaged version of the data that you are
12 analyzing?
13 A.    Yes.
14 Q.    And is there certain software that is used to analyze the
15 digital data?
16 A.    We use a number of programs.  There are probably four or
17 five main applications that we use.  It largely depends on the
18 type of source media, whether it be -- you know, a cell phone
19 may be processed with a tool that would be different than a
20 flash drive or a computer.
21 Q.    So what would be best practices for analyzing a flash
22 drive?
23 A.    Best practices for analyzing a flash drive would be to
24 make the forensic image of it and then use the tool of choice
25 to process the data from that forensic image.  In modern lab

404

1    environments, in a modern examiner -- modern-day examiners, we

2    oftentimes will use programs such as AXIOM by Magnet Forensics.

3    Q.   Does the -- those systems, do they allow you to determine

4    what types of digital evidence you can look for?

03:15    5    A.   Yes.

6    Q.   So, in other words, it's sortable?

7    A.   Yes.

8    Q.   On a flash drive, if you run it through a software system,

9    say AXIOM, you'd be able to narrow to a timeframe?

03:15    10    A.   Yes.

11    Q.   So you can, but have you done that in your experience?

12    A.   We use timeline analysis quite frequently.

13    Q.   In some of your -- well, do some of your cases involve

14    very large amounts of data?

03:15    15    A.   Very large amounts of data, yes.

16    Q.   Where it's maybe not all relevant to whatever case you're

17    working on?

18    A.   Correct.

19    Q.   Has that been the case in business-related litigation

03:16    20    you've -- you've worked on?

21    A.   Yes.

22    Q.   What about criminal fraud cases as well?  Have you -- have

23    you handled those situations?

24    A.   Correct.  In -- in cases such as criminal fraud cases, I

03:16    25    think it's important to note that we -- we would not be

1   expected to be the primary imaging firm in -- which is true in

2   really all of our criminal cases.  Another agent or agencies

3   have created those forensic images, and we seek to obtain

4   copies of those forensic images.  But, nonetheless, we still

03:16   5   inventory what we have forensic images of.  We routinely go

6   through that and triage the case and start the analysis process

7   based on the facts as we know them.

8   Q.   So when you have a high-volume number of business records

9   that you're looking at analyze, you know, how do you -- how do

03:17   10   you determine what you're looking for?

11   A.   We seek information in business record cases either prior

12   to seizing and imaging the devices that are -- that are in play

13   or after we've imaged them.  We will meet with the personnel

14   that are knowledgeable to what they suspect has happened, and

03:17   15   we take careful notes.  And we begin that analysis based on the

16   information that we learned -- that we learn during those

17   discussions and those meetings.

18   Q.   So with the circumstances of a particular issue, you can

19   focus on an area of the digital -- digital evidence.

03:18   20   A.   We require that.  I mean, it -- if we have volumes of

21   digital data, we need direction from the parties that have

22   retained us then, you know, what -- you know, what exactly is

23   it you're looking for, what types of files and what

24   information, what timelines.

03:18   25   Q.   So not only is it not sometimes unnecessary to go through

406

1   every bit of digital evidence, but sometimes it's impossible?

2   **A.**   Correct and correct.

3   **Q.**   I'm going to jump to QuickBooks.  Are you familiar with

4   QuickBooks?

03:18   5   **A.**   I use it daily.

6   **Q.**   In your business?

7   **A.**   Yes, sir.

8   **Q.**   Okay.  QuickBooks -- does QuickBooks have its own files,

9   own file names?

03:19   10   **A.**   QuickBooks -- the standalone versions of QuickBooks, they

11   do have unique file extensions.  Dot QBO, dot QBX would be a

12   couple of the common QuickBooks file extensions.  In my

13   environment we used that desktop platform for a number of

14   years, and in the last couple of years I've used the online

03:19   15   platform which is accessed through a web browser.

16   **Q.**   So if a QuickBooks -- if one of those unique QuickBooks

17   file extensions -- when you're sorting through digital

18   evidence, you'd be able to filter only for those type of file

19   extensions --

03:19   20   **A.**   Yes.

21   **Q.**   -- like you could any file extension that you wanted to

22   isolate.

23   **A.**   Yes.

24   **Q.**   Are QuickBooks files image files?

03:20   25   **A.**   Are QuickBooks files image files?

1   **Q.**   Yeah.

2   **A.**   QuickBooks files, if they -- if it's the standalone

3   version of QuickBooks, the types of files like those QBO or the

4   QBX files, they're database files.

5   **Q.**   And is that proprietary insofar as you require a

6   QuickBooks software or application to access those files?

7   **A.**   Again, depending on the version, either -- either the

8   QuickBooks program to access them or a dedicated QuickBooks

9   file viewer if you're parsing information out of one of those

10   databases.

11   **Q.**   For a QuickBooks user, is it quite obvious what a

12   QuickBooks file extension would be?

13   **A.**   I think for most QuickBooks users it's pretty obvious what

14   they are, yes.

15   **Q.**   It doesn't require any sort of special training to

16   identify a QuickBooks file extension?

17   **A.**   Not that I'm aware of.

18   **Q.**   You received forensic images in this case, related to this

19   case.

20   **A.**   I did.

21   **Q.**   Including a 2-gigabyte Lexar thumb drive?

22   **A.**   Yes.

23   **Q.**   Can you just describe kind of the forensic image of this

24   thumb drive and how it -- how it appears?

25   **A.**   It is -- the forensic image that I recall receiving is in

1    the EO1 image file format, which is the most common image

2    format for a forensic image.  The forensic image, I believe,

3    was created by a Tableau TX1 imaging device.

4    **Q.**   Do you know who imaged the thumb drive?

03:22    5    **A.**   The copy that I have I believe was imaged by North Dakota

6    BCI, Special Agent Jesse Smith.

7    **Q.**   So I think we touched on it before, but the thumb drives

8    -- thumb drives require some sort of external computer source

9    to access the data within it?

03:22    10   **A.**   Right.  We classify -- we classify thumb drives as being

11   dumb devices.  So in our world we have smart devices and dumb

12   devices.  A smart device would have a micro processer or a

13   clock and the ability to process data.  A dumb device typically

14   just stores data.

03:22    15   **Q.**   When you looked at the -- going back to the Lexar thumb

16   drive, when you reviewed the forensic image, was there anything

17   you noticed that stood out?

18   **A.**   The last accessed dates of many of the files that were on

19   there were recorded post search warrant.

03:23    20   **Q.**   Mr. Meinke, I'm showing you Government's Exhibit 91.  Can

21   you see that?

22   **A.**   Yes.

23   **Q.**   Is this a -- have you seen a copy of this document before?

24   **A.**   I saw it early in the courtroom today.  I don't know if

03:23    25   I've seen it prior to today.

1   **Q.**   Okay.  And on the right column -- furthest right column

2   titled "Source," can you tell what that source description is?

3   **A.**   The source description is a single partition from a

4   2-gigbyte or 1.94-gigabyte Lexar flash drive that was formatted

03:24   5   using the FAT16 file system.

6   **Q.**   You mentioned EO1 before.  Do you see that on the items

7   listed on the "Source" column?

