## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NORTH DAKOTA

United States of America,      )
                      )
        Plaintiff,    )      Case No. 3:22-cr-5
                      )
    vs.          )    **REPORT AND RECOMENDATION**
                      )
Nicholas James Morgan-Derosier,  )
                      )
        Defendant.    )

Nicholas James Morgan-Derosier is charged with multiple crimes involving child pornography and sexual exploitation of children. Morgan-Derosier moved to suppress evidence seized during a September 15, 2020 search of his person and residence, and evidence obtained from electronic devices that were seized during the search. At the request of the presiding district judge, this court held an evidentiary hearing on the motion on May 3 and 4, 2023, and now issues this Report and Recommendation.

Five witnesses testified at the evidentiary hearing: David Buzzo, who at the time of the search was a Grand Forks, North Dakota, Police Department (GFPD) detective investigating financial crimes; Jennifer Freeman, a GFPD detective and forensic examiner; Michael Arel, who at the time of the investigation was a Homeland Security Investigations (HSI) special agent stationed in Grand Forks; Daniel Casetta, an HSI special agent stationed in Grand Forks; and Daniel Meinke, a computer forensics expert engaged by the defense. Three of the five witnesses, Detectives Buzzo and Freeman and Special Agent Casetta, were part of the law enforcement contingent that conducted the September 15 search.

The court received many exhibits, most without objection, including all exhibits Morgan-Derosier had attached to his pre-hearing briefing. Morgan-Derosier and the

United States each filed two briefs prior to the hearing and one post-hearing brief. (Doc. 73; Doc. 77; Doc. 82; Doc. 88; Doc. 109; Doc. 113).

Summarized very briefly, Detective Buzzo obtained a warrant from a state court judge to search for evidence of suspected crimes involving Morgan-Derosier's operation of a lawn care business—Team Lawn. During the September 15 search, law enforcement officers seized a number of electronic devices. Later on September 15, after the search of the premises was completed, Detective Freeman began a search of one of the seized devices, found evidence of child pornography, and obtained a second state court search warrant authorizing searches of the seized electronic devices for child pornography. Searches of the seized devices ultimately led to a grand jury's indictment of Morgan-Derosier. Prior to the September 15 search, GFPD had investigated a child pornography Cybertip that had been linked to Morgan-Derosier, but that investigation was inactive at the time of the search.[1]

In his motion, Morgan-Derosier argues the first state court warrant was invalid on its face because it was overbroad and lacked particularity. Further, assuming the first warrant was facially valid, Morgan-Derosier argues law enforcement officers executed it in an unreasonable manner. The United States contends the warrant was sufficiently particular, sufficiently limited in scope, and law enforcement officers reasonably executed it.

---

[1] Detective Buzzo referred to the Cybertip investigation as being "closed" and Detective Freeman referred to it as "inactive." The court considers any distinction between those two terms irrelevant to the current issues.

**Hearing Evidence**

**1.      Investigation of Cybertip**

Because it preceded the Team Lawn investigation, the court begins with a summary of evidence concerning the Cybertip investigation. A timeline received as an exhibit for demonstrative purposes details the sporadic manner in which GFPD's investigation of the Cybertip unfolded.[2] (See Ex. 90).

In January 2019, the National Center for Missing and Exploited Children (NCMEC) referred a Cybertip to the Internet Crimes Against Children (ICAC) Task Force. The ICAC Task Force referred it to the North Dakota Bureau of Criminal Investigation, which referred it to GFPD. (Tr. 262). A GFPD sergeant assigned investigation of the Cybertip to Detective Freeman.

NCMEC characterized an image described in the Cybertip—which Google had found stored in Google Photos and reported to NCMEC—as depicting sexually explicit conduct involving a prepubescent minor. (Ex. 77, p. 5). The information Google provided to NCMEC included a phone number associated with a Google Photos account. (Tr. 262). Detective Freeman did an open search of that phone number and discovered it came back to a business name—Team Lawn. Id. Detective Freeman apparently believed the number was for a landline.

Detective Freeman identified the owners of Team Lawn as Morgan-Derosier and Robert Coons. Id. On February 4, 2019, she sent an email to Special Agent Arel, who was

---

[2] The government's exhibits, which are attached to the minute entry at Doc. 99, are cited as "Ex." The defendant's exhibits, which are attached to his briefs at Doc. 77 and Doc. 82, and to the minute entry at Doc. 99, are cited as "Def. Ex." The hearing transcript, which is available at Doc. 101 and Doc. 102, is cited using the continuous pagination at the bottom-center of each page.

then a member of the ICAC Task Force and whose primary focus was child exploitation

cases. (Tr. 263-64). Detective Freeman asked Special Agent Arel for advice on how a

landline phone number could be associated with Google. Special Agent Arel responded

that the number had been "ported" from a landline provider to a cell service provider.

(Ex. 83). Through a subpoena to the cell service provider, Special Agent Arel learned the

subscriber for the phone number given on the Cybertip was Sandra Simons of

Champlin, Minnesota, with a business contact name of Team Lawn and an additional

phone number for Team Lawn. (Ex. 85; Tr. 236-37).

On February 26, 2019, Detective Freeman sent an email to Special Agent Arel,

stating:

> Robert Coons and Nicholas Derosier were the owners of Team Lawn. They
> took all the websites down and actually all of the electronics were
> conveniently reported stolen now in a burglary.

> Roberts Coons lived at ▮▮▮▮▮▮▮, where the business was located out of.
> Robert was the man who was killed in the accident. Nicholas lives in EGF
> and was the reporting party on the fatal accident and also the burglary into
> Robert's home. It is all super weird.

(Ex. 85). Special Agent Arel responded via email the next day, stating Simons (the cell

number subscriber) was likely Morgan-Derosier's mother or another relative who might

be paying the cell phone bill. Special Agent Arel advised Detective Freeman he had sent

a subpoena to Google requesting any additional information, especially IP addresses,

related to the Cybertip. Id.

On March 8, 2019, Special Agent Arel sent another email to Detective Freeman,

attaching Google's response to the subpoena—which identified Morgan-Derosier as the

subscriber associated with the phone number in the Cybertip. (Ex. 86). But apparently

because GFPD's email system did not accept the message's attachment, Detective
Freeman did not receive Special Agent Arel's March 8 email. (Tr. 265-66).

On July 1, 2019, Detective Freeman sent another email to Special Agent Arel,
asking if he had received a response from Google concerning the Team Lawn case. (Ex.
87). Special Agent Arel responded the same day, again sending Google's response to the
subpoena as an email attachment. (Ex. 88). Once again, GFPD's email system
quarantined the email because it came from a domain outside of grandforksgov.com.
(Tr. 267). Having received no response from Special Agent Arel and knowing that it
might take time to receive a response to the subpoena from Google, Detective Freeman
"filed the case inactive" on July 16, 2019. She explained that classification "doesn't close
the case necessarily" but that the case could be reopened and reinvestigated if additional
information came forth. (Tr. 267-68). Special Agent Arel did not learn that Detective
Freeman had not received the two emails with attachments until he prepared for the
evidentiary hearing. (Tr. 245).

Approximately one year after classifying the Cybertip investigation as inactive, in
July 2020, Detective Freeman received a phone call from an Eagan, Minnesota, Police
Department (EPD) detective regarding a text conversation between a suspect—Justin
Langen—and Morgan-Derosier. (Tr. 270). The EPD detective described the conversation
as suggesting Langen and Morgan-Derosier had exchanged images of child
pornography, but no images were recovered from Langen's phone. According to the EPD
detective, Morgan-Derosier had alluded to wanting to perform or having performed sex
acts on his five-year-old nephew. (Tr. 271). Detective Freeman obtained the EPD's
report. EPD scheduled forensic interviews of Morgan-Derosier's nephews, who denied
there had been any sexual contact between them and Morgan-Derosier. (Tr. 271-72).

Detective Freeman also requested and received information from the United States Postal Service on occupants of the Team Lawn business address. Detective Freeman concluded there was not probable cause to apply for a search warrant at that time, and the Cybertip case remained inactive. (Tr. 272-73).

### 2.    Investigation of Morgan-Derosier's Business Activities

Morgan-Derosier and Robert Coons owned Team Lawn. Coons died in February 2019, when he was hit by snow removal equipment Morgan-Derosier was operating in the High Plains Court area of Grand Forks. (Tr. 25).

The investigation of Team Lawn leading to the application for the first search warrant proceeded sporadically between December 2019 and September 2020. Detective Buzzo testified his first contact with the investigation was in December 2019 when a Grand Forks resident reported she had issued a check to Team Lawn in November 2018, the date of the check had been changed to November 2019 when it was cashed, her initials were next to the date change, but she had not changed the date or initialed the changed date. (Tr. 13-14; Ex. 1a). Because of the dollar value involved, investigation of the matter was not given priority, and Detective Buzzo took no action on the matter until August 12, 2020, when he reviewed reports in his backlog. (Tr. 16).