8   **A.**   Correct, so the -- it's a series of numbers that end in a

9   file extension of dot EO1.

03:24   10   **Q.**   And you can tell from that file extension how it was

11   imaged?

12   **A.**   I can't tell from the file extension how it was imaged,

13   but I know, based on my training and experience, that that file

14   extension is very common to being a forensic image.

03:25   15   **Q.**   And the middle column, that is described "Last Accessed

16   Date."  Do you see that?

17   **A.**   Yes.

18   **Q.**   Do you notice anything particular about that column?

19   **A.**   It appears that everything in that column has a date and

03:25   20   timestamp of 9/17/2020, at 12:00 a.m.

21   **Q.**   In addition to receiving the digital evidence, have you

22   received other discovery in this case?

23   **A.**   I have.

24   **Q.**   Does anything about September 17, 2020, stand out based on

03:25   25   your knowledge of this case?

1   **A.**   September 17, '20?

2   **Q.**   Yes.

3   **A.**   I don't recall that being notable.

4   **Q.**   Okay.  Do you remember when the search warrant took place?

03:26   5   **A.**   It's my understanding that the original search warrant was

6   applied -- or executed on September 15th, and the second search

7   warrant was granted on September 16th of 2020.

8   **Q.**   So is there anything unusual about having last accessed

9   dates, times on September 17th?

03:26   10   **A.**   Yes, it was highly indicative that the device was plugged

11   into a computer or similar without the use of a write blocker.

12   **Q.**   And how can you make that conclusion?

13   **A.**   Data was altered on the device post both search warrants.

14   **Q.**   The last accessed means something affected the file in

03:26   15   question?

16   **A.**   Correct, at that -- at that point we know that -- that

17   several files were altered at least with that date and

18   timestamp.  Other alterations could have occurred without

19   knowledge.

03:27   20   **Q.**   And you -- you understood that from personally viewing the

21   forensic image, correct?

22   **A.**   Yes.

23   **Q.**   It wasn't just from Exhibit 91?

24   **A.**   No, it was from the forensic image.

03:27   25   **Q.**   So is there any way of knowing what else could've been

411

1   altered from the data besides the last accessed date?

2   A.   Not -- not in its totality.

3   Q.   You know, can you explain why that would be?

4   A.   Well, an example would be, in the files that are listed

5   here on this exhibit, we know that the last accessed dates and

6   times of being recorded at 9/17/2020, at 12:00 a.m., we don't

7   know, for example, how many times those files were accessed

8   between 9/15, September 15, of 2020 and this date and time.

9   Q.   Is there any other way that could've been altered other

10  than misuse of a write blocker?

11  A.   I'm sorry?

12  Q.   You -- you believe that it was a write blocker that -- or

13  the absence of a write blocker that caused those alterations?

14  A.   Yes.

15  Q.   Okay.  And that's because there's -- the thumb drive can't

16  do anything on its own?

17  A.   Correct, the thumb drive -- the date and timestamp

18  attributes that you see here are in direct correlation to the

19  computer system that it was connected to at the time that the

20  activity was occurring.

21  Q.   Can you describe the actual physical write blocker, what

22  it looks like?

23  A.   Oh, they come in various shapes and sizes.  Some of them

24  will fit in the palm of my hand.  Others are a size of like

25  small laptop computer, console-style.  Depends on their

03:27

03:28

03:28

03:28

03:29

412

1  capabilities.

2  **Q.**   And as a forensic examiner, you -- do you always use a

3  write blocker if you are going to make an image of a device?

4  **A.**   Always.  Always in -- let me clarify.  Always as it

03:29   5  relates to devices such as something like a flash drive.  When

6  -- when we are doing cell phone forensics it -- no, we image

7  those off of a running device to get the content from that.

8  **Q.**   Is it common to forget to use a write blocker when you're

9  going to image a device?

03:29   10  **A.**   I'm sorry?  Is it common?

11  **Q.**   Yeah.

12  **A.**   It's very common.

13  **Q.**   Do you often forget to use a write blocker when you're

14  performing these images?

03:30   15  **A.**   No.

16  **Q.**   Why not?

17  **A.**   From the early days of training as a computer forensic

18  examiner, that was beat into our heads by the instructor, that

19  that is the first thing you do, always.  I don't recall an

03:30   20  incident in our office where a piece of media such as a flash

21  drive was accidentally imaged without -- or accidentally

22  accessed without a write blocker in place.

23  **Q.**   Mr. Meinke, I'm showing you Government's Exhibit 79.  Can

24  you see that okay?

03:30   25  **A.**   Yes.

413

1  Q.   Have you previously had a chance to look at this document?

2  A.   I saw it in court earlier today.

3  Q.   When you look at this, what -- what do you -- what do you

4  see?  What does this depict?

03:31  5  A.   Well, it appears to be a screenshot of a computer, and

6  it's showing the file path and then a directory of contents

7  containing folders and files.

8  Q.   Those are folders and files that appear to be on a

9  computer?

03:31  10  A.   Pardon me?

11  Q.   That are on a computer?

12  A.   They appear to be on a computer, correct.

13  Q.   Do you find anything unusual about that?

14  A.   Yes.

03:31  15  Q.   Could you explain?

16  A.   The file path listed in the top task bar area there

17  where -- "Local Disk (F)," and then the next entry is "20106220

18  Derosier Electronics"; Subdirectory, "Item#8 2GB Lexar thumb

19  drive"; Subdirectory, "Raw Evidence," so someone had to have

03:32  20  created those folders.

21  Q.   And when you looked at Jesse Smith's forensic image, were

22  those -- were those file names present?

23  A.   No.  That -- the folder paths?

24  Q.   Correct.

03:32  25  A.   No.

414

1  Q.   Based on your review of Special Agent Smith's forensic

2  image, is this -- appear to be an accurate depiction of the

3  flash drive?

4  A.   No.  If we go back and look at the exhibit previously,

5  you'll notice that we go from the -- the partition to the Lexar

6  USB drive and then directly into the files that were on it.  On

7  this screenshot, the files that are shown in this screenshot

8  are buried several directories down.

9  Q.   In your experience, are you familiar with the Mega

10 platform?

11 A.   Yes.

12 Q.   What is it?

13 A.   It's a cloud-based storage platform.

14 Q.   Is that -- is it encrypted?

15 A.   Is it encrypted?  No, they use end-to-end encryption

16 during upload and download processes.

17 Q.   And can you explain what end-to-end encryption would mean?

18 A.   From the point files were being uploaded to their platform

19 and also when files were being retrieved from the platform, the

20 data is encrypted during that transmission.

21 Q.   And is -- the Mega platform, does that originate in the

22 United States?

23 A.   No.

24 Q.   Do you know where it's from?

25 A.   I believe it's in Auckland, New Zealand.

415

1   **Q.**   Is that a service that is popular among child pornography

2   traders?

3   **A.**   I have -- I have analyzed several cases that include or

4   involve the Mega platform.

03:34   5   **Q.**   Is it common for -- in your experience is it common for

6   businesses to use the Mega platform?