The December 2019 GFPD report involving the Team Lawn check noted the reporting citizen had reported the matter to the North Dakota Attorney General's Consumer Protection and Antitrust Division as well as to the GFPD. Detective Buzzo contacted the AG's Office and spoke with an investigator in the Consumer Protection Division. Detective Buzzo testified he was told the AG's Office had investigated other complaints against Morgan-Derosier and his business and there had been an injunction issued on October 15, 2019, prohibiting Morgan-Derosier and Team Lawn from

conducting any business in the state. (Tr. 18; Ex. 2). Detective Buzzo testified

complaints to the AG's Office included construction fraud in taking money for projects

that were not started, or not completed, as well as misrepresentation on a contractor

licensing application. (Tr. 203). The AG's Office investigator also told Detective Buzzo of

a "tipster" who had reported Morgan-Derosier was doing business in violation of the

injunction. (Tr. 19). The next day, the AG's Office investigator sent an email to Detective

Buzzo, advising the tipster had reported Morgan-Derosier was working on projects

having prices exceeding $4,000, the amount triggering a state requirement for a

contractor's license. (Tr. 21-22; Ex. 3). Detective Buzzo then conducted internet searches

and found job postings for Grand Forks lawn care businesses directing applicants to call

"Nick" at the phone number known to be associated with Morgan-Derosier. (Tr. 23; Ex.

4).

In searching GFPD's records management database on August 12, Detective

Buzzo found Morgan-Derosier's name associated with the February 2019 incident in

which Coons was killed. Detective Buzzo testified he "happened across" Detective

Freeman that day and told her he was investigating something involving Team Lawn

"that was beginning to look like an issue." (Tr. 25-26). Detective Buzzo testified his

mention of Team Lawn was like "a light bulb" to Detective Freeman because she

recognized the name from her previous investigation of the Cybertip. (Tr. 128-29).

Detective Freeman gave Detective Buzzo a document she had received from the United

States Postal Service on July 29, 2020, in response to her July 14, 2020 request for

names of persons and entities receiving mail at ███████████████ in Grand Forks.

The response identified the address as that of Team Lawn & Landscape, Morgan-

Derosier, Derosier Outdoors, and "Beeche (last name)." (Def. Ex. 18). Detective Buzzo

testified he learned for the first time on August 12, 2020, that the name "Team Lawn" had been associated with the Cybertip that had been assigned to Detective Freeman in January 2019. (Tr. 201-02). Detective Freeman testified she did not believe she had mentioned the Cybertip to Detective Buzzo when she gave him the address verification form. (Tr. 275).

On August 24, 2020, another Grand Forks resident, who had been referred to GFPD by the AG's Office, reported having seen Team Lawn doing landscaping work in a condominium area on High Plains Court in Grand Forks. Detective Buzzo testified he then drove to High Plains Court and observed a trailer, equipment, and materials associated with landscaping work at two locations—███████████ and ███████ ███████—though he saw no workers in the area. A check of the license plate on the trailer showed it was registered to Team Lawn, Inc. (Tr. 26-29; Ex. 5). From the street, Detective Buzzo took various photographs of the apparent job sites. (Exs. 6a through 6j).

Detective Buzzo then contacted the Grand Forks City Inspector's Office and inquired about permits for the two job sites. He testified he learned from the City Inspector's Office that no permits had been issued, though that office was aware of the work at ███████████ and gave him the name of the owner of that property. Detective Buzzo contacted the property owner, who advised Morgan-Derosier was actively doing work, or had recently done work, at five properties within Grand Forks County. (Tr. 31-32).

The next day, August 25, 2020, Detective Buzzo again drove to the High Plains Court area. That day, three men—Christyan Logan, Blake Thorson, and Shawn Halvorson, who identified themselves as Morgan-Derosier's employees—were present. Detective Buzzo asked the men for documentation of their employment, and Logan

arranged for someone to send him a photo of a pay stub. The pay stub identified Logan's employer as "Garden & Patio HQ, DeRosier Outdoor." (Ex. 7). Detective Buzzo testified that, when Logan showed him the photo, he recognized the layout and template of the pay stub as one created with Quickbooks payroll software. (Tr. 33-35). The three men described computers Morgan-Derosier had at his residence that were used for payroll processing. (Def. Ex. 2, p. 3; Tr. 33-35). Another man—Nicholas Beeche—later arrived on the scene and told Detective Buzzo he had been working for Morgan-Derosier for about seven months. (Tr. 36).

While in the High Plains Court area on August 25, Detective Buzzo had asked one of the employees he encountered to call Morgan-Derosier to ask that he come to the location. (Tr. 36-37). Morgan-Derosier arrived at the location in response to a call, and Detective Buzzo conducted a recorded interview of him. (Ex. 73). Detective Buzzo summarized the interview during his testimony. He testified Morgan-Derosier confirmed the phone number included in the job advertisements was his, confirmed he was doing business in North Dakota under the name GPHQ, and stated GPHQ was licensed in North Dakota. Morgan-Derosier told Detective Buzzo the injunction was not legitimate for several reasons. (Tr. 39). While at the location, Detective Buzzo called the AG's Office to inquire about licensure of GPHQ. The AG's Office and the Office of the Secretary of State told Detective Buzzo neither GPHQ nor Morgan-Derosier were licensed to conduct business in North Dakota. (Tr. 40).

On August 25, Detective Buzzo had asked Logan, Thorson, and Halvorsen for names of others who had been working for Morgan-Derosier and was given the name of Jack Hirst, the "tipster" who had contacted the AG's Office earlier. Detective Buzzo later contacted Hirst, who confirmed information others had provided about job sites at

which Morgan-Derosier worked and further stated he was owed money for the work he had done for Morgan-Derosier. (Tr. 42). Detective Buzzo had also been given the name of Andrew Fox, who had been identified as another former Morgan-Derosier employee. (Tr. 43). Detective Buzzo interviewed Fox, who confirmed he had worked for Morgan-Derosier after the injunction was issued. (Tr. 44). Fox provided copies of pay stubs and other documents concerning a claim Fox had filed against Morgan-Derosier for unpaid wages. (Exs. 8 through 11). Fox told Detective Buzzo that Morgan-Derosier operated his business from his residence, gave the location of that residence, and gave Detective Buzzo information about electronic devices Morgan-Derosier had used in connection with his business. (Tr. 46). Detective Buzzo recognized payroll documents Fox provided as having been prepared using a QuickBooks application. Fox provided a copy of Morgan-Derosier's response to Fox's wage claim and, in that response, Morgan-Derosier stated Fox had been employed by Team Lawn after October 15, 2019. (Ex. 11).

On September 10, 2020, Detective Buzzo applied for a search warrant for records of a Team Lawn bank account identified on a payroll document Fox had provided. (Def. Ex. 17). The warrant requested documents showing account activity from October 1, 2019, through September 10, 2020. Records Detective Buzzo received in response on September 14, 2020, showed Morgan-Derosier had conducted business after the date of the injunction and also showed checks had been written on the account after the account was closed. (Doc. 101, pp. 55-57; Ex. 12). A later search warrant directed to another bank "likely" requested documents within the same date restrictions. (Tr. 190-91).

On September 10, 2020, Detective Buzzo interviewed the citizen who had reported on August 24, 2020, that Team Lawn was continuing to do business. The citizen provided Detective Buzzo with invoices for work Team Lawn had done on her

properties after the date of the injunction. (Tr. 58-59). The next day, Detective Buzzo interviewed a Grand Forks County resident who reported Morgan-Derosier had not completed landscaping projects for which she had paid him. (Tr. 60).

Detective Buzzo prepared an application for a search warrant on September 14, 2020. In his affidavit supporting that application, Detective Buzzo described the evidence he had gathered during the course of his investigation. (Ex. 13, pp. 5-11). Detective Buzzo stated his belief that probable cause existed to show Morgan-Derosier had committed the crimes of "Violation of a Judicial Order and Contractors License Required, and Construction Fraud," and that evidence of those crimes would be found within electronic devices located at Morgan-Derosier's residence. Id. at 14. Further, the affidavit included a request to search Morgan-Derosier's person if his cell phone was not found in the residence and requested authorization for a forensic search of the various electronic devices. Id. Detective Buzzo submitted the search warrant application for review by an assistant state's attorney, who made no changes before it was presented to a judge. (Tr. 62). A Grand Forks County district judge signed the search warrant without making any changes. (Tr. 63).

Detective Buzzo prepared the search warrant application through an electronic portal utilized by the North Dakota state courts. The United States presented a demonstration of the process used to submit a search warrant application through that portal. (Court Ex. A).[3] To prepare a proposed search warrant using the electronic portal, an applicant selects among options provided in a template, but at no time prior to a judge signing the warrant does the applicant see the proposed search warrant itself. (Tr.

_____

[3] Court Exhibit A is a CD that was filed conventionally.

68-69). Detective Buzzo described the search warrant itself as having been "created by the [electronic] system." (Tr. 141). He testified he did not know whether the assistant state's attorney who reviewed the application had seen the warrant itself before it was sent to a judge for consideration. (Tr. 158-59).

Detective Buzzo testified he made an error when using the search warrant application portal. He selected the option to search a person—as he intended to do—but did not select the option to search a residence—which he also intended to do. (Tr. 64-65). Detective Buzzo testified he was unaware of the error in the warrant until the United States Attorneys Office contacted him in preparation for the suppression hearing. (Tr. 115-16).