7   **A.**   I haven't --

8           MR. SCHMITZ:  Lack of foundation.

9           THE COURT:  Mr. Bellmore?

03:35   10          MR. BELLMORE:  Yeah, Your Honor, he's testifying as

11  to his direct experience working in these cases.

12          MR. SCHMITZ:  Your Honor, his direct experience is

13  anecdotal.  He's only worked a few of these business cases.  We

14  weren't allowed to ask the same question of our -- our witness.

03:35   15          THE COURT:  Oh, I think the question asked of your

16  witness was whether she had knowledge.  Mr. Bellmore, why don't

17  you lay a bit more foundation.

18  **Q.**   (MR. BELLMORE CONTINUING)  Mr. Meinke, how many -- if you

19  can, how many business-related cases have you analyzed digital

03:35   20  evidence in?

21  **A.**   I -- I don't know.  Several.

22          MR. SCHMITZ:  Your Honor, I'd object to this line of

23  questioning.  Several cases is anecdotal, at best.  It's not

24  any sort of -- it doesn't have any -- enough to be relevant,

03:36   25  and it could be prejudicial.

416

1          MR. BELLMORE:  Your Honor, that's a objection to an

2     answer, not a question, and again --

3          MR. SCHMITZ:  Your Honor, my objection is Rule 403.

4          MR. BELLMORE:  Your Honor, the Rules of Evidence do

03:36   5     not apply in this hearing.

6          THE COURT:  For purposes of this proceeding, I will

7     overrule the objection.

8          THE WITNESS:  May I answer, Your Honor?

9          THE COURT:  If you remember the question.

03:36   10         THE WITNESS:  I don't recall any business cases that

11    I have worked on that have involved the Mega platform.

12    **Q.**  (MR. BELLMORE CONTINUING)  In the cases that you have

13    analyzed, has that Mega come up in criminal cases that are not

14    child pornography related?

03:36   15         MR. SCHMITZ:  Again, Your Honor, lack of foundation.

16    Criminal cases that are not child pornography related could

17    encompass more than business cases.  We don't really know what

18    this witness's experience is with that work.

19         THE COURT:  Mr. Bellmore, please lay more foundation.

03:37   20    **Q.**  (MR. BELLMORE CONTINUING)  You have -- Mr. Meinke, you

21    have -- you have analyzed digital evidence in a variety of

22    crimes.

23    **A.**  Yes, many different types of crimes.

24    **Q.**  Not just child pornography.

03:37   25    **A.**  Not just child pornography.

1   Q.   Drug cases?

2   A.   Yes.

3   Q.   White-collar crime?

4   A.   Yes.

03:37   5   Q.   Murders?

6   A.   Yes.

7   Q.   Anything I'm missing?  Anything else?

8   A.   Manslaughter, arson, a whole host of different types of

9   criminal cases.

03:37   10   Q.   And in handling those cases, as well as any other

11   component of your business, you've become familiar with the

12   platform Mega.

13   A.   Yes.

14   Q.   And has that platform ever showed up in a business-related

03:38   15   crime that you've analyzed?

16            MR. SCHMITZ:  Again, Your Honor, same objection.

17   This is an anecdotal story from a witness.  Whether he's seen

18   this in seven cases is not relevant to whether it showed up

19   here.  It's just not probative, and it's prejudicial.

03:38   20            THE COURT:  That's overruled.  Please answer as best

21   you can.

22            THE WITNESS:  Not to my knowledge.

23   Q.   (MR. BELLMORE CONTINUING)  You're a business owner, right?

24   A.   Yes, sir.

03:38   25   Q.   Do you use Mega in your business?

418

1          MR. SCHMITZ:  Objection, lack of relevance.

2          THE COURT:  That's sustained.

3  **Q.**   (MR. BELLMORE CONTINUING)  You mentioned earlier that in

4  working in these cases, beyond digitally examining evidence,

03:38  5  you also review case-related documentation?

6          MR. SCHMITZ:  Objection, leading.

7          THE COURT:  That's sustained.

8  **Q.**   (MR. BELLMORE CONTINUING)  What else do you -- in a

9  particular case, Mr. Meinke, what else do you consider when you

03:39  10  are retained by -- by an attorney?

11  **A.**   As much of the facts as we can as it relates to criminal

12  cases.  By the time we're retained on criminal cases, it's fair

13  to say that there's usually a fair amount of discovery that's

14  available.  My colleague and staff attorney typically works

03:39  15  with the agency or the firm that has retained us and makes

16  arrangements to get copies of any discovery, any other

17  information that may be helpful for us to do our work.

18  **Q.**   Does that include court documents?

19  **A.**   Most oftentimes, yes.

03:39  20  **Q.**   Does that include search warrant documents?

21  **A.**   Yes.

22  **Q.**   And did you receive copies of discovery in this particular

23  case?

24  **A.**   Yes.

03:40  25  **Q.**   And have you reviewed it?

1   **A.**   Yes.

2   **Q.**   Does that include court documents as well?

3   **A.**   Yes.

4   **Q.**   Including warrants?

03:40   5   **A.**   Yes.

6   **Q.**   Mr. Meinke, did you review the search warrant for the

7   residence that was issued on September 15th in this case?

8   **A.**   Yes.

9   **Q.**   Did that include reviewing the document entitled

03:41   10   Exhibit A?

11   **A.**   Entitled Exhibit A?

12   **Q.**   Yeah, it was in Exhibit A.

13   **A.**   This is part of Exhibit A.

14   **Q.**   Oh, this is -- let's make sure before just for kind of the

03:42   15   record, okay?  I don't know if you can see that behind there.

16   It's -- it's in a shadow, but --

17   **A.**   Oh, yes, I can.  Yes.

18   **Q.**   The phrase here, "possession, receipt or distribution

19   or (sic) visual depictions," when you hear those words

03:42   20   together, what -- what does that mean to you?

21             MR. SCHMITZ:  Objection, Your Honor, relevance.

22             THE COURT:  That's overruled.

23             THE WITNESS:  I've seen that verbiage in hundreds of

24   child pornography search warrants, affidavits for search

03:42   25   warrants.

1   Q.   (MR. BELLMORE CONTINUING)  And you're -- you're aware,

2   based on your knowledge of this case, that the search warrant

3   of the residence was not for child pornography?

4          MR. SCHMITZ:  Objection, leading.

03:43   5          THE COURT:  Sustained.

6   Q.   (MR. BELLMORE CONTINUING)  Mr. Meinke, what was the search

7   warrant -- what were the underlying offenses for the search

8   warrant?

9   A.   It's my understanding that it was for illegal business

03:43   10   activity.

11          THE COURT:  Counsel, I need to take a short break to

12   deal with a few other matters, so let's plan to reconvene at

13   3:55.

14          (A recess was taken from 3:43 p.m. to 3:59 p.m., the

03:59   15   same day.)

16          THE COURT:  Please continue, Mr. Bellmore.

17          MR. BELLMORE:  Thank you, Your Honor.  I have no

18   further questions.

19          THE COURT:  I think I might have one.  Just hang on a

03:59   20   minute.  Do you have Exhibit 91 handy?