The search warrant template includes no questions about what crimes would be investigated through the proposed search. (Tr. 74-75). The portal does not allow submission of a search warrant application without an attached affidavit. (Tr. 77). The warrant issued by the Grand Forks County District Court reads as follows:

> Affidavit having been made before me by David Buzzo, Grand Forks Police Department, that there is reason to believe that <u>on or within the person known as Nicholas Derosier a/k/a Nicholas Morgan-Derosier</u>, presently located at . . ., Grand Forks, ND 58201, there is now being concealed evidence or property, namely, computers, cell phones, other electronic communication devices, electronic storage devices such as the computer's hard drive, removable media such as, CDs, DVDs, or portable flash (USB) drives, as listed in Exhibit A, described with particularity in the attached and incorporated exhibit, which:
>
> •   Is evidence of a crime;
>
> •   is contraband, fruits of crime, or other items illegally possessed;
>
> and as I am satisfied that there is probable cause to believe that the evidence or property so described is being concealed on the above-described.

(Ex. 13, p. 1) (emphasis added). The warrant states it incorporates Exhibit A, which

is titled "Description of Items To Be Searched For and Seized." Exhibit A states:

> By forensic or other means of examination: Files containing evidence of the crimes of Contractor License Required, Construction Fraud, and Violation of a Judicial Order in any form wherever they may be stored.

> Portable electronic devices capable of storing files related to the aforementioned crimes. Such items include, but are not limited to, cellular telephones, iPads, iPods, tablet computers, notebook computers and netbook computers.

> Information, correspondence, records, documents or other materials pertaining to the possession, receipt or distribution of visual depictions of projects, job sites, communications, account data, timesheet information, customer information, address, and accounts that were transmitted or received using the digital media, including, but not limited to: electronic mail, chat logs, and electronic messages or any other forms of transmission.

> Records evidencing ownership of digital media devices and removable storage, to include; evidence of who used or controlled the computer at the time the items described in this warrant were created, edited, or deleted, such logs, registry entries, saved usernames and passwords, documents, and browsing history; Evidence of software that would allow others to control the computer, such as, viruses and other forms of malicious software; Evidence of the attachment to the computer of other storage devices, disks, or similar containers; Evidence of the times the computer was used, passwords, encryption keys, and other devices that may be necessary to access the computer.

> Any computer, computer system and related peripherals; tapes, cassettes, cartridges, streaming tape, commercial software and hardware, computer disks, disk drives, monitors, computer printers, modems, tape drives, disk application programs, data disks, system disk operating systems, magnetic media floppy disks, hardware and software operating manuals, tape systems and hard drive and other computer related operation equipment, digital cameras, scanners, computer photographs, Graphic Interchange formats and/or photographs, undeveloped photographic film, slides, and other visual depictions of such Graphic Interchange formats (including, but not limited to, JPG, GIF, TIF, AVI, and MPEG), and any electronic data storage devices including, but not limited to hardware, software, diskettes, backup tapes, CD-ROMS, DVD, Flash memory devices, and other storage mediums; any input/output peripheral devices, including but not limited to passwords, data security devices and related documentation, and any hardware/software manuals related to or used to: contain information pertaining to the use of the computers or other electronic devices for

storing, facilitating, and/or drafting payroll accounts, customer accounts, estimates, statements, and other business documents.

Id. at 2. The search warrant itself—a single page—includes no reference to the supporting affidavit. (Tr. 143). The warrant included no date range of documents to be searched and seized. (Ex. 13; Tr. 154-56).

**3.    September 15, 2020 Execution of the Search Warrant**

Detective Buzzo testified that, after the judge signed the warrant, he developed an operations plan for executing it. (Tr. 79). He also described a briefing conducted for personnel who were to be involved in executing the warrant. He testified, as is typical, all available officers of the GFPD Criminal Investigations Bureau attended the briefing and participated in executing the warrant. (Tr. 80). He testified there were "possibly eight" detectives involved in the search and using that number of officers was "not many" in light of there being multiple subjects involved and in light of the various tasks assigned to those officers. (Tr. 162, 207). Detective Freeman, GFPD's only computer forensics examiner, who was a member of the ICAC Task Force, was among those who attended the briefing and participated in the search. (Tr. 81, 208, 314-15).

Detective Buzzo testified he called Special Agent Casetta, who had previously been an officer with GFPD, shortly before the briefing and invited him to participate in the search because he had experience with financial crimes and "it's always helpful to have extra manpower there - - extra set of eyes should other issues pop up." (Tr. 82-83). Special Agent Casetta testified his primary assignment at the time of the search was with a narcotics task force, he also worked some financial crimes, and the only thing he knew about the September 15 search prior to participating in it was that it involved investigation of financial crimes. (Tr. 382). Detective Buzzo testified he had not

investigated any child pornography case previously and, if he had had a question about child pornography, he would have called either Special Agent Arel or HSI Special Agent Tim Litzinger, both of whom he knew to be experienced in child pornography investigations. (Tr. 209-10). Special Agent Casetta is now lead agent in this case but testified he had not been a lead investigator on any child pornography case prior to this one. At the time of the hearing, he was part of the ICAC Task Force. Id.

During the pre-search briefing, Detective Buzzo provided those in attendance with copies of the search warrant and of Exhibit A, but not with copies of his affidavit. (Tr. 84-85). Both Detective Buzzo and Detective Freeman testified a supervisor had spoken about the Cybertip at the briefing, stating that if anything not related to construction fraud, contracting without a license, or violation of a judicial order were found, they would need to stop the search and seek to amend the search warrant. (Tr. 86, 278-79). Detective Buzzo testified he was unaware of any details concerning the Cybertip at the time of the search. (Tr. 87).

When law enforcement officers arrived at Morgan-Derosier's residence on September 15, three other residents—Thorson, Logan, and Julia Anderson—were present. Detective Buzzo testified the three were told they were free either to stay or leave while the search was conducted and that they never "really left" the property. (Tr. 90-91, 169). None of the three were formally interviewed, though law enforcement personnel had conversations with them. (Tr. 280-81). Special Agent Casetta testified the three were "extremely cooperative," he had "casual conversation" with them, and he asked their feelings about Morgan-Derosier. (Tr. 372). He testified Anderson "just spurted out" that Morgan-Derosier had raped his eight-year-old nephew in Minnesota and Logan and Thorson told him about a thumb drive with a file labeled "boys" that was

in a safe in Morgan-Derosier's bedroom and told him where a key to the safe was located. (Tr. 373). Special Agent Casetta testified he shared that information with other officers and he and another officer then searched Morgan-Derosier's bedroom and the safe in the bedroom. (Tr. 374, 387-89).

Detective Freeman was responsible for logging evidence other personnel found during the search. (Tr. 280). Various photographs taken during the search were received in evidence, showing the exterior of the residence, vehicles parked outside the residence, landscaping equipment, a whiteboard inside the residence that listed information about various landscaping projects, computers, thumb drives, cell phones, a checkbook, credit cards, diapers found in Morgan-Derosier's bedroom, and boxes of business documents. (Exs. 14 through 72). An exhibit inventory shows fourteen electronic devices were seized from Morgan-Derosier and his residence during the search. (Ex. 76). Detective Freeman testified she did no onsite forensics while the search was being conducted, as she would have done had the search targeted child sexual exploitation material. (Tr. 282-83).

Hearing exhibits include photographs of a class ring bearing the name "Nicholas," of Morgan-Derosier's birth certificate and driver's license, and of documents appearing to relate to the AG's Office investigation of Team Lawn. (Def. Exs. 19 through 21). Detective Buzzo testified he considered those items important in showing Morgan-Derosier's ownership of the safe, where those items, as well as several electronic storage devices, were found. (Tr. 215-17).

Documents scattered around desks in the living area and documents in file cabinets and file boxes in the basement were not seized. (Tr. 178-80). Detective Buzzo testified documents relating to time periods when Coons, the previous co-owner of

Team Lawn who died in February 2019, was involved in the business were not seized. (Tr. 209-10).

Morgan-Derosier was not present when law enforcement personnel arrived at the residence, but he arrived while the search was underway. Detective Buzzo told him the search was being done to look for evidence of the three crimes listed in his affidavit, "amongst other things." (Ex. 75, p. 3). Morgan-Derosier surrendered a cell phone he was carrying but declined to give law enforcement the code required to access contents of the cell phone. (Tr. 119-20). Detective Buzzo conducted a recorded interview of Morgan-Derosier of one hour, seven minutes; a copy of the recording and a transcript of the interview are in evidence. (Ex. 74; Ex. 75). Detective Buzzo asked no questions about child pornography or child exploitation. He testified law enforcement officers did not search for child pornography and he did not abandon the search for business records. (Tr. 115).

At one point, Special Agent Casetta joined the interview of Morgan-Derosier and told him he had found "interesting stuff," referring to diapers that were found in Morgan-Derosier's bedroom. (Ex. 75, p. 30). Morgan-Derosier responded that the diapers were there because his nephews had visited. Special Agent Casetta also told Morgan-Derosier that the other occupants of the residence "seem[ed] not to like [him]." Id. When Special Agent Casetta asked if there would be any "weird stuff" found on the electronic devices, Morgan-Derosier replied, "Shouldn't be." Id. at 31. Morgan-Derosier told Special Agent Casetta there would be business documents in the bedroom safe, id. at 36-37, though it is not clear whether he made that statement before or after Special Agent Casetta had searched the safe.