21          THE WITNESS:  Not in front of me, Your Honor.

22          THE COURT:  Here's the first page of it.  The last

23   column, I think all of the source descriptions include the

24   words "Partition 1."

03:59   25          THE WITNESS:  Correct.

421

1          THE COURT:  Can you tell me what that means?

2          THE WITNESS:  Storage media oftentimes will have more

3    than one partition on it to -- like a system reserve partition,

4    for example.  So there's a -- oftentimes there'll be a

04:00    5    partition that just would be available to contain user data,

6    and there may be smaller partitions on various types of devices

7    that may be intended to keep either analytics or diagnostics

8    for the piece of media itself.  They're oftentimes hidden.

9          THE COURT:  So there may be more than one partition

03:59    10   on any given --

11         THE WITNESS:  On devices, yes, there may be more than

12   one.

13         THE COURT:  All right.  Thank you.  Mr. Schmitz.

14         MR. SCHMITZ:  Thank you, Your Honor.

15                    CROSS-EXAMINATION

16   BY MR. SCHMITZ:

17   Q.   Good afternoon.  Good afternoon, Mr. Meinke.

18   A.   Good afternoon.

19         MR. SCHMITZ:  Can we get Exhibit 79, please?

04:01    20   Q.   (MR. SCHMITZ CONTINUING)  Remember being asked questions

21   about this, Mr. Meinke?

22   A.   Yes, sir.

23   Q.   And I'm not sure -- and I don't remember exactly what your

24   testimony was, but are you aware that this is a mounted

04:01    25   forensic image in X-Ways?

                              422

1   **A.**   I would have no way of knowing that, so I'm not aware of

2   that.

3   **Q.**   Okay.  So could this be a mounted forensic image in

4   X-Ways?

04:01   5   **A.**   It certainly doesn't look like it to me.

6   **Q.**   Why not?

7   **A.**   It's -- it appears to be a folder structure where the

8   contents of what was purported to being on Item Number 8 are

9   nested into subfolders.

04:02   10   **Q.**   And is that folder structure and the folder path a

11   direction as to where this item was mounted?

12   **A.**   It was mounted on the PC as Local Disk F, which I don't

13   know what that is.

14   **Q.**   And are you familiar with the X-Ways program?

04:02   15   **A.**   Yes, I am.

16   **Q.**   Do you use it?

17   **A.**   Pardon me?

18   **Q.**   You don't -- do you use it?

19   **A.**   Not very often.  I have a copy of it.

04:02   20   **Q.**   You use FTK Imager more?

21   **A.**   Other different programs.  I use them both.

22   **Q.**   Do you use FTK Imager more than X-Ways?

23   **A.**   Well, you use FTK Imager primarily to make images and/or

24   to mount devices.  X-Ways is a much more robust platform that

04:02   25   does a lot more than that.

1   **Q.**   Right, but X-Ways, you mount it.  You can use X-Ways to

2   mount images?

3   **A.**   You can use all kinds of different tools to mount images,

4   yes.

04:02   5   **Q.**   And that -- that could be a mounted image from X-Ways,

6   right?

7   **A.**   I suppose it could be.

8   **Q.**   If that's a mounted image from X-Ways, that's an exact

9   copy of the thumb drive, is that right?

04:03   10   **A.**   I don't know that to be true.

11   **Q.**   Do you know any reason that would not be true?

12   **A.**   All I'm seeing here, sir, is a screenshot.

13   **Q.**   Right.  So do you have any reason to believe that's not an

14   accurate mounted image from X-Ways?

04:03   15   **A.**   No.

16   **Q.**   Okay.  And do you have any reason to believe that the hash

17   value of that mounted image would be the exact same as the

18   thumb drive?

19   **A.**   I would want to confirm that before I would either -- I

04:03   20   would want to confirm that.

21   **Q.**   Right, but you have no reason to believe it would not be,

22   right?

23   **A.**   Based on the fact that the flash drive was plugged into an

24   unprotected machine, I would be suspicious of that.

04:03   25   **Q.**   Right, so this flash drive was an exact mounted copy of

1   that -- of that thumb drive after it was plugged into that

2   machine.

3          MR. BELLMORE:  I object, Your Honor.  That's not a

4   question.

04:04   5          THE COURT:  That's sustained.

6   Q.   (MR. SCHMITZ CONTINUING)  Isn't that right?

7   A.   I don't know what this is.

8   Q.   Well, you testified on direct exam that that wasn't an

9   exact copy of the thumb drive --

04:04   10  A.   What I testified to --

11  Q.   -- did you not?

12  A.   -- was that the contents that I'm seeing on the screen,

13  the data that's purported to being on that thumb drive is

14  nested into subfolders that were not part of the forensic image

04:04   15  that I obtained a copy of.

16  Q.   Okay.  I need to get specific with you about this, Mr.

17  Meinke, if you don't mind.

18  A.   That's fine.

19  Q.   So when you talk about folders, are you talking about

04:04   20  these items over here (indicating)?

21  A.   Up on the top, sir.

22  Q.   Okay.  So the path.

23  A.   Yes, the file path --

24  Q.   So you're not --

04:04   25  A.   -- folder path.

1   Q.   -- talking about folders, you're talking about the path.

2   A.   Correct.

3   Q.   Okay.  Just so we're talking about the same thing, you're

4   talking about the path.  You're not -- have I highlighted the

04:04   5   path?

6   A.   Correct.

7   Q.   All right.  Now, if this was a mounted x-ray -- X-Ways

8   image, would that path be the direction to that image on that

9   drive?

04:05   10   A.   If it were the image of the flash drive and only the image

11   of the flash drive, I wouldn't expect to see these directories,

12   these folders being in view.

13   Q.   If it was a mounted image, you wouldn't expect to see

14   that?

04:05   15   A.   If the mounted image contains these folders --

16   Q.   Okay.  I think I understand what you're saying.  This was

17   a screenshot from somebody's computer that had mounted this

18   image.  These screenshots are from that computer, right?

19   A.   It appears so.

04:05   20   Q.   So the file path, obviously, wouldn't be involved in the

21   thumb drive itself, but these files are what we've been talking

22   about today, Mr. Meinke.  Are these files the same files that

23   were on the thumb drive?

24   A.   Well, we'd have to compare what's in the folders on this

04:06   25   screenshot to what's on the thumb drive, but generally

426

1  speaking, yes.

2  **Q.**   Okay.  I think we've hit pay dirt.  So these files -- and

3  you reviewed the thumb drive, right?

4  **A.**   I reviewed the forensic image of the thumb drive.

04:06   5  **Q.**   That's right.  So you reviewed the forensic image of

6  what's on the thumb drive, and do you see anything on this

7  exhibit that's different than what you've seen on that thumb

8  drive?  And I'm not talking about the metadata from the thumb

9  drive.  I'm talking about the files here.

04:06   10  **A.**   Just the general structure with the folders and the

11  various files on here, I don't see --

12  **Q.**   Yes.

13  **A.**   I don't see anything out of the order (sic).

14          MR. SCHMITZ:  Okay.  Thank you.

04:06   15          THE COURT:  Mr. Meinke, what is a mounted image?