In his report of the September 15 search, Detective Buzzo stated:

> Although several business documents were present photographs were taken. It had been confirmed through speaking with DEROSIER that he used QB accounting software and the necessity to seize all business documents were moot (the computers and other electronic storage and communication devices had been seized). There were large volumes of business documents dating back years located in different filing boxes and cabinets in the basement of the home. I determined those documents were not relevant to this case. Also, the bulk of the names and projects I observed on the documents of the desk area were already known.

(Def. Ex. 2, p. 20). Detective Freeman testified a Lexar thumb drive was found in a safe near documents labeled "Team Lawn." (Tr. 285).

**4.      Search of Electronic Devices**

After the September 15 premises search was completed, Detective Freeman returned to the police station and began forensic examination of the electronic devices seized during the search. She testified she was not looking for child pornography when she executed the warrant. She began the forensic examination by removing the internal hard drive of a tower computer and started the process of imaging that hard drive. Because she knew it would take a lot of time to image that hard drive, Detection Freeman started on a smaller device—the Lexar thumb drive—in the meantime. (Tr. 281, 291-92). No evidence explained why Detective Freeman chose the Lexar thumb drive rather than one of the other seized thumb drives to begin her forensic search.

In examining the Lexar thumb drive, Detective Freeman did not use a "write blocker," and she testified she made a mistake in not doing so. She described a write blocker as a device used to prevent alteration of documents on an electronic device that is being analyzed. (Tr. 292-93). One end of a USB device is plugged into a write blocker and the other end of the write blocker is plugged into a computer. (Tr. 355).

Detective Freeman testified she used AXIOM software to parse through data imaged from a device, and portions of an AXIOM report of the Lexar thumb drive report

were received in evidence. (Tr. 293-94; Ex. 91). Because she had not used a write blocker, the "last accessed date" data on the report had been changed. The report shows all files on the Lexar thumb drive were last accessed on September 17, 2020, at 12:00 a.m. (Ex. 91). Detective Freeman testified she had stopped her search of the Lexar thumb drive on September 15 but had left the thumb drive plugged into her machine. According to Detective Freeman, a virus scan likely ran on her computer at 12:00 a.m. on September 17, resulting in that date being reflected as the "last accessed date" on the AXIOM report. (Tr. 297-98). She testified she did not access the thumb drive on that date, no data other than the last accessed date changed because she did not use a write blocker when examining the Lexar thumb drive, and her search of that device was not changed because of the change in the last accessed date. (Tr. 296-98, 363).

Detective Freeman testified she searched the Lexar thumb drive for "just minutes" before finding child sexual abuse material and she had clicked through "just a handful of files" before opening one containing child sexual abuse material. (Tr. 307-08). She described seeing a folder on the thumb drive labeled "Mega," and testified she was familiar with Mega as an online platform that allowed users to send links to encrypted documents to other users. Detective Freeman testified she suspected there might be child exploitation materials in the Mega file because of her training and experience, because of her knowledge that other residents of Morgan-Derosier's home had told officers Morgan-Derosier had raped his nephew, because of the Cybertip, and because of the information she had received from EPD about a conversation between Morgan-Derosier and a suspect EPD was investigating. (Tr. 301-05). She also testified she needed to look at the contents of the Mega folder to search for visual depictions of

evidence of business fraud, (Tr. 305), but had not previously worked on a business records case involving the Mega platform, (Tr. 342).

Detective Freeman testified she clicked on a file in the Mega folder created on September 7, 2020, and labeled "Klein 33" not knowing who "Klein" might be, and saw an image of child sexual abuse material. She testified that, after seeing that image, she contacted an assistant state's attorney who advised her to open another image file for verification and then apply for another search warrant. Detective Freeman testified she then opened a file labeled "Klein 35," found another image of child sexual abuse material, stopped her forensic search, and applied for another search warrant. (Tr. 306-07).

On September 16, 2020, Detective Freeman applied for and was granted a warrant authorizing a search of the electronic devices seized on September 15 for sexual abuse material. (Def. Ex. 7). She found 60 files of child sexual abuse material on the Lexar thumb drive, and 3,474 files of child sexual abuse material were found among the electronic devices seized on September 15, not including those later found on the cell phone seized from Morgan-Derosier's person. (Tr. 310-12). Detective Freeman testified she would have found child pornography images when searching any of the devices for visual depictions of job sites or visual depictions of documents. (Tr. 312-13). She testified she did not do a keyword search because it would not have been helpful in searching image files. (Tr. 291, 301-02).

Meinke, Morgan-Derosier's computer forensics expert, described the process his company uses to create a bit stream image of the entire contents of a device that is to be searched and to verify that data was not altered by the process of creating the image. (Tr. 403-04). Meinke reviewed a forensic image of the Lexar thumb drive seized on

September 15, which had been imaged by a North Dakota Bureau of Criminal Investigation agent. (Tr. 408-09). Meinke testified that, because a write blocker was not used, there was no way to know whether data other than the "last accessed date" was altered after the thumb drive was seized. (Tr. 411-12).

Meinke testified about his review of Government Exhibit 79, a screenshot showing a directory of a computer's contents. He described the document as unusual because it listed folders that were not present on the image of the thumb drive the NDBCI agent had created. Meinke testified the image depicted on Exhibit 79 does not accurately depict the thumb drive contents because, unlike in the image the NDBCI agent created, "the files that are shown in this screen shot are buried several directories down." (Tr. 414-15, 425). As to the "general structure" and the various files depicted on Exhibit 79, Meinke testified he saw nothing "out of the order." (Tr. 427). Meinke stated he observed no files that were placed on the Lexar thumb drive after September 15 and, if child pornography materials were found on that drive, it was fair to say they existed prior to that date. (Tr. 434).

**5.      State Charges Concerning Business Activities**

Following the September 15 search, Detective Buzzo continued to collect and review evidence concerning Team Lawn. On November 4, 2020, Morgan-Derosier was charged in state court with construction fraud, contracting without a license, theft of property, forgery, and violation of a judicial order—some misdemeanors and some felonies. After a preliminary hearing, felony charges were dropped and Morgan-Derosier later pled guilty to the misdemeanor charges. The felony charges of construction fraud and contracting without a license were later refiled and remained pending at the time of the evidentiary hearing. (Tr. 116-21).

## Law and Discussion

The Fourth Amendment states, "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized." U.S. Const. amend. IV. Morgan-Derosier argues the September 14 warrant violated the Fourth Amendment for three reasons: One, the warrant did not "particularly describe[e] the place to be searched, and the persons or things to be seized." Two, the warrant's scope was not justified "upon probable cause." And three, GFPD's execution of the warrant resulted in an "unreasonable search." Morgan-Derosier requests that, because of these errors, the court suppress all evidence GFPD seized during the search of his home, including contents of all the electronic devices. (Doc. 73, p. 1).

Morgan-Derosier challenges both the warrant's issuance and its execution. "Whether a warrant is properly issued . . . is a separate question from whether it is reasonably executed." United States v. Hamilton, 591 F.3d 1017, 1025 (8th Cir. 2010). Morgan-Derosier's first two arguments challenge the warrant's issuance. He argues the warrant was defective because it did not particularly describe the items to be searched for and seized, and it authorized GFPD to search and seize items beyond what was justified by probable cause. These arguments—referred to as particularity and overbreadth respectively—will be addressed first. Morgan-Derosier's third argument challenges the manner of the warrant's execution. Morgan-Derosier contends the warrant, even if validly issued, was executed in an unreasonable manner because GFPD

abandoned its search for business records and instead searched for child pornography. This argument will be addressed second.

If the warrant was issued without sufficient particularity, was issued without probable cause, or was executed in an unreasonable manner, GFPD's search of Morgan-Derosier's home and subsequent seizure of his electronics would be "unreasonable" within the meaning of the Fourth Amendment.[4] Evidence obtained as a result of an unreasonable search or seizure is subject to the exclusionary rule—a judicially created remedy that "forbids the use of improperly obtained evidence at trial." Herring v. United States, 555 U.S. 135, 139, (2009). There are exceptions to the exclusionary rule, however, and the United States asserts two apply here—the good faith exception and the inevitable discovery doctrine. But those exceptions would become relevant only if the court finds a Fourth Amendment violation, an issue the court turns to now.

### The Warrant's Issuance: Particularity and Overbreadth

The "Warrant Clause" of the Fourth Amendment "requires particularity and forbids overbreadth." United States v. Cioffi, 668 F.Supp.2d 385, 390 (E.D.N.Y. 2009). Particularity requires a search warrant to "be sufficiently definite to enable the searching officers to identify the property authorized to be seized." United States v. Summage, 481 F.3d 1075, 1079 (8th Cir. 2007). Seizure of the items particularly described must be justified by probable cause. Thus, a warrant's scope, or "breadth,"

---

[4] A warrant lacking in particularity or probable cause when issued is an invalid warrant, and law enforcement's search and seizure pursuant to an invalid warrant is considered warrantless. See Groh v. Ramirez, 540 U.S. 551, 558 (2004) ("In this respect the warrant was so obviously deficient that we must regard the search as 'warrantless' within the meaning of our case law."). Warrantless searches and seizures are presumptively unreasonable subject to only certain exceptions, and which are discussed later. See id. at 559.

must be limited by the probable cause on which the warrant is based. This limitation requires a "nexus between the evidence to be searched for and the place to be searched." Id. at 1078.