16          THE WITNESS:  A mounted image, when -- when we have a

17  forensic image of a device, there are various tools that

18  that -- that forensic image is unalterable and really

19  unrecognized by a computer, so we have to use tools and

04:07   20  platforms to mount that up, basically to emulate it, to make it

21  appear as though it actually is a drive again.

22          THE COURT:  Thank you.

23  **Q.**   (MR. SCHMITZ CONTINUING)  And, Mr. Meinke, I think -- and

24  I'm hesitant to ask this question, but I think what you're

04:07   25  saying is this was not on the thumb drive.  Those files were

427

1   not on the thumb drive, is that right?

2   **A.**   They were not.

3   **Q.**   Okay.

4           THE COURT:   Maybe you want to make it clear for the

5   record what files you're referring to in saying "these files."

6           MR. SCHMITZ:   Right, and for the record - thank you,

7   Your Honor - I'm highlighting the left side of Government's

8   Exhibit 79, which starts with the column "Quick Access" and

9   goes down to "Network."

10  **Q.**   (MR. SCHMITZ CONTINUING)   All right.   And I think what

11  you're also saying, Mr. Meinke, is this right here (indicating)

12  is a file path that was not on the thumb drive, right?

13  **A.**   Correct.

14  **Q.**   Okay.   That is the file path for somebody who was

15  displaying what was on the file -- thumb drive, correct?

16  **A.**   I would assume so.

17  **Q.**   If -- if it was a mounted copy.

18  **A.**   This is the first I've heard of a mounted image, but that

19  -- that would be a possibility, yes.

20  **Q.**   And to be clear, when you say it's the first time you've

21  heard of a mounted image, it's the first time you've heard of

22  this being mounted, not a mounted image in general, right?

23  **A.**   As it relates to this case --

24  **Q.**   Right.

25  **A.**   -- for this court proceeding.

1   **Q.**   Okay.  All right.  So I want to talk to you a little bit

2   -- you testified a little bit about write blockers, right?  And

3   you've been doing this for -- for a long time, right?

4   **A.**   Yes, sir.

04:09   5   **Q.**   2006 -- were you doing forensic analysis before 2006?

6   **A.**   I didn't know it was computer forensics at the time.  I

7   learned of the field prior to 2006, and so I started my

8   training at that time.

9   **Q.**   Okay.  So when -- when do you remember in your training of

04:09   10   write blockers coming about?

11   **A.**   The very first piece of equipment that I purchased

12   included several write blockers.

13   **Q.**   And those were probably brand-new, right?  It was a

14   brand-new technology back then?

04:09   15   **A.**   No.

16   **Q.**   How long have they been around?

17   **A.**   I don't know how long they've been around.  In the -- in

18   the initial kit that I purchased in -- either prior -- just

19   prior to 2006 or shortly after 2006, the write blockers were

04:09   20   included.  They were not brand-new to the industry at that

21   point.  I don't know how long they had been in place, but they

22   weren't new then.

23   **Q.**   Yeah, well, late nineties, early 2000s.  At least by the

24   time you got there, write blockers existed.  But before that

04:10   25   there was a time where we were doing forensic analysis without

1  write blockers, isn't that right?

2  A.   I would assume so.

3  Q.   Well, they probably didn't invent -- invent, did they, a

4  write blocker before they invented a computer, right?

04:10   5  A.   Probably not.

6  Q.   Probably not, so -- and isn't it true that write blockers

7  can sometimes fail for various reasons?

8  A.   Yes.

9  Q.   Now, do you know -- you said you did -- you've done over a

04:10   10  thousand child pornography cases?

11  A.   Yes, sir.

12  Q.   So your experience with child pornography is -- well, how

13  would you classify it?

14  A.   Extensive.

04:10   15  Q.   Extensive.  Do you know of a single case where evidence

16  was suppressed because a write blocker wasn't used?  And when I

17  say "suppressed," I mean under the Fourth Amendment.

18  A.   I would have to go back and look at all my cases.  I -- I

19  can't think of one off the top of my head, but it's possible

04:10   20  that it did happen.

21  Q.   Well, there's a difference, isn't there, between evidence

22  not being admitted because it's not authenticated versus

23  because somebody's Fourth Amendment rights were violated,

24  right?  Do you know of any case in your thousand cases, plus

04:11   25  extensive experience, as you sit there today where evidence was

430

1    suppressed because a write blocker wasn't used?

2    **A.**    Not that I can recall.

3    **Q.**    Okay.  Now let's get to Government's Exhibit 91 because we

4    talked about that a bit.  You were asked on direct examination

5    several questions, and you were asked by the Judge about

6    Partition 1.  Are you -- do you know what this number signifies

7    in your training and experience?

8    **A.**    I know the dot EO1 signifies it's a forensic image.  The

9    naming convention prior to that would be inputted by the person

10   that made the forensic image.

11   **Q.**    Right.

12   **A.**    So I don't -- I don't know what the -- the structure

13   changes within each case, each organization.

14   **Q.**    Do you know what this - oops, sorry - FAT16 means?

15   **A.**    Yes.  This flash drive was formatted using the FAT16 file

16   system, and FAT stands for file allocation table.

17   **Q.**    Okay.  Now, you talked about data being altered on a drive

18   because you don't use a write blocker.  What data gets altered?

19   **A.**    Entire volumes can be deleted or destroyed without --

20   because a write blocker not being in place.  I mean, everything

21   and anything can be altered if a write blocker is not used.

22   **Q.**    Well, that's true, but I guess my question is, assuming

23   somebody didn't go in -- like a user go in and specifically

24   intentionally alter data, could data be altered by normal

25   housekeeping functions of that computer?

04:12
04:12
04:13
04:13
04:13

431

1   **A.**   Data can be altered.  I mean, the simple process of

2   plugging a flash drive into a computer will alter data.

3   **Q.**   Okay.  Stop.  Let's talk about that.

4        MR. BELLMORE:  Your Honor, I'm going to ask that the

04:14   5   witness be allowed to answer the question.

6   **Q.**   (MR. SCHMITZ CONTINUING)  Okay.  Were you -- were you

7   done?

8   **A.**   No, I was not.

9   **Q.**   Okay.  Please.

04:14   10  **A.**   So the simple act of plugging the flash drive into the

11  computer can alter data, processes running.  Remembering that

12  the flash drive is a dumb device, it is heavily dependent on

13  the computer for its instruction, so automated processes going

14  on in the computer can alter -- can and will alter data on that

04:14   15  device, and, of course, user interaction can and will alter

16  data on that device.

17  **Q.**   And I asked besides user interaction, right?

18  **A.**   Correct.

19  **Q.**   So besides user interaction, right?  From the automated

04:14   20  processes, the housekeeping processes, you mentioned plugging

21  it in.  What data -- what data on that drive would be altered

22  by plugging it in?

23  **A.**   Certain key information.  The flash drive has to

24  communicate with the computer.  It's a two-way communication,

04:15   25  and so we would expect certain artifacts and entries to likely

432

1  be altered on that flash drive depending on the computer it's

2  plugged into.

3  **Q.**  And showing you Exhibit 79 for the record, would any of

4  these files appear because of automated functions?