Particularity and overbreadth are distinct concepts but share a common purpose. Together, particularity and overbreadth guard against the "exploratory rummaging in a person's belongings" that would be authorized by the "general warrant abhorred by the colonists." United States v. Armstrong, No. 21-CR-228, 2022 WL 17417901, at *19 (D. Minn. Sept. 2, 2022), report and recommendation adopted, 2022 WL 16960633 (D. Minn. Nov. 16, 2022). Often, particularity and overbreadth are intertwined—for example, a warrant's "unparticularized description" of items to be seized likely means it authorizes the seizure of items beyond "the scope . . . established [by] probable cause." United States v. Wey, 256 F. Supp. 3d 355, 382 (S.D.N.Y. 2017). Nonetheless, "particularity and overbreadth remain two distinct parts of the evaluation of a warrant for Fourth Amendment purposes." United States v. SDI Future Health, Inc., 568 F.3d 684, 702 (9th Cir. 2009).

### 1.   Particularity

A warrant must particularly describe "the place to be searched, and the persons or things to be seized." United States v. Grubbs, 547 U.S. 90, 97 (2006). Whether a warrant meets the Fourth Amendment's particularity requirement is to be assessed with "a standard of practical accuracy rather than a hypertechnical one." Armstrong, 2022 WL 17417901, at *13. Thus, the specificity required depends upon "the circumstances and the type of items involved." Id. Overall, "the warrant must be sufficiently definite to enable the searching officers to identify the property authorized to be seized." Summage, 481 F.3d at 1079.

The September 14 warrant described the place to be searched as "on or within the person known as Nicholas Derosier a/k/a Nicholas Morgan-Derosier, presently located at . . . , there is now being concealed evidence or property." (Ex. 12). The United States acknowledges this sentence contains a clerical error; the warrant was intended to authorize a search of Morgan-Derosier's "person and his premises." (Doc. 77, p. 1) (emphasis added). In United States v. Szczerba, the Eighth Circuit found a warrant valid that authorized officers to search "said person" instead of the intended "said property." 897 F.3d 929, 937 (8th Cir. 2018). Because the warrant otherwise meticulously described the property to be searched and seized, the Eighth Circuit concluded a "reasonable officer executing the warrant likely would have read the warrant to authorize the search of the particularly described property." Id. at 937. It is unclear whether the Eighth Circuit found no Fourth Amendment violation or applied the good faith exception to the exclusionary rule in Szczerba. If the latter, this court would recommend finding the good faith exception applies to GFPD's reasonable reliance on the warrant in this regard.

### A.   Identification of Crimes Under Investigation

In general, a warrant must identify the specific crime being investigated because reference to "general criminal activity provides no readily ascertainable guidelines for the executing officers as to what items to seize." United States v. Saddler, No. 4:19-CR-40109-KES, 2020 WL 7130693, at *8 (D.S.D. Sept. 10, 2020), report and recommendation adopted as modified, 2020 WL 6255652 (D.S.D. Oct. 23, 2020). In this case, the warrant itself did not identify any specific crimes under investigation but Exhibit A to the warrant identified three crimes—"Contractor License Required, Construction Fraud, and Violation of a Judicial Order." (Ex. 13, p. 2).

Morgan-Derosier argues the warrant did not incorporate Exhibit A's list of specific offenses under investigation and therefore the warrant "did not identify any criminal conduct under investigation." (Doc. 73, p. 15). The United States contends the warrant incorporated Exhibit A in its entirety and thus the warrant "lists three crimes by their proper names." (Doc. 77, p. 19).

"[T]he Fourth Amendment's particularity requirement can be satisfied by including the items to be seized in the warrant or in an incorporated document." United States v. Sierra, No. 5:19-CR-50110, 2022 WL 2866371, at *2 (D.S.D. July 21, 2022). For a supporting document to be incorporated into the warrant, the warrant must use "appropriate words of incorporation." Groh, 540 U.S at 558. Because Exhibit A identified specific crimes, but the warrant itself did not, the parties' arguments largely turn on whether the warrant incorporated Exhibit A.

The warrant stated "there is now being concealed evidence or property . . . as listed in Exhibit A, described with particularity in the attached and incorporated exhibit." (Doc. 73-6). In this court's opinion, these are "appropriate words of incorporation" of Exhibit A. See, e.g., United States v. Curry, 911 F.2d 72, 77 (8th Cir. 1990) (describing suitable words of reference such as "see attached affidavit").

Assuming the warrant incorporated Exhibit A, Morgan-Derosier argues it nonetheless fails the particularity requirement for two reasons. First, Morgan-Derosier contends the warrant incorporated only "the list of items in Exhibit A, not the specific crimes." (Doc. 73, p. 16 n.68). But, in this court's opinion, that interpretation of the warrant would be too narrow. The warrant described Exhibit A as the "attached and incorporated exhibit." The most natural reading is that the warrant incorporated all of Exhibit A, not only part of it.

Second, Morgan-Derosier argues Exhibit A's list of specific offenses was "overshadowed" by the broad, catch-all authorization to search for "evidence of a crime" and "contraband, fruits of crime, or other items illegally possessed" contained in the warrant itself. Id. at 16 n.2. In Andresen v. Maryland, the Supreme Court addressed warrants that contained lists of items to be seized, though each list ended with the catch-all phrase "together with other fruits, instrumentalities and evidence of crime at this (time) unknown." 427 U.S. 463, 479 (1976). Similar to this case, the defendant in Andresen argued the catch-all phrase was so broad as to have authorized "the search for and seizure of any evidence of any crime." Id. at 480. The Supreme Court disagreed with that interpretation and read the warrant's general reference to "crime" as limited by its previous identification of specific offenses in the same sentence. Id. at 480-81. ("We think it clear from the context that the term 'crime' in the warrants refers only to the crime of false pretenses."). Courts have interpreted Andresen to mean that "[t]he word 'crime'. . . should not be read in isolation to encompass all crimes but to refer only to the crime . . . mentioned earlier in the warrant."[5] United States v. Castro, 881 F.3d 961, 965 (6th Cir. 2018); see also United States v. Fiorito, 640 F.3d 338, 347 (8th Cir. 2011) (citing Andresen for the proposition that a "broad phrase at the opening must be read in the context of the specific list that follows").

In this case, Exhibit A identified three specific crimes under investigation. True, unlike Andresen, the warrant's catch-all phrase was on a different page from Exhibit A's

---

[5] The warrant itself includes no reference to Detective Buzzo's affidavit, and the United States argues it is open question whether the affidavit need only accompany the warrant to be incorporated. (Doc. 77, p. 15). In any event, the United States primarily relies on Exhibit A to satisfy the particularity requirement, and this court views Exhibit A in its entirety as incorporated into the warrant.

identification of specific crimes. But the particularity requirement employs "a standard of practical accuracy rather than a hypertechnical one." Armstrong, 2022 WL 17417901, at *13. Reading the warrant together with Exhibit A, and in light of Andresen, this court would conclude the warrant's authorization to search for "evidence of a crime" and "contraband, fruits of crime, or other items illegally possessed" was limited to a search for evidence of the three offenses identified in Exhibit A.

If, however, the presiding district judge finds the warrant not sufficiently particular because of its catch-all language, this court would recommend applying the good faith exception to the exclusionary rule. See United States v. Leon, 468 U.S. 897 (1984). Briefly, the good faith exception holds that suppression is inappropriate if "the officer who conducted the search acted in reliance upon the defective warrant and that reliance was objectively reasonable." United States v. Sheehan, No. 21-1983, 2023 WL 3876648, at *11 (1st Cir. June 8, 2023). The warrant's reference to "evidence of a crime" and "contraband, fruits of crime, or other items illegally possessed" resulted from it being composed through the electronic portal utilized by the North Dakota state courts. (Court Ex. A). In this court's opinion, even if the warrant was not sufficiently particular, GFPD's reliance on the warrant was objectively reasonable in these circumstances.

### B.    Failure to Limit Warrant Time Frame

Morgan-Derosier argues the warrant was not sufficiently particular because "it [was] not limited in time." (Doc. 73, p. 17). Specifically, Morgan-Derosier contends the warrant failed to identify when the alleged criminal conduct took place and therefore authorized GFPD "to seize years' worth of records" that were irrelevant to whether he violated the October 15, 2019 injunction. Id. The United States argues the warrant was

sufficiently particular because it identified specific crimes under investigation and the court "can and should stop there." (Doc. 77, p. 22).

Neither the warrant itself nor Exhibit A limited the documents to be seized to those created within a certain time frame. But, in general, a time limitation is not required to satisfy the particularity requirement. See United States v. Graham, No. CRIM 08-251, 2009 WL 1066048, at *8 (D. Minn. Apr. 20, 2009). Rather, a warrant's required level of specificity depends upon "the circumstances and the type of items involved." Armstrong, 2022 WL 17417901, at *13.

Courts have held a warrant's description of items to be seized is sufficient if it is "confined in scope to particularly described evidence relating to a specific crime for which there is demonstrated probable cause." United States v. Deppish, 994 F. Supp. 2d 1211, 1219 (D. Kan. 2014). In other words, a warrant is sufficiently particular if it authorizes law enforcement officers to search and seize "evidence of a specific illegal activity." United States v. Cobb, 970 F.3d 319, 328 (4th Cir. 2020); see also United States v. Smith, No. CR 19-324, 2021 WL 2982144, at *8 (D.D.C. July 15, 2021) ("A warrant authorizing the search of electronic data is sufficiently particular if its scope is limited to evidence pertaining to a specific crime."). The Eighth Circuit has found search warrants sufficiently particular that limited the items to be seized to property believed to be evidence of specific crimes.[6] See United States v. Shrum, 59 F.4th 968, 973 (8th Cir.