04:15  5  **A.**  Could these files appear because of an automated function?

6  **Q.**  Yeah.

7  **A.**  They could.

8  **Q.**  What automated function would put one of those files on

9  there?

04:15  10  **A.**  An auto script to copy from the computer to the flash

11  drive.

12  **Q.**  Okay.

13  THE COURT:  And perhaps identify for the record

14  what --

04:15  15  MR. SCHMITZ:  Oh, Exhibit 79, and we're looking

16  inside the folder structure there.  Is that sufficient, Your

17  Honor?  So highlighting on the exhibit, the right side of the

18  exhibit from the "Name" column and then -- the "Name" column

19  and down, and from the "Name" column and right.

04:15  20  THE COURT:  All right.  Thank you.

21  **Q.**  (MR. SCHMITZ CONTINUING)  And if, hypothetically, one of

22  those things happened, wouldn't the created dates be on the

23  date that that auto script put that program onto the drive?

24  **A.**  Yes.

04:16  25  **Q.**  Did you notice any of that in the AXIOM report?

433

1    **A.**   No.

2    **Q.**   Okay.  So is it fair to say no files were put onto that

3    flash drive from automated functions after September 15th?

4    **A.**   I did not observe any files that were placed on the flash

04:16    5    drive after that date.

6    **Q.**   Okay.  And in terms of the modified date, were any of the

7    files on that flash drive modified to the extent that the

8    modified dates would've changed?

9    **A.**   Not that I -- not that I recall.

04:16    10   **Q.**   So if there was child pornography found on this drive,

11   it's fair to say that existed prior to September 15, 2020, the

12   date of the search warrant.

13   **A.**   I would agree with that.

14   **Q.**   All right.  Now, do you remember being asked about best

04:17    15   practices for conducting a search?

16   **A.**   Yes.

17   **Q.**   All right.  If you were asked to conduct a search of this

18   drive, Government's Exhibit 79, how would you go about it for

19   -- excuse me, for business -- fraudulent business records?

04:18    20   **A.**   I would get information from the party that retained us as

21   to what types of business records they expect to find

22   throughout the case.

23   **Q.**   Okay.

24   **A.**   And I would base my search on that information.

04:18    25   **Q.**   Showing you what's been admitted as Government's Exhibit

1   13, hypothetically speaking, if you were searching for visual

2   depictions of projects and job sites, how would you go about

3   searching that device?

4   A.   If I were searching for visual depictions of projects and

5   job sites, I would be looking at image files.

6   Q.   Okay.  And what would you do to go about looking through

7   those image files?

8   A.   After the forensic image was properly created, I would

9   typically process the case in one of a number of different

10  platforms such as AXIOM, and AXIOM -- AXIOM's automated

11  processes will typically put files such as pictures into a

12  category called Media.

13  Q.   Okay.  So then what -- then what would you do?  So after

14  you put the -- dump the files into -- into this medium, what

15  would you do?

16  A.   Likely it would be a manual review.

17  Q.   So you would physically go through all of the pictures?

18  When I say "physically," we're talking on the screen.

19  A.   Right.  I mean, if -- you know, once AXIOM processes the

20  flash drive, puts the media into the categorization, we can

21  view it typically in thumbnail view where you may be able to

22  see 20 or 30 thumbnail images on a single page.

23  Q.   Now, this is the Mega folder.  For the record, I'm showing

24  Exhibit 79, page 2.  If you were searching this Mega folder --

25  and it wouldn't look like this because you would've dumped into

435

1  different forensic software, but if you -- if you were

2  searching this folder to do any thorough search for visual

3  depictions of job sites, would you have opened those files?

4          MR. BELLMORE:  Objection, Your Honor.  That calls for

5  speculation.

6          MR. SCHMITZ:  Your Honor, he's an expert.  That's

7  what he's sort of paid to do.

8          THE COURT:  It's overruled.

9          THE WITNESS:  I would -- based on the information in

10 front of me, I would have to manually review the images.

11 **Q.**  (MR. SCHMITZ CONTINUING)  So you would've -- to be clear,

12 you would've looked at them.

13 **A.**  If this is the dataset that I had to work with?

14 **Q.**  Yes.

15 **A.**  I would've had -- I would've manually reviewed the images

16 inside of a platform such as AXIOM.

17 **Q.**  Right, and with that caveat, I understand.  All right.  Do

18 you remember you were asked on direct exam about using timeline

19 analysis?

20 **A.**  Right.

21 **Q.**  What's time -- just explain for the Judge again what

22 timeline analysis is.

23 **A.**  Again, that's a -- that's a feature of tools such as

24 AXIOM.  We can drill down the various artifacts and put them

25 into timeline view, which AXIOM will then give us a different

436

1    window.  So instead of looking at, an example, like these

2    images in a thumbnail view, it'll give us a timeline view of

3    the activity going on with the various categories that we've

4    selected.

04:21    5    Q.    Right, and to be clear -- so just to sort of dumb this

6    down here more, right, timeline analysis, does it not organize

7    your device with basically everything you've done in order, so

8    that could include -- could it -- that includes browser

9    history?

04:21    10    A.    It can include browser history.

11    Q.    Includes e-mails, like when you send an e-mail?

12    A.    Right.

13    Q.    And it'll include writing a résumé and saving it?

14    A.    Yes.

04:22    15    Q.    Documents -- anything you do on your computer, it just

16    lines up, right?

17    A.    It gets -- it does its best to parse out that timeline

18    information and put it in chronological order for you to what

19    was going on both systemwide and userwide.

04:22    20    Q.    Right.  Now, if you use timeline analysis, is timeline

21    analysis going to pick up files in unallocated space?

22    A.    No.

23    Q.    So it won't pick up deleted items.

24    A.    Well, if the deleted items aren't in unallocated space it

04:22    25    might pick them up.  But if they're in unallocated -- if

437

1    they're truly in unallocated space, no, it won't pick them up.

2    **Q.**   Okay.  And oftentimes deleted items go into unallocated

3    space.

4    **A.**   Oftentimes deleted content is located in unallocated

04:22    5    space.

6    **Q.**   Until that operating system needs to -- needs space, and

7    then it'll get saved over and it might leave, right?

8    **A.**   Correct.

9    **Q.**   And that timeline analysis, it's not going to pick up --

04:23    10    if you use that timeline analysis, to start it, say,

11    October 15, 2019, it won't pick up a PST file that was created

12    earlier than that, won't -- will it?

13    **A.**   If that's the date and timestamp -- if the date and

14    timestamp attribute for that PST file is earlier than that, it

04:23    15    won't pick it up.

16    **Q.**   Right, and that PST file could have e-mails in it that

17    occurred after.

18    **A.**   It's possible.

19    **Q.**   And when you say "after," I mean after October --

04:23    20    October 15, 2019.

21    **A.**   Yes.

22    **Q.**   So it might not pick up those either.

23    **A.**   Correct.

24    **Q.**   It's not going to pick up thumb cache, right, that occurs

04:23    25    after October 15, 2019?

1    **A.**   The timeline analysis is not an exacting analysis with a

2    tool such as AXIOM.