---

[6] To be valid, the warrant must identify specific criminal offenses under investigation. The Eighth Circuit has held references to broad swaths of the criminal code do not establish particularity because such general references "do not limit the search in any substantive manner." See Rickert v. Sweeney, 813 F.2d 907, 909 (8th Cir. 1987) (finding reference to the general conspiracy statute and general tax evasion statute not sufficient to establish particularity).

2023) (finding a warrant particular that authorized seizure of "any and all other evidence related to a sexual abuse/exploitation investigation").

The warrant, with Exhibit A incorporated, limits the items to be seized to those relating to the three specific alleged offenses. Exhibit A authorizes the seizure of portable electronic devices capable of storing files "related to the aforementioned crimes"; computers and other electronics that could "contain information pertaining to . . . storing, facilitating, and/or drafting payroll accounts, customer accounts, estimates, statements, and other business documents"; and "correspondence, records, documents or other materials pertaining to the possession, receipt or distribution of visual depictions of projects, job sites, communications, account data, timesheet information, customer information, address, and accounts." (Ex. 13, p. 2).

That description of items authorized to be seized, though broad, was sufficiently particular because it was limited to potential evidence of three specific crimes. After all, "a broad warrant does not necessarily lack particularity." United States v. Nejad, 436 F. Supp. 3d 707, 725 (S.D.N.Y. 2020). Morgan-Derosier's arguments that the warrant authorized the seizure of items beyond those justified by probable cause are better addressed through consideration of overbreadth rather than particularity.

## 2.    Overbreadth

Warrants must be justified by probable cause, and a warrant is overbroad when its scope exceeds its justification. See United States v. Thorne, 548 F. Supp. 3d 70, 94 (D.D.C. 2021). "Probable cause to search exists if there is a fair probability that contraband or evidence of a crime will be found in a particular place." United States v. Nieman, 520 F.3d 834, 839 (8th Cir. 2008) (internal quotation marks and citations omitted). Thus, "[t]here must be evidence of a nexus between the contraband and the

place to be searched before a warrant may properly issue."7 United States v. Alexander, 574 F.3d 484, 490 (8th Cir. 2009). Morgan-Derosier contends the warrant was overbroad in two respects: There was no nexus between evidence of the alleged offenses and (a) records created prior to October 15, 2019, or (b) image or video files. (Doc. 82, p. 5).

### A.     Records Dated Prior to October 15, 2019

Morgan-Derosier contends the warrant authorized GFPD "to seize years' worth of records" despite the investigation being of the alleged violation of the October 15, 2019 injunction. Further, Morgan-Derosier argues "[t]he warrant did not describe any nexus between the things to be searched, all files on . . . Morgan-Derosier's devices, to the evidence to be seized, evidence of business crimes after 15 October 2019." (Doc. 109, p. 5). The United States responds that business documents created before October 15, 2019, were relevant "to show he continued his business after that date" and, in any event, the warrant was "not limited to a search for files containing evidence of the violation of the court order." (Doc. 112, p. 9). The United States also points out the "Klein" files—which led to the second search warrant—were created after October 15, 2019. Id.

"[C]ase law is hardly uniform as to when, if at all, the absence of a time frame would violate the overbreadth prong of the Fourth Amendment." United States v.

---

7 The court considers the warrant, Exhibit A, and Detective Buzzo's affidavit together in assessing overbreadth. The question of incorporation of supporting documents is relevant to determining particularity, not to questions of overbreadth. See United States v. Cohan, 628 F. Supp. 2d 355, 364 n.4 (E.D.N.Y. 2009) ("[T]he probable-cause analysis must be performed from the perspective of the magistrate [judge] who issued the warrant, to whom the supporting affidavit is always presented, regardless of whether it is incorporated or attached.").

Cohan, 628 F. Supp. 2d 355, 365 (E.D.N.Y. 2009) (collecting cases). Some courts, including those cited by Morgan-Derosier, treat a warrant without a time frame, when one is available, as overbroad. See United States v. Lazar, 604 F.3d 230, 238 (6th Cir. 2010) ("Failure to limit broad descriptive terms by relevant dates, when such dates are available to the police, will render a warrant overbroad."); see also United States v. Winn, 79 F. Supp. 3d 904, 921 (S.D. Ill. 2015) (stating the same). Other courts have treated limitation to a time frame as irrelevant. See United States v. Courtney, No. 4:07CR00261 , 2008 WL 4998997, at *5 (E.D. Ark. Nov. 20, 2008) ("Defendant's insistence that the application and warrant were defective because they lacked a 'time frame' eludes the Court entirely."). In between these positions, some courts have held the absence of a time frame is relevant to overbreadth, but the absence of a timeframe does not necessarily result in a warrant being invalid. See Cohan, 628 F. Supp. 2d at 366.

In addition to describing alleged violation of the October 15, 2019 injunction, Detective Buzzo's affidavit detailed two other alleged offenses—lack of a contractor's license and construction fraud. (Ex. 13). Evidence of those offenses could be found in files created before October 15, 2019. Moreover, documents created before October 15, 2019, could be relevant to establishing the circumstances that led to the injunction. The court also notes the warrant's breadth was otherwise cabined by Exhibit A's limitation that the property to be seized relate to the specified offenses. (See Ex. 13, p. 2). On balance, in this court's opinion, the warrant's lack of a time frame limitation does not render the warrant overbroad.

If the presiding district judge, however, finds the warrant overbroad because it did not include a time frame limitation, this court would nonetheless recommend not

granting suppression for two reasons. First, any overbroad aspects of a warrant can be severed without suppressing evidence. "[W]here the warrant is invalid only in part, the warrant is 'severable,' and items seized pursuant to valid portions of the warrant need not be suppressed." United States v. Timley, 443 F.3d 615, 622 (8th Cir. 2006). In this case, the suspected child pornography in the "Klein" files, which led to the second search warrant, was created after October 15, 2019. Thus, if the warrant's authorization to search documents created before October 15, 2019, were severed, the evidence that led to the second warrant would not be suppressed. Second, given the uncertainty of the case law, GFPD's reliance on the warrant was objectively reasonable, and this court would apply the good faith exception to the exclusionary rule. See Leon, 468 U.S. 897.

### B.   Image and Video Files

Morgan-Derosier argues the warrant was overbroad because it "failed to draw a probable cause connection between the alleged crimes and [Morgan-Derosier's] photos and videos." (Doc. 82, p. 6). The United States contends there was probable cause to search images and videos because business documents can be stored in multiple formats and images and videos can be used to show Morgan-Derosier owned the seized devices. (Doc. 112, p. 11). In reply, Morgan-Derosier argues GFPD knew "he was operating his business in the broad light of day, including using QuickBooks accounting software to pay his employees and using a web site and ads featuring his own name, phone number, and address." (Doc. 73, p. 21). Thus, Morgan-Derosier contends GFPD had "no reason to believe" he was "hiding his business records or making files appear like something else." (Doc. 82, p. 7).

In Summage, a case cited by the United States, law enforcement officers investigated a defendant for sexually abusing a mentally handicapped adult and believed

the defendant photographed and recorded the abuse. 481 F.3d at 1079. Law

enforcement officers obtained a warrant to search and seize "all video tapes and DVDs,

pornographic pictures, [and] video and digital recording devices and equipment" in the

defendant's home. Id. at 1079-80. The Eighth Circuit found the warrant sufficiently

particular because "no indication was given regarding the nature of the format in which

the sought-for video and photographs were created or stored" and therefore "it was

necessary to search a broad array of items for the relevant materials." Id.

 Though Summage concerned particularity and not overbreadth, the Eighth

Circuit's conclusion applies with equal force in the overbreadth context. Indeed, other

courts have found a warrant can validly authorize a search of multiple file types because

individuals "can—and often do—hide, mislabel, or manipulate files to conceal criminal

activity such that a broad, expansive search of the computer may be required." United

States v. Bass, 785 F.3d 1043, 1050 (6th Cir. 2015) (internal quotation marks and

citations omitted). Still, "the government must . . . demonstrate to the magistrate

[judge] factually why such a broad search and seizure authority is reasonable in the case

at hand." United States v. Hill, 459 F.3d 966, 975 (9th Cir. 2006).

 Detective Buzzo's affidavit detailed his investigation into Morgan-Derosier's

business. The affidavit states he investigated Morgan-Derosier for violation of a judicial

order, contractor license required, and construction fraud. (Ex. 13, p. 4). According to

Detective Buzzo's affidavit, Morgan-Derosier created a new, unlicensed business after

the October 15, 2019 order, withheld wages from two employees, and accepted partial

payment for unfinished projects. Id. It is probable evidence of those offenses could be

stored as images or videos. For example, in his affidavit, Detective Buzzo states he was

provided a screenshot, which is an image, of a text message conversation between

Morgan-Derosier and Andrew Fox, a former employee, about Morgan-Derosier's alleged withholding of wages. Id. at 9.