3    **Q.**   So it's going to miss some stuff, is that --

4    **A.**   Yes.

04:23    5    **Q.**   When you say "exacting," it's going to miss stuff.

6    **A.**   Yes.

7    **Q.**   And it might miss important stuff.

8    **A.**   It might.

9    **Q.**   All right.  You talked about the use of Mega, and I got

04:24    10   all fired up about it.  Sorry about that.  But you talked about

11   the use of Mega.  Just explain to the Judge again what Mega is

12   because she's only heard it four times.

13   **A.**   Mega is a -- they are a cloud-based storage provider.

14   They're very similar to Dropbox.  If you're familiar with

04:24    15   Dropbox, they're very similar.

16   **Q.**   Is it familiar -- is it similar to Google Drive?

17   **A.**   It has a lot of similarities.

18   **Q.**   And it's odd that you mentioned Dropbox and Google Drive.

19   Are you aware that Mr. Morgan-Derosier used Dropbox and Google

04:24    20   Drive cloud services for his business?

21   **A.**   I -- I don't recall that, but I -- if you say so, I won't

22   deny it.

23           MR. SCHMITZ:  Thank you, Your Honor.  Those are all

24   my questions.

04:25    25           THE COURT:  Mr. Bellmore, anything else?

439

1          MR. BELLMORE:  I have no further questions, Your

2     Honor.

3          THE COURT:  Thank you, sir.

4          THE WITNESS:  Thank you.

04:25    5          THE COURT:  Mr. Bellmore, do you plan to offer

6     additional evidence?

7          MR. BELLMORE:  Well, Your Honor, no additional

8     witnesses.  Again, I'm going to kind of want to -- we left --

9     we left the exhibit question, I think, unanswered.  So as far

04:26   10     as the evidence question, I would still like to resolve that,

11     but I have no further witnesses.

12          THE COURT:  All right.  And, Ms. Puhl, what is your

13     plan as to additional witnesses?

14          MS. PUHL:  We have no rebuttal witnesses, Your Honor.

04:26   15     Thank you.

16          THE COURT:  Okay.  Then let's take a look at the

17     question of exhibits.  Attached to Mr. Morgan-Derosier's brief

18     were 11 exhibits.  Ms. Puhl, have you had a chance to consider

19     whether there's any objection to those being considered for

04:26   20     purposes of this motion?

21          MS. PUHL:  Which -- are you able to identify which

22     specific exhibit?

23          THE COURT:  Sure.

24          MS. PUHL:  I don't object to any of the exhibits that

04:26   25     Mr. Bellmore offered during the hearing.  If there are

                              440

1    additional exhibits that are attached to the motion, I expect I

2    won't -- I expect we won't object, but I just want to be

3    certain.

4            THE COURT:  I'll let you review this list that

04:27   5    Mr. Thomson --

6            MS. PUHL:  Okay.

7            THE COURT:  -- has prepared, and as to some of them

8    you'll see notations of corresponding Government's Exhibit

9    numbers.

04:27   10           (A brief discussion was had off the record.)

11           MS. PUHL:  Thank you for your patience, Your Honor.

12           THE COURT:  Certainly.

13           MS. PUHL:  We have no objection.

14           THE COURT:  There were 11 attachments to the opening

04:31   15   brief, four attachments to the reply brief.  That would seem to

16   total 15.

17           MS. CARTER:  Your Honor, I apologize.  There's one I

18   did not mention with Ms. Puhl.  Defense Exhibit 14, that was

19   the interview of Mr. Morgan-Derosier that occurred at the

04:31   20   scene.  It's the same audio recording as the government's

21   introduced in this hearing today, so that's the 16th that's

22   missing, I think, from your list there.  And that one was

23   conventionally filed with the court as when we filed our reply

24   brief.

04:31   25           THE COURT:  Yes.  Yes, I recall that now.  Thank you.

441

1      And I do have one question that I meant to ask

2  Detective Freeman, but forgot, so I will ask counsel whether

3  you can answer it.  Exhibit 77 is the cyber tip report.  Page

4  marked 3789 has some handwriting.  Can someone identify the

5  source of that handwriting?

6           MS. PUHL:  I believe it's Special Agent Arel.

7           THE COURT:  Mr. Bellmore?

8           MR. BELLMORE:  I don't have any --

9           THE COURT:  Don't know.

10          MR. BELLMORE:  -- objection for that being entered

11  into the record.

12          MS. PUHL:  I think it just references that it was

13  ported away, right?

14          THE COURT:  Yes.

15          MR. BELLMORE:  And he testified to that fact.

16          THE COURT:  Yes.  Okay.  Ms. Puhl, are you confident

17  that the exhibit questions have been resolved?

18          MS. PUHL:  Yes, I am.  Thank you, Your Honor.

19          THE COURT:  Mr. Bellmore?

20          MR. BELLMORE:  Yes, Your Honor.

21          THE COURT:  Okay.  Then what's next, counsel?  Is

22  there going to be a request for preparation of a transcript?

23          MR. SCHMITZ:  Your Honor, if it please the Court, I'd

24  request -- I don't want to argue this motion in full now, but I

25  think a sort of ten minutes, five minutes of like what I think

442

1   the issues are at least from the government's perspective would

2   be helpful, but that's just a request.  And, you know,

3   obviously, we'd have no objection if the defendant wanted to do

4   the same.

5           THE COURT:  Mr. Bellmore, how would you like to

6   proceed from here?

7           MR. BELLMORE:  Well, Your Honor, we are fresh off

8   nearly two full days of testimony.  If the Court was -- would

9   entertain, you know, some sort of presentation by the parties,

10  at least from the defense perspective, with all the exhibits

11  that we've had, you know, I would like to be able to make an

12  argument, being able to present that, and that's just not

13  something that I will be able to piece together immediately.

14          So I -- I think the Court's first question actually

15  was about preparing a transcript.  We would be asking for that.

16  If that's for the Court to rely upon for the motion to

17  suppress, I would like to -- I think it's probably necessary.

18          THE COURT:  Typically if there is a request for a

19  transcript, then I see a request for submitting post hearing

20  briefs after the transcript is received, so I'm trying to --

21  trying to figure out how you folks would like to proceed.

22          MR. BELLMORE:  Your Honor, I don't know if there

23  would be -- I guess what I was envisioning was maybe a middle

24  ground because I understand that the transcript takes quite

25  amount of time.  But, again, given the amount of evidence here

443

1 and, you know, new information that I think both sides probably

2 have learned through this process, that some sort of briefing

3 is possible.

4 Maybe it could be done, and I think we could do it

04:35 5 comfortably without the transcript, but based on, you know, the

6 evidence now and to have a deadline window tied to today, not

7 to a transcript that is - I don't know - hopefully not too far

8 along, but I know it takes time.

9 THE COURT:  I'll ask the court reporter.  Do you have

10 an estimate?

11 (A brief discussion was had off the record.)

12 THE COURT:  The court reporter is saying two to three

13 weeks.