Moreover, Detective Buzzo's affidavit establishes that Morgan-Derosier could conceal evidence by storing it as images or videos. Detective Buzzo stated in his affidavit, "Computers have facilitated the ability of people to keep their records stored and hidden. Photographs, videos, and others records that were previously stored in boxes are now collected as digital images and files that can be stored and maintained on electronic media." Id. at 12. Detective Buzzo continued, "Criminals can mislabel or hide files and directories; encode communications to avoid using key words; attempt to delete files to evade detection; or take other steps designed to impede law enforcement searches for information." Id.

Detective Buzzo's affidavit established probable cause to believe evidence of the alleged offenses—violation of a judicial order, contractor license required, and construction fraud—could be found in multiple file types, including images and videos. Even if evidence of those offenses might not ordinarily be stored as images or videos, Detective Buzzo's affidavit establishes the probability that Morgan-Derosier could "hide, mislabel, or manipulate files" and therefore a broad search of his electronic devices was justified.

### 3.    Validity of September 14 Warrant

In this court's opinion, the warrant was sufficiently particular and not overbroad. The warrant was sufficiently particular because, through the incorporated Exhibit A, it identified specific offenses under investigation and described the items to be seized as "evidence relating to a specific crime." See Deppish, 994 F. Supp. 2d at 1219. The warrant was not overbroad because Detective Buzzo's affidavit established probable

cause to believe evidence of specific offenses could be found on Morgan-Derosier's electronic devices, and a date or file type limitation on GFPD's search was neither practical nor required. If, however, the presiding district judge finds the warrant invalid because it was overbroad or not sufficiently particular, this court recommends not suppressing evidence because GFPD relied on the warrant in good faith.

### The Warrant's Execution

Search warrants must be executed in a reasonable manner to satisfy the Fourth Amendment. "Courts may properly probe the manner in which law enforcement executes a warrant to ensure compliance with the Constitution." Lykken v. Brady, 622 F.3d 925, 930 (8th Cir. 2010). For example, probable cause to search may dissipate from a warrant's issuance to its execution, or law enforcement officers may exceed the scope of the warrant. See United States v. Green, 554 F. App'x 491, 495 (6th Cir. 2014).

Morgan-Derosier asserts the warrant was pretextual. The fact that a warrant was pretextual does not, by itself, violate the Fourth Amendment.[8] See Whren v. United States, 517 U.S. 806 (1996); Horton v. California, 496 U.S. 128, 138 (1990); United States v. Romo-Corrales, 592 F.3d 915, 919 (8th Cir. 2010). In considering claims of pretext, courts look to "objective standards of conduct" instead of an officer's subjective intentions. Horton, 496 U.S. at 129. Even if "an officer is interested in an item of evidence and fully expects to find it," a search remains reasonable so long as it is "confined in area and duration by the terms of a warrant." Id. at 138.

---

[8] Morgan-Derosier states, "Det. Buzzo obtained the search warrant as a pretext to permit law enforcement to search his computers for child pornography. Mr. Morgan-Derosier asserts that a pretextual warrant is unconstitutional because it permits an unreasonable search. He recognizes, however, this circuit's contrary case law. . . He preserves this argument to raise on appeal." (Doc. 73, p. 22 n.73).

Morgan-Derosier argues GFPD conducted an unreasonable search when officers "abandoned their search for evidence of business crimes" to search for other contraband. (Doc. 73, p. 23). Morgan-Derosier argues GFPD abandoned its search for evidence of business crimes "at least by the time Det. Freeman began searching the Lexar thumb drive and she had certainly abandoned it when she began searching the 'Mega' folder" on that thumb drive. Id. Morgan-Derosier further points out Detective Freeman investigated him for possession of child pornography in early 2019 and Special Agent Casetta was told child pornography was located in his safe. (Doc. 82, pp. 8-9). The United States responds that "officers did not 'abandon' the business record search . . . until after they obtained a warrant to search for child pornography." (Doc. 77, p. 32).

The Fourth Amendment prohibits officers from abandoning a search authorized by a warrant and thereby "impermissibly expand[ing]" their search into a general one. United States v. Carey, 172 F.3d 1268, 1277 (10th Cir. 1999); see also United States v. Suing, 712 F.3d 1209 (8th Cir. 2013). Both Morgan-Derosier and the United States cite Suing and Carey as relevant cases; Morgan-Derosier asserts this case is more like Carey and the United States asserts it is more like Suing.

In Carey, law enforcement officers suspected the defendant was possessing and selling cocaine. 172 F.3d at 1268. After he was arrested, the defendant consented to a search of his apartment and "gave [law enforcement] instructions on how to find drug related items." Id. at 1270. Law enforcement officers seized several drug-related items and two computers. Back at the police station, a detective obtained a warrant to search the computers for "names, telephone numbers, ledger receipts, addresses, and other documentary evidence pertaining to the sale and distribution of controlled substances." Id. at 1270. The detective's key-word search of "text-files" produced no drug-related

files. The detective did find a "JPG" file (in other words, an image file) containing child pornography. Id. at 1271. After discovering the child pornography, the detective continued to search the computer files and found more child pornography. Id. at 1271-72.

The Tenth Circuit held the detective's continuous search for child pornography was an "unconstitutional general search" and thus "exceeded the scope of the warrant." Id. at 1276. The Tenth Circuit later characterized Carey as addressing not "what" was searched but "how the agents carried out the search." United States v. Loera, 923 F.3d 907, 917 (10th Cir. 2019). "[A]lthough it was permissible for the officer [in Carey] to open the first JPG file to see if it was responsive to the warrant, his opening of the remaining files exceeded the bounds of the authorizing warrant." Id. (citing Carey, 172 F.3d 1273 n.4, 1276).

In Suing, the defendant was suspected of possessing child pornography, but Nebraska police were unable to determine his current address. 712 F.3d 1209 (8th Cir. 2013). A year later, Arizona police stopped the defendant in his vehicle for following a tractor-trailer too closely. The defendant consented to a search of his vehicle. After the vehicle was moved to a law enforcement facility, it was searched more thoroughly and officers found an external hard drive, plugged it into a computer, and searched it for evidence of drug activity. They immediately discovered child pornography. Id. at 1211. Police officers then shut down the computer and obtained a warrant to search for evidence of child pornography. Distinguishing Carey, the Eighth Circuit determined "the officer did not abandon his drug search and continue a new, extended search for child pornography without judicial authority." Id. at 1212. Thus, "the officer did not exceed

the scope of [the defendant's] consent, even assuming the consent was limited to a search of the vehicle for evidence of drug activity." Id.

After she discovered suspected child pornography, Detective Freeman stopped her search of Morgan-Derosier's electronic devices and obtained a second search warrant. (Tr. 306-07). But Morgan-Derosier asserts Detective Freeman abandoned her search for business records before viewing the suspected child pornography. Detective Freeman, Morgan-Derosier contends, abandoned her search for business records when she searched "the Lexar thumb drive and she had certainly abandoned it when she began searching the 'Mega' folder." (Doc. 73, p. 23).

Even if Detective Freeman suspected there might be child pornography on the Lexar thumb drive and "fully expect[ed] to find it," the search remained reasonable so long as it was "confined in area and duration by the terms of a warrant." See Horton, 496 U.S. at 138. In Carey, the Tenth Circuit did not fault the detective for opening a "JPG file" (in other words, an image file) after a key-word search of "text-based" files produced nothing related to drugs. It was only once the detective in Carey "spent five hours . . . perusing the trove of nonresponsive material" that was "characteristically distinct and set apart from the other files on the computer" that the Tenth Circuit held the detective exceeded the bounds of the warrant.[9] See Loera, 923 F.3d at 917-18 (citing Carey, 172 F.3d at 1274). Unlike in Carey, Detective Freeman stopped her search of the

---

[9] Carey is a one of a series of Tenth Circuit "electronic search precedents" that consider "the reasonableness of the search method the government employed." Loera, 923 F.3d at 917-18. The Eighth Circuit does not appear to have a comparable series of precedents concerning electronic searches, though, of course, it has recognized law enforcement officers may not exceed the bounds of a search warrant. See, e.g., Hummel-Jones v. Strope, 25 F.3d 647, 650 (8th Cir. 1994).

Lexar thumb drive after discovering suspected child pornography and obtained a second search warrant. (Tr. 306-07). And, for reasons articulated above, the September 14 warrant properly authorized Detective Freeman to search the Lexar thumb drive for business records.