14 MS. PUHL:  Your Honor, we briefed these issues

04:36 15 extensively, and it's -- you know, much of what was discussed

16 during these two days has to do with subjective intent.  And

17 perhaps as a threshold matter, we should've discussed that

18 initially because in our sur-reply we make the case that it's

19 not even relevant.  Nonetheless, we did -- we did entertain the

04:36 20 discussion about that and entertain testimony about that.

21 I just don't think that we need to do more briefing.

22 As I said, it's been extensive.  I think we can handle this

23 orally, without transcripts at this point.  That's our

24 preference.

04:37 25 The trial -- the trial is set for August 1st, I

444

1  believe, but we're going to be -- I mean, if we wait for

2  transcripts, briefing, and we're getting very close to that

3  trial date.

4         THE COURT:  Give me a minute.

5         MR. BELLMORE:  Your Honor, I would like to be heard

6  on that when the Court's ready.

7         THE COURT:  Yes, Mr. Bellmore.

8         MR. BELLMORE:  Your Honor, the government -- as far

9  as the briefing is concerned, the Court allowed the government

10  to file its sur-reply.  As we are the moving party in this

11  case, typically the procedure is to allow a opening brief, a

12  response, and a reply.  The sur-reply was requested, indicating

13  that our reply raised new issues, which I argue it did not, and

14  instead, what the government did for the first time is raise

15  the issue of inevitable discovery.

16         So there's this imbalance of our standard practice in

17  briefing, and so we would like the opportunity to file a

18  written response.  And we will be, you know, as flexible on

19  timelines as possible, you know, keeping in mind the age of

20  this case, as well as the trial date being August 1st.

21         THE COURT:  What deadline might you suggest for post

22  hearing briefing, Mr. Bellmore?

23         MR. BELLMORE:  We're looking at a calendar, Your

24  Honor.  Thank you for your patience.

25         THE COURT:  Sure.

445

1          MR. BELLMORE:  Our office is in conference in two

2    weeks, but two weeks seems to make sense as far as picking the

3    actual amount of time that we would need, but, you know, I

4    think -- I think three weeks would be sufficient.

04:39    5          THE COURT:  May 25th?

6          MR. BELLMORE:  Yes, Your Honor.

7          THE COURT:  And, Ms. Puhl, of course the government

8    is not required to submit any brief, but if you were, would you

9    want to do it simultaneously or responsively?

04:40    10          MS. PUHL:  Your Honor, given the fact that the

11   defendant raised a new issue this week that was not raised in

12   the brief, this issue of the write blocker that was raised for

13   the first time, I think it would be prudent that we do a

14   responsive brief.

04:40    15          THE COURT:  And if the defense brief is due on

16   May 25th, when could yours be completed?

17          MS. PUHL:  I think two weeks would be sufficient,

18   Your Honor, and that would put us at June 8th.

19          THE COURT:  Any objection to that, Mr. Bellmore?

04:41    20          MR. BELLMORE:  No, Your Honor, just noting that the

21   government has had two responsive briefs in this case, but I

22   will not object.  I would ask the Court if the Court is

23   inclined to set a page limit on this case I think just to make

24   sure that everyone is kind of abiding by the same rules this

04:41    25   time around.

1          THE COURT:  And what page limit might you suggest?

2          MR. BELLMORE:  We will -- we would just not need more

3    than 15 pages, Your Honor.

4          THE COURT:  Ms. Puhl?

04:42   5          MS. PUHL:  I'll commit to not filing a brief in

6    excess of 15 pages without -- I wouldn't do so without

7    permission.

8          THE COURT:  Okay.  Well, you all know that there are

9    already a lot of briefs here.  Of course, this is a bit out of

04:42  10    the usual course since it is an area where the government has

11    the burden of proof.  So let's plan on defense filing a post

12    hearing brief by May 25th, United States by June 8th, limit of

13    15 pages unless there is a request to exceed that made in

14    advance of the filing.  And, of course, after the report and

04:43  15    recommendation is completed, then there will be some time for

16    objections to it.

17          Given that, Mr. Schmitz, are you still wanting to

18    make any oral argument here?

19          MR. SCHMITZ:  I can for the Court to tee up the

04:43  20    issues, but if we're briefing it -- you know, I don't want to

21    waste the Court's time, but I'm happy to sort of not argue the

22    motion, right?  I'm not going to go through the evidence in the

23    case, but there's been a lot of ink spilled on this in two days

24    of testimony, and I do think the issues can be sort of narrowly

04:43  25    summed up into what we think the Court needs to rule on.  If

447

1   the Court -- if it's not going to be helpful to the Court,

2   that's fine too.

3           THE COURT:  Well, I heard Mr. Bellmore say that he

4   might not feel prepared to do that at this time.

04:44   5           MR. BELLMORE:  Your Honor, I would reserve -- you

6   know, since the Court has issued a briefing schedule, I would

7   reserve my argument for the briefing.

8           THE COURT:  Okay.  Then let's not do oral argument

9   today.

04:44   10           Is there anything else we should talk about today,

11   Ms. Puhl?

12           MS. PUHL:  Thank you.  Nothing further, Your Honor.

13           THE COURT:  Mr. Bellmore, anything else?

14           MR. BELLMORE:  Your Honor, I would like to clarify,

04:44   15   is the Court ordering the transcripts, or is that something

16   that defense should do by motion?

17           THE COURT:  You should do that.

18           MR. BELLMORE:  Thank you.  Then I have nothing

19   further.

04:44   20           THE COURT:  Mr. Morgan-Derosier, I talked yesterday

21   morning about the process that's going to happen from here out.

22   And to repeat, I will be preparing a written report and

23   recommendation that will be filed.  It will go to Judge Welte.

24   It will go to the lawyers.  And there will then be a time

04:45   25   period when both lawyers will have a chance to object to that.

448

1        Judge Welte will then consider the objections and the

2  report and recommendation, and he'll make a decision, so I

3  cannot tell you when that's going to happen, but obviously from

4  what you've just heard discussed, it's not going to be right

04:45     5  away.

6        THE DEFENDANT:  No, it sounds like it's going to take

7  some time, Your Honor.

8        THE COURT:  Do you have any questions about the

9  process, Mr. Morgan-Derosier?

04:45   10        THE DEFENDANT:  Not so much about the process, but I

11  think the lengthy detention concerns me.

12        THE COURT:  Well, we're not going to talk about that

13  today.

14        All right.  Thank you, all.  We're adjourned.

04:45   15        (Proceedings concluded at 4:45 p.m., the same day.)

16               - - - - - - - - - -

17

18

19

20

21

22

23

24

25

1        <u>CERTIFICATE OF COURT REPORTER</u>

2            I, Sandra E. Ehrmantraut, a Certified Realtime

3    Reporter,

4            DO HEREBY CERTIFY that I recorded in shorthand the

5    foregoing proceedings had and made of record at the time and

6    place hereinbefore indicated.

7            I DO HEREBY FURTHER CERTIFY that the foregoing

8    typewritten pages contain an accurate transcript of my

9    shorthand notes then and there taken.

10           Dated:  May 10, 2023

11

12                        <u>/s/ Sandra E. Ehrmantraut  </u>
                          Certified Realtime Reporter
13

14

15

16

17

18

19

20

21

22

23

24

25