In sum, this case is closer to <u>Suing</u> than to <u>Carey</u>. For those reasons, in this court's opinion, Detective Freeman did not abandon her search for business records by searching the Lexar thumb drive and the 'Mega' folder, and she properly obtained a second search warrant after her initial discovery of suspected child pornography. This court concludes the September 14 warrant was valid and executed in a reasonable manner.[10]

### Exclusion of Evidence

If the presiding district judge finds the warrant to be overbroad or not sufficiently particular, or finds that GFPD exceeded the bounds of the warrant, then GFPD's search was unreasonable. <u>See</u> <u>Groh</u>, <u>540 U.S. at 558</u>. Evidence obtained from an unreasonable search or seizure is subject to the exclusionary rule and would ordinarily be suppressed

---

[10] In its reply, the United States asserts application of the plain view doctrine. (<u>Doc. 113, p. 1</u>). The plain view doctrine is an exception to the warrant requirement and "permits law enforcement officers to seize an object in plain view provided the officer is lawfully in the position from which he or she views the object, the object's incriminating nature is immediately apparent, and the officer has a lawful right of access to the object." <u>Saddler</u>, <u>2020 WL 7130693</u>, at *14 (internal quotation marks and citation omitted). Once Detective Freeman opened the "Klein" files, the suspected child pornography was immediately apparent. But Detective Freeman must have had a lawful right of access to the "Klein" files, and that right of access is determined by the warrant's validity. If the warrant was invalid, Detective Freeman had no lawful right to access the "Klein" files and the plain view doctrine does not apply. If the warrant was valid, reliance on the plain view doctrine is unnecessary.

from use at trial. <u>See</u> <u>Herring</u>, <u>555 U.S. at 139</u>. Regarding the suppression of evidence,

the Supreme Court has described:

> The Fourth Amendment protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." The Amendment says nothing about suppressing evidence obtained in violation of this command. That rule—the exclusionary rule—is a "prudential" doctrine, <u>Pennsylvania Board of Probation and Parole v. Scott</u>, <u>524 U.S. 357, 363</u> (1998), created by this Court to "compel respect for the constitutional guaranty." <u>Elkins v. United States</u>, <u>364 U.S. 206, 217</u> (1960); <u>see</u> <u>Weeks v. United States</u>, <u>232 U.S. 383</u> (1914); <u>Mapp v. Ohio</u>, <u>367 U.S. 643</u> (1961). Exclusion is "not a personal constitutional right," nor is it designed to "redress the injury" occasioned by an unconstitutional search. <u>Stone v. Powell</u>, <u>428 U.S. 465, 486</u> (1976); <u>see</u> <u>United States v. Janis</u>, <u>428 U.S. 433, 454</u> n.29 (1976) (exclusionary rule "unsupportable as reparation or compensatory dispensation to the injured criminal" (internal quotation marks omitted)). The rule's sole purpose, we have repeatedly held, is to deter future Fourth Amendment violations. <u>E.g.</u>, <u>Herring v. United States</u>, <u>555 U.S. 135, 141</u> and n.2 (2009); <u>United States v. Leon</u>, <u>468 U.S. 897, 909, 921</u> n.22 (1984); <u>Elkins</u>, ("calculated to prevent, not to repair"). Our cases have thus limited the rule's operation to situations in which this purpose is "thought most efficaciously served." <u>United States v. Calandra</u>, <u>414 U.S. 338, 348</u> (1974). Where suppression fails to yield "appreciable deterrence," exclusion is "clearly . . . unwarranted." <u>Janis</u>, supra, at 454.

<u>Davis v. United States</u>, <u>564 U.S. 229, 236-37</u> (2011) (citations altered). There are

exceptions to exclusionary rule, and, if the search was unreasonable, the United States

asserts two would apply—the good faith exception and the inevitable discovery doctrine.

**1.      The Good Faith Exception**

Under the good faith exception, even if a warrant is defective, evidence obtained

through the warrant need not be suppressed if the "officer who conducted the search

acted in reliance upon the defective warrant and that reliance was objectively

reasonable." <u>Sheehan</u>, <u>2023 WL 3876648</u>, at *11. It does not apply, however, if "a

reasonably well trained officer would have known that the search was illegal despite the

issuing judge's authorization." <u>United States v. Maccani</u>, <u>526 F. Supp. 3d 420, 447</u> (N.D.

Iowa 2021). Courts recognize four circumstances where an officer's reliance on a defective warrant would be objectively unreasonable:

> (1)    when the affidavit supporting the warrant contained a false statement included knowingly and intentionally or with reckless disregard for the truth, thus misleading the magistrate, (2) when the magistrate issuing the warrant wholly abandoned his judicial role in issuing the warrant, (3) when it is entirely unreasonable to believe that an affidavit provides probable cause to issue a warrant, and (4) when the warrant is so facially deficient that no police officer could reasonably interpret the warrant as valid.

Id. at 447 (internal quotation marks and citations omitted).

In this court's opinion the warrant was valid, and reliance on the good faith exception is therefore unnecessary. But should the presiding district judge conclude the warrant was not valid, the parties offer detailed argument about the good faith exception. Morgan-Derosier argues the warrant was not obtained in good faith because it "copies boilerplate language from child pornography warrants to obtain expansive searches of electronic devices." (Doc. 109, p. 10). He argues the phrase "other materials pertaining to the possession, receipt, or distribution of visual depictions" is boilerplate child pornography search warrant language. Morgan-Derosier further asserts that GFPD's investigation into Team Lawn was most likely a stalking horse for a child pornography investigation. (Doc. 73, p. 22 n.73). The United States responds that the warrant's use of the challenged "boilerplate" language was appropriate, Detective Buzzo's investigation into Morgan-Derosier's business crimes was not a pretext, and the warrant was obtained in good faith. (Doc. 77, p. 34; Doc. 112, p. 12).

There are several facts that, on the surface, give the appearance that GFPD's investigation into Morgan-Derosier's landscaping business was pretextual. But, at the hearing, witnesses provided context to these facts. Special Agent Casetta, for example,

participated in the search because he is a former GFPD officer, and it was common for GFPD to ask other law enforcement officers to join in the execution of a warrant. (Tr. 82-83). Though he is the lead agent on this case, at the time of the search Special Agent Casetta did not have experience with child pornography cases. Detective Freeman was a member of the ICAC Task Force, but she was also GFPD's only computer forensics officer. (Tr. 81, 208, 314-15). She did not receive emails from Special Agent Arel identifying Morgan-Derosier as the subject of the Cybertip. (Tr. 265-66). Detective Buzzo testified he was unaware of any detail about the Cybertip at the time of the search. (Tr. 87). Overall, it appears GFPD's investigation into Morgan-Derosier's landscaping business was genuine, and the warrant was obtained in good faith. Moreover, for the reasons outlined above, the warrant was not so facially deficient that no reasonable officer could believe it was valid.

Having reviewed the entire record, even if the warrant is found to be invalid, this court would recommend not suppressing evidence because GFPD relied on the warrant in objective good faith.

**2.    Inevitable Discovery Doctrine**

The inevitable discovery doctrine is another exception to the exclusionary rule. "[I]n order for evidence acquired unlawfully and not reacquired lawfully to be admissible under the inevitable-discovery doctrine, it is sufficient that the evidence would have been acquired lawfully but for the constitutional violation."[11] United States v. Baez, 983 F.3d 1029, 1038 (8th Cir. 2020).

---

[11] There is a "second strand" of Eighth Circuit case law that requires the United States show both (1) "the evidence would have been acquired lawfully but for the constitutional violation" and it was, in fact, (2) "actively pursuing a substantial, alternative line of investigation at the time of the constitutional violation." Baez, 983

In this court's opinion there was no Fourth Amendment violation, and therefore consideration of the inevitable discovery doctrine is unnecessary. If the presiding district judge reaches the issue, however, the parties offer extensive argument. Morgan-Derosier argues Detective Freeman "had no lawful means" to search his electronic devices absent the September 14 warrant. He points out Detective Freeman testified she did not have probable cause to search for child pornography until she opened the "Klein" files. (Doc. 109, p. 7). The United States argues GFPD would have discovered the large amount of suspected child pornography on Morgan-Derosier's other electronic devices when searching for business records. (Doc. 112, p. 15). It contends that "[i]t can hardly be disputed that, if the United States was looking for visual depictions of job sites, or for evidence of attribution, the United States would have found at least some of those six thousand-plus images of children being sexually abused." Id. at 115.

If the presiding district judge finds the warrant not sufficiently particular or overbroad, and the good-faith exception not applicable, GFPD's search and seizure of Morgan-Derosier's electronic devices—including those other than the Lexar thumb drive—pursuant to that invalid warrant would be unreasonable. Therefore, GFPD's search of the rest of Morgan-Derosier's electronic devices would constitute a constitutional violation. The same is true if the presiding district judge finds GFPD executed the warrant in an unreasonable manner. GFPD's search and seizure of Morgan-Derosier's electronic devices would be unreasonable, and thus any suspected

F.3d at 1039. Because, in this court's opinion, if there was a constitutional violation, the United States cannot show it would have acquired the evidence sought to be suppressed but for a constitutional violation, the second requirement is not considered. The court notes, however, that GFPD was not actively pursuing an alternative line of investigation at the time of the search because the Cybertip had been filed as inactive. (Tr. 267-68).

child pornography would be discovered because of, not in spite of, the constitutional violation.

## Recommendation

In this court's opinion, the warrant GFPD obtained on September 14, 2020, was sufficiently particular, not overbroad, and executed in a reasonable manner. If the presiding district judge finds the warrant overbroad or not sufficiently particular, however, this court  recommends not suppressing evidence because GFPD relied on the warrant in good faith. For those reasons, this court recommends Morgan-Derosier's motion be **DENIED**.

Dated this 28th day of June, 2023.

/s/ Alice R. Senechal

Alice R. Senechal
United States Magistrate Judge

## NOTICE OF RIGHT TO OBJECT[12]

Any party may object to this Report and Recommendation a by filing with the Clerk of Court no later than **July 6, 2023,** a pleading specifically identifying those portions of the Report and Recommendation to which objection is made and the basis of any objection. Failure to object or to comply with this procedure may forfeit the right to seek review in the Court of Appeals.

---

[12] See Fed. R. Crim. P. 59; D.N.D. Crim. L.R. 59.1(D)(3)